1  | **K&L GATES LLP**
2  | 10100 Santa Monica Boulevard
   | Seventh Floor
3  | Los Angeles, California  90067
   | Telephone: 310.552.5000
   | Facsimile: 310.552.5001
4
5  | Geoffrey M. Davis (SBN 214692)
   | geoff.davis@klgates.com
6  | Daniel S. Hurwitz (SBN 235260)
   | daniel.hurwitz@klgates.com
   | Bradley W. Gunning (SBN 251732)
7  | Email: Brad.gunning@klgates.com

8  Attorneys for Defendant **CRANE CO.**

9  UNITED STATES DISTRICT COURT

10 CENTRAL DISTRICT OF CALIFORNIA

11

12

13 DAVID SCLAFANI, an individual; and PATRICIA ANN SCLAFANI, an individual,

14              Plaintiffs,

15      v.

16 AIR & LIQUID SYSTEMS CORPORATION, et al.,

17              Defendants.

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 2:12-cv-03037-SVW (PJWx)

Assigned to the Hon. Stephen V. Wilson

**DEFENDANTS' MOTION IN LIMINE NO. 12 TO EXCLUDE VIDEOTAPE STUDIES OF GASKET AND PACKING REMOVAL OF MATERIAL ANALYTICAL SERVICES AND ALL TESTIMONY BASED THEREON**

Date:    May 6, 2013
Time:    3:00 p.m.
Ctrm:    6
Trial:   May 14, 2013

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on May 6, 2013 at 3:00 p.m., or as soon thereafter as can be heard in Courtroom 6 of the United States District Court for the Central District, located at 312 N. Spring St., Los Angeles, California, Defendants Crane Co., Air & Liquid Systems Corporation, successor by merger to Buffalo Pumps, Inc., Foster Wheeler Energy Corporation, and The Goodyear Tire and Rubber Company ("Defendants") will move *in limine* for an order excluding videotape studies of gasket and packing removal of Material Analytical Services and all testimony based thereon. Defendants' motion is made following the meet and confer of all parties' counsel pursuant to Local Rule 7-3, which took place on April 5, 2013. This motion is based on this Notice, the attached Memorandum of Points and Authorities, the attached Declaration of Bradley W. Gunning and all exhibits thereto, the papers and record on file herein, and such oral and documentary evidence as may be presented at the hearing on this motion.

K&L Gates LLP

Dated:  April 22, 2013          By:  /s/ Bradley W. Gunning
                                     Bradley W. Gunning
                                     Brad.gunning@klgates.com
                                     Tel: (310) 552-5000
                                     Attorney for Defendant Crane Co.

LA-534445 v1

RECYCLED PAPER
12cv03037

1

2   Dated: April 22, 2013

Respectfully submitted,
GORDON & REES LLP
By:  /s/ Richard R. Ames
MICHAEL J. PIETRYKOWSKI (SBN: 118677)
JAMES G. SCADDEN (SBN: 090127)
JOHN F. HUGHES (SBN: 090127)
RICHARD R. AMES (SBN. 185822)
Attorneys for Defendants
Air & Liquid Systems Corporation, successor by
merger to Buffalo Pumps, Inc.
GORDON & REES LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 986-5900
Facsimile: (415) 986-8054
rames@gordonrees.com

3

4

5

6

7

8

9

10

11

12

13

14   DATED:  April 22, 2013

BRYDON HUGO & PARKER

15

16

By:  /s/ Charles S. Park
Edward R. Hugo [Bar No. 124839]
Charles S. Park [Bar No. 161430]
135 Main Street, 20th Floor
San Francisco, CA 94105
Telephone: (415) 808-0300
Facsimile:  (415) 808-0333
Email:  service@bhplaw.com

Attorneys for Defendant
FOSTER WHEELER ENERGY
CORPORATION

17

18

19

20

21

22

23

24

25

26

27

28

RECYCLED PAPER

1

DATED:  April 22, 2013                    LEWIS BRISBOIS BISGAARD & SMITH LLP

2

3                                         By:  **/s/ Elan N. Stone**

4                                              James D. Fraser
                                               Elan N. Stone
5                                              estone@lbbslaw.com
6                                              Tel.: (213) 250-1800
                                               Fax: (213) 580-7942
7                                              Attorneys for  Defendant
8                                              THE GOODYEAR TIRE & RUBBER
                                               COMPANY
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   BACKGROUND ...................................................................................... 1

III.  SUMMARY OF ARGUMENT ................................................................. 3

IV.   ARGUMENT ............................................................................................ 6

     A.   The MAS Studies Employ Unreliable Methodology Not Generally Accepted Within The Relevant Scientific Community ......................... 6

          1.   The MAS PCM Analysis Ignores OSHA Quality Controls ............ 8

          2.   The MAS TEM Analysis Has Been Rejected By Others In The Field Of Asbestos Fiber Measurement, Including OSHA .............. 10

          3.   MAS's Use Of Tyndall Lighting Is Unreliable ............................. 12

          4.   The MAS Studies Are Unreliable For Numerous Other Reasons .. 14

     B.   The MAS Studies Are Not Substantially Similar To Mr. Sclafani's Working Conditions ................................................................................. 15

     C.   The Tests Are Inadmissible Under Rule 403 of The Federal Rules of Evidence ..................................................................................................... 16

          1.   The Videotapes Will Mislead the Jury, Confuse the Issues and Consume Undue Time ................................................................... 19

     D.   The Studies And Videotapes Have Been Excluded By Courts In Other Jurisdictions ............................................................................................... 20

V.    CONCLUSION ....................................................................................... 23

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
303 F.3d 256 (2d Cir. 2002) ...................................................................... 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993) ............................................................................... 6, 7

*Gen. Elec. Co. v. Joiner,*
522 U.S. 136 (1997) ................................................................................. 7

*Heller v. Shaw Indus., Inc.,*
167 F.3d 146 (3d Cir. 1999) ..................................................................... 7

*Kumho Tire Co. Ltd. V. Carmichael,*
526 U.S. 137 (1999) ................................................................................. 6

*Lambert vs. John Crane,*
United States District Court for the Southern District of Indiana, No. 94-
154-C-B/G, September 11, 2000 ........................................................... 17

*Mary Ellen Tyre v. CSX Transportation, Inc., Duval County,*
No. 16-2002-CA-4837, Div. B ............................................................... 12

*Watkins v. Telsmith, Inc.,*
121 F.3d 984 (5th Cir. 1997) .................................................................... 6

*Wosk vs. AlliedSignal,* Case No. 117097-97, March 16, 1999 ................. 17

**STATE CASES**

*Berning vs. A.P. Green, et. al.,*
Superior Court of San Francisco County, California, Case No. 319733,
January 8, 2002 ..................................................................................... 21

*Carlson vs. Lear Siegler, et. al.,*
Superior Court of San Francisco County, California, Case No. 979595,
August 13, 1998 .................................................................................... 20

*Cook vs. AC&S, Inc.,*
January 20, 2000 at 104, 171 ................................................................ 18

*Gilbert vs. Bendix Corporation,*
Court of Common Pleas of Northhampton County, Pennsylvania, No. 96-
C28 3489, August 11, 1998 .................................................................. 18

*Grego vs. Trailmobile Trailers, et. al.,*
Superior Court of San Francisco County, California, Case No. 996240,
February 10, 2000 ................................................................................ 20

*Hansen vs. Asbestos Defendants, et. al.,*
Superior Court of San Francisco County, California, Case No. 321639,
December 12, 2001 ............................................................................... 21

*In Re: Lamar County Asbestos Litigation,*
District Court of Lamar County, Texas, June 20, 2001 .................... 17, 22

ii

MOTION IN LIMINE TO EXCLUDE VIDEOTAPE STUDIES OF GASKET AND PACKING REMOVAL OF
MATERIAL ANALYTICAL SERVICES AND ALL TESTIMONY BASED THEREON

*James vs. Raybestos-Manhattan, et al.,*
    Superior Court of San Francisco County, California, Case No. 316856,
    December 12, 2001 ..................................................................................... 21

*Jones vs. Owens Corning,*
    Superior Court of Fulton County, Georgia, March 12, 2001 at 26 .................... 18

*Lewis vs. John Crane, et. al.,*
    Superior Court of San Francisco County, California, Case No. 306774,
    April 3, 2000 ............................................................................................... 20

*Richardson v. A. W. Chesterton Company, et. al.,*
    Superior Court of San Francisco County, California, Case No. 411448,
    March 19, 2003 ........................................................................................... 21

*Trinchese vs. Raybestos Manhattan, et. al.,*
    Superior Court of San Francisco County, California, Case No. 400787,
    June 18, 2002 .............................................................................................. 21

**FEDERAL REGULATIONS**

19 CFR 1910.1001(j)(6) ........................................................................................ 9

29 CFR 1910.1001(c) ....................................................................................... 8, 10

**FEDERAL RULES**

Fed. R. Evid. 702 ............................................................................................... 6, 7

MOTION IN LIMINE TO EXCLUDE VIDEOTAPE STUDIES OF GASKET AND PACKING REMOVAL OF
MATERIAL ANALYTICAL SERVICES AND ALL TESTIMONY BASED THEREON

## I.     INTRODUCTION

Defendants anticipate that Plaintiffs may identify experts who intend to rely on certain studies conducted by Material Analytical Services ("MAS") and/or videotapes depicting those studies.  The studies purport to involve asbestos fiber release produced by gasket and packing work, as well as videotapes purporting to depict such releases.  As will be explained more fully below, testimony based on those studies and videotapes should be excluded from evidence for the following reasons:

1) The methodology used in the studies is not generally accepted in the scientific community.  Therefore, any testimony regarding these studies should be excluded pursuant to Frye;

2) The studies are irrelevant as they are not substantially similar to Mr. Sclafani's work conditions in the present case; and

3) The studies create a substantial danger of undue prejudice, confusion of the issues and misleading the jury, and would necessitate an undue consumption of time.

## II.     BACKGROUND

MAS is an engineering consulting firm that specializes in material characterization work, asbestos analysis and the testing of asbestos-containing products.  MAS was founded by Dr. William Longo.  Dr. Longo and MAS employees, such as Mr. Richard Hatfield, frequently testify as expert witnesses on behalf of plaintiffs in asbestos litigation.  In or about 1999, MAS designed and conducted work practice studies concerning the removal and replacement of flange gaskets and valve packing.[1]  These studies are videotaped using "Tyndall Light Phenomena" against

---

[1] See, e.g. William E. Longo, William B. Egeland, Richard L. Hatfield and Larry R. Newton article, Fiber Release During the Removal of Asbestos Containing Gaskets: A Work Practice Simulation,

black walls specially designed to enhance the observation of fibers released during the experiment.[2]  The studies do not occur in any type of real world working environment. Instead, the gaskets and packing are removed inside of an exposure characterization laboratory ("ECL"), which measures approximately fifteen (15) by twenty (20) by eight (8) feet.[3]

The flanges and steam valves used in the studies were salvaged in 1994 from an old steam powerhouse at an Oregon wood-processing mill, which operated from 1928 through the early 1990s.[4]  The flanges and steam valves were stored in a dry climate to assure minimal rusting over time.[5]

To allegedly simulate the flange gasket replacement activity for the studies in the Longo Article, Dr. Longo himself removes ten gaskets and any residual gasket material by hand scraping, hand wire brushing,[6] or power wire brushing.[7]  To simulate the valve packing replacement activity, machinists clean out the stuffing box and

---

attached as Exhibit "A" to the Declaration of Bradley Gunning; MAS Gaskets and Pumps Study IV Videotape, attached as Exhibit "B"; Removal and Replacing Valve Packing: Work Practice Simulation Study II; Section 1: Study Design and Protocol, attached as Exhibit "C";  Removal and Replacing Valve Packing: Work Practice Simulation Study II  Videotape, attached as Exhibit "D"; and Removal and Replacing Valve Packing Simulation, Study II; Section 2: Summary of Data for Industrial and Maritime Machinist, attached as Exhibit "E." Attached hereto are true and correct copies of said Exhibits.  A compendium of all exhibits will be provided to the court.

[2] See Exhibits A and B.

[3] Id.

[4] See Affidavit of Robert L. Gay, dated August 12, 2000, as found in Removal and Replacing Valve Packing: Work Practice Simulation, Study II; Section 3; Bulk Sample Analysis, attached as Exhibit "F"; and Description of Salvaged Flanges and Valves, dated June 29, 1998, as found in Removal and Replacing Valve Packing: Work Practice Simulation, Study II; Section 3: Bulk Sample Analysis and Affidavit, attached as Exhibit "G."  Attached hereto are true and correct copies of Exhibits "F" and "G".

[5] See Exhibits F and G.

[6] MAS has conducted more than five gasket replacement studies.  It is understood the Longo Article is based on Gasket studies II and III (and partially I).  Furthermore, Plaintiff has not identified which gasket videotapes they may seek to introduce.  The work practice simulations in the first three studies were performed by Dr. Longo – who is not and has never been a tradesman or Industrial Hygienist.

[7] See Exhibit A, at  56.

RECYCLED PAPER

1  replace the packing by cutting the appropriate length of packing and placing it into the

2  stuffing box.[8]

3  ## III.   SUMMARY OF ARGUMENT

4        Crane Co. anticipates that Plaintiffs will identify experts who may rely on these

5  studies and/or videotapes to argue that the material released in these videos constitute

6  "respirable" asbestos fibers, that the studies reflect the amount of such fibers released

7  from the activities depicted in the videos, and that these videos are accurate re-

8  creations of such events.   This Court, however, should exclude any testimony

9  concerning the purported amount of asbestos fibers released from the work depicted in

10 the MAS studies because:

11             • The scientifically accepted procedure for collecting air

12               samples and measuring them has been the same for

13               decades and has been codified in federal regulations

14               for more than ten years.   MAS, however, did not

15               follow these procedures.

16             • Although air samples are customarily collected by

17               certified industrial hygienists who must demonstrate

18               mastery of the approved procedures for collecting a

19               valid sample to obtain certification, MAS did not

20               employ certified industrial hygienists to collect valid

21               samples.   Instead, though they are not certified

22               industrial hygienists, Dr. Longo and Mr. Hatfield

23               collected the samples themselves, without following

24               the accepted methods of sample collection.

25

26

27 [8] See Exhibit C.

28

- Dr. Longo's and Mr. Hatfield's opinions regarding the air samples they have tested deviate astronomically from *all previous studies*, including government studies *not* done for the purposes of litigation, which have repeatedly established that asbestos gaskets and packing are not dangerous.
- MAS did not employ a professional tradesman to work with some of the various products at issue.  For example, in the gasket studies, the samples were taken and the videos shot as Dr. Longo personally removed gaskets on his specially prepared theater lighting set. Dr. Longo admits he knew nothing about how tradesmen remove gaskets.
- Counting asbestos fibers in an air sample is an inherently subjective procedure.  MAS did not utilize an independent laboratory to conduct counting procedures.    Instead,  they  used  Dr. Longo's handpicked microscopists.

Moreover, this Court should also exclude the MAS videotapes on the following grounds:

- Any potential probative value of this evidence is substantially outweighed by the danger of the undue prejudice to Defendants that will result from its introduction.   Significantly, MAS employees have acknowledged the limitations and questionable probative value of the MAS videotapes.
- The MAS videotapes will mislead the jury, confuse the issues and necessitate an undue consumption of time

and energy.  Defendants will be required to conduct extensive cross-examination to show that the tests do not accurately represent the conditions experienced by Mr. Sclafani, that the tests are not conducted pursuant to generally accepted scientific principles, and that the reported data and videotaped materials are biased by MAS' incentive to produce data and imagery that is most favorable to Plaintiffs.  Defendants will also have to call their own experts and submit their own tests and videos if this evidence is admitted.

- The MAS videotapes and studies have been excluded by numerous other courts.

- The MAS videotapes are neither relevant nor reliable because the studies were not conducted under substantially similar circumstances as those allegedly experienced by Mr. Sclafani.  Plaintiffs have not shown that the equipment manipulated in the MAS videos and studies is substantially similar to (i) the working environment, (ii) work practice or (iii) the duration of the tasks performed by Mr. Sclafani.

- MAS failed to measure the particles illuminated by their theater lights that were not asbestos.  Thus, the videos show an undetermined amount of existing dust, metal, brush fibers, and/or other materials.  Another court excluded these videos precisely because it was impossible to know how much of the dust shown in the videos is asbestos.

IV.    **ARGUMENT**

   A.    **The MAS Studies Employ Unreliable Methodology Not Generally Accepted Within The Relevant Scientific Community**

   Under Federal law, admissibility of expert opinion is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

   In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the U.S. Supreme Court held that Rule 702 established the trial court's "gatekeeping function," which requires a court to ensure that:  (1) the evidence or testimony is relevant, *i.e.*, there is a proper "fit" between the testimony and the issue to be resolved at trial; and (2) "the reasoning or methodology underlying [an expert's] testimony is scientifically valid." *Daubert*, 509 U.S. at 591-93.  Principally, expert testimony must be reliable. *Kumho Tire Co. Ltd. V. Carmichael,* 526 U.S. 137, 141 (1999).

   In order to prevent unreliable opinions from confusing the jury, the trial judge must act as a "gatekeeper" and undertake a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. 579, 593-594 (1993).  This requirement applies to all expert opinion testimony, not just scientific testimony.  *Kumho,* 526 U.S. at 147; *see also Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997) (holding that an opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist). Expert testimony is inadmissible when "there is simply too great an analytical gap between the data and

1  the opinion offered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Therefore,

2  "when an expert opinion is based on data, a methodology, or studies that are simply

3  inadequate to support the conclusions reached, *Daubert* and Rule 702 **mandate** the

4  exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger

5  Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (emphasis added); *see also Heller v. Shaw

6  Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999) (noting that "a district court must

7  examine the expert's conclusions in order to determine whether they could reliably

8  follow from the facts known to the expert and the methodology used").

9       As will be seen below, the methodologies employed by MAS to measure

10  airborne asbestos fibers differ significantly from those used by OSHA and other

11  significant members of the scientific community. Accordingly, such opposition to the

12  MAS methodologies establish that they are not reliable and not "generally accepted"

13  for purposes of Federal evidentiary law.

14       OSHA has regulated the permissible exposure limits of asbestos in the

15  workplace for nearly 30 years. The accepted scientific principles for measuring such

16  exposure are reflected in the OSHA regulations. Specifically, when air samples are

17  collected, the filters are analyzed using the method prescribed by OSHA, known as the

18  ID-160 method, or the method prescribed by the National Institute of Occupational

19  Safety and Health ("NIOSH"), known as the NIOSH 7400 method.[9]  Those methods

20  require that a microscopist, using phase contrast microscopy ("PCM"), count only

21  fibers greater than 5 microns in length with an aspect ratio of at least 3:1.[10]  Also,

22  because PCM is used, only fibers with a width of at least .25 microns are counted. The

23  results are measured in fibers per cubic centimeter (f/cc), and can be compared to

24  Permissible Exposure Limits ("PELs") set by OSHA, which are based on the results of

25

26

---

27  [9] See CFR 1910.1001(d)(6)(i) and App. A thereto. See also, Affidavit of John Spencer, Certified Industrial Hygienist, attached as Exhibit "H", at ¶ 1. Attached hereto is a true and correct copy of Exhibit "H".

28  [10] Aspect ratio refers to die ratio of the fibers length to its width.

RECYCLED PAPER

epidemiological studies.  29 CFR '1910.1001(c).  Collecting dust by these methods and comparing the results to the PELs is done every day in the real world to protect the health of people working in industrial facilities throughout the United States.

### 1.  The MAS PCM Analysis Ignores OSHA Quality Controls

After it collected samples, MAS analyzed the data using PCM and transmission electron microscopy ("TEM").  The PCM analysis done by the MAS lab is contrary to the accepted methods because MAS failed to employ quality control methods.  Specifically, the OSHA Reference Method makes clear that, *inter alia*, laboratories independent of that which collected an air sample are to participate in measuring the asbestos dust in such sample:

> **SAMPLING AND ANALYTICAL PROCEDURE**
>
> * * *
>
> **14.  Blind recounts shall be conducted at the rate of 10 percent.**
>
> **QUALITY CONTROL PROCEDURES**
>
> 1.     Intralaboratory program.  Each laboratory and/or each company with more than one microscopist counting slides shall establish a statistically designed quality assurance program involving blind recounts and comparisons between microscopists to monitor the variability of counting by each microscopist and between microscopists.  In a company with more than one laboratory, the program shall include all laboratories and shall also evaluate the laboratory-to-laboratory variability.
>
> 2.     a.     Interlaboratory program.  Each laboratory analyzing asbestos samples for compliance determination shall implement an interlaboratory quality assurance program that at a minimum includes participation of at least two other independent laboratories.  Each laboratory shall participate in

1    round robin testing at least once every 6 months with at least

2    all the other laboratories in its interlaboratory quality

3    assurance group.  Each laboratory shall submit slides typical

4    of its own work load for use in this program.  The round

5    robin shall be designed and results analyzed using

6    appropriate statistical methodology.

7    MAS skipped these procedures, though it did not stop Dr. Longo or Mr. Hatfield

8    from stating in their report of the tests and in prior testimony that they had complied

9    with the OSHA-approved methodology.  When asked why they neglected to follow the

10   OSHA requirements for a valid analysis, Hatfield explained:

11   In general, we don't provide PCM counts for clients or

12   persons in general.  The PCM work that we have done

13   generally has been for our own work and not for outside

14   people, and we just haven't been providing that, so we didn't

15   have that as an integral part of our QC.[11]

16   The failure to follow the minimum quality control procedures required by the

17   government becomes especially important when one compares MAS's results to those

18   obtained by others who used reputable labs for their analyses instead of their own

19   handpicked microscopists.  Specifically, OSHA has determined that the very type of

20   gaskets and packing products at issue in this case and subject to the MAS studies are

21   not dangerous.  In fact, the asbestos exposure from such gaskets and packing is so low

22   that OSHA does not require that companies warn about such products.   19 CFR

23   1910.1001(j)(6).  This warning exemption is supported by studies conducted by the

24   U.S. Navy and by certified industrial hygienists that show that asbestos exposure from

25   the installation and removal of asbestos-containing gaskets is comparable to the

26   exposure one receives from ambient air, which is not considered hazardous.

27

28   [11] See December 5, 2000 Deposition of Richard Hatfield, attached as Exhibit "I", at. 79.  Attached
     hereto is a true and correct copy of Exhibit "I".

LA-534445 v1                                              RECYCLED PAPER

1   Indeed, the current OSHA PEL is 0.1 fibers/cc. 29 CFR 1910.1001(c).   The

2   reason OSHA exempts the gasket and packing material from the warning requirements

3   is that other reliable tests on those products demonstrate that the fiber release during

4   expected use of the products is well below the PEL.   Yet, MAS's results are 28 to 37

5   times higher than the PEL.   In fact, Mr. Hatfield concedes that he is not aware of any

6   other study that reports results that even exceed the PEL, and certainly not by 2,800 to

7   3,700%.[12]

8
       **2.   The MAS TEM Analysis Has Been Rejected By Others In The
9          Field Of Asbestos Fiber Measurement, Including OSHA**

10   In addition to the flawed PCM analysis, MAS used an electron microscope to

11   analyze their samples.   This process is called transmission electron microscopy, or

12   TEM.   OSHA, however, specifically rejects TEM for fiber counting, concluding that

13   TEM "fiber counting accuracy is unacceptably poor."   OSHA does prescribe a TEM

14   procedure for distinguishing asbestos fibers from other material.   This procedure is

15   known as the NIOSH 7402 method.   MAS, however, does not follow the NIOSH 7402

16   method.

17   Under NIOSH 7402, the filter sample is prepared using the direct method of

18   sample preparation.   Longo and Hatfield's microscopists, however, were instructed to

19   use an "indirect" method of sample preparation, which includes as part of the

20   preparation the bombardment of the sample with sound waves, a process known as

21   sonification.   The sonification process shakes the solution and causes bundles and

22   matrices to break-up into smaller fibers.

23   The MAS indirect method creates a larger number of asbestos fibers than existed

24   in the original sampling and subjects the sampling to improper microscopic analysis.

25   Basically, MAS ignores OSHA protocol in favor of a technique that produces

26

27   [12] See October 20, 2000 Deposition of Richard Hatfield, attached as Exhibit "J", at 153-54.   Attached
28   hereto is a true and correct copy of Exhibit "J".

exaggerated, inaccurate, and misleading results.  Dr. Longo has even conceded that the indirect method of sample preparation results in higher numbers.[13]

As support for their use of the indirect method, Longo and Hatfield cite to ASTM 5755-95.[14]  While the ASTM standard does reference the indirect method of sample preparation, it relates to the analysis of surface samples – not air samples.[15]  In fact, the very standard Longo and Hatfield rely upon states that the sample analyzed may not represent the sample collected because of the sonification of the sample:

> 1.4.1  The procedure outlined in this test method employees an indirect sample preparation technique.  It is intended to disperse aggregated asbestos into fundamental fibrils, fiber bundles, clusters, or matrices that can be more accurately quantified by transmission electron microscopy.  However, as with all indirect sample preparation techniques, the asbestos observed for quantification may not represent the physical form of the asbestos sampled.

Significantly, the ASTM standard that applies to air samples, ASTM D6281-98, requires the use of the direct method of sample preparation, not the destructive indirect method.

[13] See, August 30, 2000 deposition of Dr. William Longo, attached as Exhibit "K", at 166-67. Attached hereto is a true and correct copy of Exhibit "K".

[14] ASTM refers to the American Society for Testing and Materials.

[15] See Exhibit H, ¶¶ 8-9; see also affidavit of Dr. Eric John Chatfield, attached as Exhibit "L", ¶ 12; affidavit of Frederick W. Boelter, Certified Industrial Hygienist, attached as Exhibit "M", ¶16.

Attached hereto are true and correct copies of Exhibits "L" and "M".

The TEM method is not validated, relevant or reliable for occupational exposure determinations or health hazard assessments.[16]   This method is not proper for measuring airborne asbestos samples, and OSHA does not recognize the use of TEM for determination under any of the occupational asbestos standards.   Indeed, Dr. Longo, himself has admitted that MAS' TEM numbers have no relevance to OSHA's standards regarding asbestos exposure in the workplace.[17]   Similarly, in the same case, MAS employee Richard Hatfield admitted that although PEL's set by OSHA for exposure to asbestos fibers are used in making health risk assessments, MAS' TEM numbers do not relate to the PEL's.[18]   In other words, MAS' TEM numbers have no connection to or use with the very limits set by OSHA in determining what constitutes a health risk in the real world.   Not surprisingly, the judge that presided over this hearing ordered that the MAS studies and videotapes be barred from evidence.[19]   For the same reasons, this Court should do the same.

### 3.  MAS's Use Of Tyndall Lighting Is Unreliable

The MAS demonstrative aids involve the use of "Tyndall lighting," purportedly to visually demonstrate the amount of alleged "respirable" asbestos-containing dust released in the air during ordinary installation and removal of asbestos-containing materials.   The studies are performed in an enclosed, pitch-black chamber that is illuminated from above with a bright, scattered light beam known as Tyndall lighting. The Tyndall lighting supposedly demonstrates the levels of asbestos particles in the air

---

[16] See Exhibit H, ¶6, see also Exhibit L, ¶11;  Affidavit of Richard J. Lee, Microscopist and Materials Scientist, attached as Exhibit "N"; Exhibit M, ¶¶ 16-18.  Attached hereto is a true and correct copy of Exhibit "N".

[17] See transcript of "Frye Hearing," dated September 9, 2003 in Mary Ellen Tyre v. CSX Transportation, Inc., Duval County, No. 16-2002-CA-4837, Div. B, attached as Exhibit FF.  Attached hereto is a true and correct copy of Exhibit "FF".

[18] Id., at 198.

[19] See order in Mary Ellen Tyre v. CSX Transportation, Inc., Duval County, Case No. 16-2002-CA-4837, attached as Exhibit EE.  Attached hereto is a true and correct copy of Exhibit "EE".

that are normally invisible under ambient lighting conditions.  The Tyndall lighting method, however, is scientifically unreliable.

The scientific purpose of Tyndall lighting is to measure turbidity of colloidal suspensions.  Floating asbestos fibers, however, are ***not*** colloidal suspensions.  The Tyndall lighting technique used by MAS creates an inaccurate impression of the amount of asbestos fibers released in the various work processes depicted in the videos.  In particular, asbestos fibers ***and*** dust reflect light.  It is impossible to determine whether the particles seen under the Tyndall light are asbestos fibers, dust, rust, glue, or some other material.  Therefore, it appears to the naked eye that the removal of material releases many more asbestos fibers than are actually present.

The attached affidavits of John W. Spencer and Dr. Richard J. Lee clearly show why the Tyndall lighting technique is not a reliable scientific technique.  They provide in pertinent part that:

- Videotapes using artificial lighting techniques provide no information concerning the size, type or concentration of airborne asbestos particles.[20]

- The use of artificial lighting techniques creates a buoyancy due to the heat generated by the lights permitting particulate matter to remain airborne for longer periods of time, thus artificially inflating airborne fiber counts.[21]

- The use of artificial lighting techniques cannot selectively illustrate actual respirable particles of asbestos.[22]

- Videotapes using artificial lighting techniques provide no information concerning the size, type or concentration of airborne asbestos particles.[23]

---

[20] See Exhibit N, ¶12.

[21] Id.

[22] Id.

[23] Id.

- Videotapes using artificial lighting techniques are not an acceptable industrial hygiene practice for the evaluation of occupational exposures to asbestos.[24]

Tyndall lighting creates a false impression in the minds of the jury, and does not assist the trier of fact in making a determination as to the release of asbestos fibers from gaskets or packing.  For this reason, the MAS videotapes are irrelevant and should be excluded from the trial of this case.

### 4.    The MAS Studies Are Unreliable For Numerous Other Reasons

MAS achieves its test results by interjecting an element of subjectivity wherever possible.  For example, Dr. Longo personally removed the gaskets in each study, though he had never before removed gaskets in an industrial setting nor observed someone else trained to do so.[25]  This element of subjectivity affects the results of both the PCM and TEM analyses.

Furthermore, the MAS test results are tainted because they are dependent on the subjective interpretation of their own staff.  Under the NIOSH 7400 method, the microscopist, in counting the fibers per cc, must count 100 fibers or 100 fields, whichever comes first.  The microscopist selects the 100 fields by moving two knobs on his microscope.  (One would not expect to find 100 fibers in a gasket study.)  If a microscopist were so inclined, he could search for a fiber and, if he found a field that contained a fiber, could count that field multiple times without anyone knowing.  For this reason, an independent lab should do the counting as was done in the studies conducted by defendants.  MAS, however, used microscopists employed by its own lab to count fibers.  In doing so, it has obliterated any quality assurance.  Longo and Hatfield have both stated that their microscopists should have followed a pattern while counting to avoid counting the same field twice, but neither knows whether their

---

[24] See Exhibit H, ¶11.

[25] See Exhibit K, at 115-16.

RECYCLED PAPER

1    microscopists did so.[26]  Obviously, the greater the variance from other studies, the

2    more significant this factor becomes.  The MAS studies vary wildly from previous

3    studies.  At the very least, if they were going to use their own employees for the

4    counts, they should have followed the quality control procedures required for the

5    methods they employed.

6    **B.     The MAS Studies Are Not Substantially Similar To Mr. Sclafani's Working Conditions**

7        The party proffering evidence bears the burden of demonstrating its

8    admissibility.  Evidence that is not relevant is not admissible.

9        Plaintiffs cannot meet their burden in showing Mr. Sclafani's alleged exposure

10   to Defendants' products was substantially similar to that which occurred in the ECL.

11   In fact, there is no evidence that these areas in which Mr. Sclafani worked were

12   anywhere near as confined as the ECL chamber.  Moreover, there is nothing in the

13   record indicating that the air movement in Mr. Sclafani's work areas was anywhere

14   near as calm as that found in the ECL.  Indeed, one trial court has recently excluded

15   MAS's studies, videotapes and testimony regarding asbestos studies using similar

16   methodology and a chamber with the exact dimensions as those at issue because the

17   plaintiff could not demonstrate that the materials were substantially similar to the

18   plaintiff's exposure.  See, Mary Ellen Tyre v. CSX Transp., Inc., Duval County, No.

19   16-2002-CA-4837, Div. B.[27]  Significantly, the court reasoned that "the ventilation

20   consideration alone" was sufficient to support its holding.  Id. at 5.

21       Similarly, there is no evidence that the gaskets and packing in the equipment

22   located at Mr. Sclafani's jobsites were in the same condition as those in the studies and

23   videotapes.  Specifically, the packing and gaskets in the studies and videotapes were

24   found in flanges and steam valves that had been stored in a dry climate to assure

25

26

27   [26] See Exhibit J, at 71; Exhibit  K, at  160.

28   [27] A copy of the opinion is attached hereto as Exhibit "EE."

1   minimal rusting over time.[28]  At least in regards to Mr. Sclafani's worksites, it is highly

2   doubtful that the condition of the gaskets and packing removed from valves and their

3   flanges were substantially similar to the MAS gaskets that had been sitting unused in a

4   dry environment for at least five years.

5       As to the investigator performing the gasket removal work, insufficient

6   information is available to determine which exact videotape, if any, would be relied

7   upon to depict the removal of a gasket.  In the event that Plaintiffs will attempt to show

8   one of the videotapes where Dr. Longo is performing the gasket manipulation, it is

9   questionable whether someone who has never been trained as a machinist, and whose

10  sole basis for understanding how a machinist performs gasket removal is through the

11  reading of depositions, rather than observing how these individuals performed the

12  actual work, can accurately replicate Mr. Sclafani's work experience and environment.

13  In addition, Dr. Longo states determining factors that seem to affect the condition of

14  the gaskets are: length of service; temperature and pressure conditions; and

15  composition of the gasket matrix.[29]  It is unknown at this time, however, whether the

16  asbestos-containing gaskets to which Mr. Sclafani was allegedly exposed had the same

17  or similar "determining factors" as the gaskets used in the MAS videos.  Therefore, the

18  gaskets used in the MAS videos may not have been in the same condition as the

19  gaskets associated with Defendants' equipment at Mr. Sclafani's worksites.

20      **C.   The Tests Are Inadmissible Under Rule 403 of The Federal Rules of
           Evidence**

21

22      MAS employees have acknowledged the limitations and questionable probative

23  value of the videotapes.  For example, Dr. Longo has testified:

24

25

26  _____

27  [28] See Exhibits F and G.

28  [29] See Exhibit A

- The videotape does not allow the jury to differentiate between that portion of the dust cloud illuminated by the Tyndall lighting which is asbestos and that which is not. [30]
- There is no governmental standard indicating the use of Tyndall lighting to quantify or qualify asbestos fiber release in an occupational setting.[31]
- MAS has not sampled that which is in the beam to determine how much of it is asbestos versus how much of it is not asbestos.[32]
- The percentage of dust in the Tyndall beam which is asbestos can be anywhere from greater than one percent to less than one hundred percent.   Dr. Longo's testimony on this point is particularly compelling: "What I can tell the jury is that there is some percentage of asbestos in the cloud.   We know that because we make the measurements.   We haven't made the measurements to know exactly how much is asbestos and how much is not asbestos.   I will tell the jury I don't think that's a hundred percent asbestos ... I would certainly think it's more than one percent."[33]   So, in other words, Dr. Longo will testify that the dust cloud contains anywhere from 2% to 99% asbestos.   This is pure speculation.

---

[30] See Wosk vs. AlliedSignal, Supreme Court of the State of New York, County of New York, Case No. 117097-97, March 16, 1999, attached as Exhibit "P", at 46.  Attached hereto is a true and correct copy of Exhibit "P".

[31] See Lambert vs. John Crane, United States District Court for the Southern District of Indiana, No. 94-154-C-B/G, September 11, 2000, attached as Exhibit "Q", at 46.  Attached hereto is a true and correct copy of Exhibit "Q".

[32] Id. at 47.

[33] See In Re: Lamar County Asbestos Litigation, District Court of Lamar County, Texas, June 20, 2001, attached as Exhibit "R", at 67-68.  Attached hereto is a true and correct copy of Exhibit "R".

- The high intensity lighting used produces heat and the dust particles suspended in the hot air would rise upwards and, hence, into the breathing zone of the worker. [34]

Similarly, Mr. Hatfield has testified:

- Tyndall lighting does not identify asbestos from non-asbestos nor does it permit him or Dr. Longo to determine how much of the fibers that are seen in the videotape are respirable size asbestos fibers.[35]
- Neither Mr. Hatfield nor Dr. Longo have made any attempt to quantify the percentage of respirable asbestos fibers depicted in the airborne particulate matter shown in the videotapes.[36]

Also significant is the testimony of William Ewing, a certified industrial hygienist, and a co-author and collaborator on the valve packing simulations. Mr. Ewing testified that the Tyndall lighting technique cannot be used to quantify the amount of respirable asbestos fibers in the air generated by these "simulations."[37] Mr. Ewing also testified that it is impossible to determine what percentage of the material depicted in the videotapes is asbestos versus non-asbestos material, as the videotapes depict non-asbestos binder material in unknown quantities from the packing material, cotton fibers from the rag utilized in the simulation, cellulose, graphite, and calcium.[38]

---

[34] See Gilbert vs. Bendix Corporation, Court of Common Pleas of Northhampton County, Pennsylvania, No. 96-C28 3489, August 11, 1998, attached as Exhibit "S", at 259.  Attached hereto is a true and correct copy of Exhibit "S".

[35] See deposition of Richard Hatfield taken in Cook vs. AC&S, Inc., January 20, 2000, attached as Exhibit "T", at 104, 171.  Attached hereto is a true and correct copy of Exhibit "T".

[36] See Deposition of Richard Hatfield taken in Jones vs. Owens Corning, Superior Court of Fulton County, Georgia, March 12, 2001, attached as Exhibit "U", at 26.  Attached hereto is a true and correct copy of Exhibit "U".

[37] See Deposition of William Ewing taken in  Lewis v. Raybestos-Manhattan, et al., March 15, 2000, at. 98-99, 104-105, 116-117, 124-127, attached as Exhibit "V".  Attached hereto is a true and correct copy of Exhibit "V".

[38] Id.

The testimony of Ewing, Hatfield and Longo establish that the videotapes and studies depicted therein are useless to assist the jury in determining whether a plaintiff was exposed to a sufficient quantity of asbestos fibers from asbestos-containing packing or gasket material that would contribute to his development of asbestos-related disease.  Indeed, this evidence requires this Court to exercise its discretion in favor of exclusion, and the Court should exclude the MAS videotapes from evidence in this case.

### 1.    The Videotapes Will Mislead the Jury, Confuse the Issues and Consume Undue Time

The videotapes of the work practice studies will also consume undue time, confuse the issues and mislead the jury.  Indeed, the appearance of dust in the MAS videotapes is exaggerated and, therefore, misleading.   In these videos, the dust produced is illuminated using high intensity theater lights against the black backdrop of the walls of the MAS chamber.  Further, most of the illuminated dust depicted in these videos is de-focused, because the cameras used to record the studies are focused on the activity being performed, rather than the dust activity.[39]  Thus, the videos do not accurately represent the dust as it would be seen by the human eye, which has the ability to rapidly and instinctively adjust its focus.

Furthermore, the Tyndall lighting does not distinguish between asbestos fibers and other types of particles present in the chamber.  All of the particles are illuminated, whether asbestos fibers or not.  The videos depict a de-focused "snow storm" of dust, which serves no purpose other than to inflame the jury, confuse the issues, and unfairly prejudice Defendants

Moreover, to introduce evidence of these experiments will only confuse the jury and mislead them into believing that Mr. Sclafani was present while this work

---

[39] See Exhibit L, ¶17.

occurred.  These studies are not evidence, however, that Mr. Sclafani ever worked on any of Defendants' equipment.

Finally, the introduction of such evidence will consume undue time.  Defendants will be required to conduct extensive cross-examination to show that the tests are not representative of the conditions encountered by Mr. Sclafani, that they are not conducted pursuant to generally accepted scientific principles, and that the data and videotape materials are biased by MAS's incentive to produce data and imagery that is favorable to Plaintiffs.   In doing so, Defendants will have to cross-examine Mr. Hatfield, put on testimony by their own expert witnesses, and submit their own tests and videos.  Essentially, the Court will wind up holding a "trial-within-a-trial" over the MAS videotapes and studies.  The admission of such evidence will therefore require an undue amount of time in its presentation and rebuttal, especially in light of its non-existent probative value.

### D.    The Studies And Videotapes Have Been Excluded By Courts In Other Jurisdictions

There is strong precedent for the exclusion of the MAS videotapes and/or similar studies conducted by Dr. Longo used in asbestos litigation.   Indeed, the videotapes have been subject to increasing challenge throughout the country and have been excluded by other California trial judges in the following cases:

- Carlson vs. Lear Siegler, et. al., Superior Court of San Francisco County, California, Case No. 979595, August 13, 1998, attached as Exhibit "W".  Attached hereto is a true and correct copy of Exhibit "W".

- Lewis vs. John Crane, et. al., Superior Court of San Francisco County, California, Case No. 306774, April 3, 2000, attached as Exhibit "X".  Attached hereto is a true and correct copy of Exhibit "X".

- Grego vs. Trailmobile Trailers, et. al., Superior Court of San Francisco County, California, Case No. 996240, February 10, 2000, attached as

Exhibit "Y".  Attached hereto is a true and correct copy of Exhibit "Y".

- Hansen vs. Asbestos Defendants, et. al., Superior Court of San Francisco County, California, Case No. 321639, December 12, 2001, attached as Exhibit "Z".  Attached hereto is a true and correct copy of Exhibit "Z".

- Berning vs. A.P. Green, et. al., Superior Court of San Francisco County, California, Case No. 319733, January 8, 2002, attached Exhibit "AA".  Attached hereto is a true and correct copy of Exhibit "AA".

- Richardson v. A. W. Chesterton Company, et. al., Superior Court of San Francisco County, California, Case No. 411448, March 19, 2003, attached as Exhibit "BB".  Attached hereto is a true and correct copy of Exhibit "BB".

- Judge Diane Elan Wick of the Superior Court of California has issued Standing Orders regarding issues frequently raised in asbestos cases, including Order No. 54, which specifically excludes the introduction of the "[v]ideotape demonstrations of work practice simulations performed by the witness or his company."

- Trinchese vs. Raybestos Manhattan, et. al., Superior Court of San Francisco County, California, Case No. 400787, June 18, 2002, attached as Exhibit "CC", at ¶54.  Attached hereto is a true and correct copy of Exhibit "CC".

- James vs. Raybestos-Manhattan, et al., Superior Court of San Francisco County, California, Case No. 316856, December 12, 2001, attached as Exhibit "DD".  Attached hereto is a true and correct copy of Exhibit "DD".

1    Additionally, after a full hearing on July 5, 2001, in which Dr. Longo attempted
2  to explain his work practice studies and videotapes, a court in Lamar County, Texas
3  found them to be "junk science" and not only excluded the videotapes, but his entire
4  testimony.  In reaching its decision, the court described Dr. Longo as follows:

5              Dr. Longo presented at the hearing with testimonial charisma
6              and convincing demeanor . . . . Dr. Longo's testimony
7              sounded reasonable and this court accepted it at face value
8              until completing study of all exhibits, affidavits and
9              testimony. After considerable study by the court, it became
10             clear that the methodologies claimed to be used by MAS in
11             test reports were not followed . . . . Neither the MAS tests
12             nor Dr. Longo offer a satisfactory explanation as to why tests
13             were not conducted under a foreseeable variety of test
14             conditions . . . . Re-reading of Dr. Longo's testimony reveals
15             it to be practiced and to employ misdirection and
16             evasiveness.  It is at best disingenuous, not credible and
17             unsupported by any respectable community of scientists.[40]

18    See also Mary Ellen Tyre v. CSX Transp., Inc., Duval County, No. 16-2002-
19  CA-4837, Div. B, discussed supra (excluding testimony and similar studies of MAS).
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26
27  _____
    [40] In Re: Lamar County Asbestos Litigation, Exhibit "R", at 67-68.
28

# V.    CONCLUSION

For the foregoing reasons, this Court should issue an order *in limine* barring introduction of the MAS videotapes, the studies depicted therein, and any testimony of any witness based on such studies.


K&L Gates LLP

Dated:  April 22, 2013            By:  /s/ Bradley W. Gunning
                                       Bradley W. Gunning
                                       Brad.gunning@klgates.com
                                       Tel: (310) 552-5000
                                       Attorney for Defendant Crane Co.


Dated: April 22, 2013            Respectfully submitted,
                                 GORDON & REES LLP
                                 By:  /s/ Richard R. Ames
                                 MICHAEL J. PIETRYKOWSKI (SBN: 118677)
                                 JAMES G. SCADDEN (SBN: 090127)
                                 JOHN F. HUGHES (SBN: 090127)
                                 RICHARD R. AMES (SBN. 185822)
                                 Attorneys for Defendants
                                 Air & Liquid Systems Corporation, successor by
                                 merger to Buffalo Pumps, Inc.
                                 GORDON & REES LLP
                                 275 Battery Street, Suite 2000
                                 San Francisco, CA 94111
                                 Telephone: (415) 986-5900
                                 Facsimile: (415) 986-8054
                                 rames@gordonrees.com

LA-534445 v1

| | |
|---|---|
| 1 | DATED:  April 22, 2013 |
| 2 | |

BRYDON HUGO & PARKER

By: **/s/** Charles S. Park
    Edward R. Hugo [Bar No. 124839]
    Charles S. Park [Bar No. 161430]
    135 Main Street, 20th Floor
    San Francisco, CA 94105
    Telephone: (415) 808-0300
    Facsimile:   (415) 808-0333
    Email:  service@bhplaw.com

    Attorneys for Defendant
    FOSTER WHEELER ENERGY
    CORPORATION

DATED:  April 22, 2013

LEWIS BRISBOIS BISGAARD & SMITH LLP

By: **/s/ Elan N. Stone**
    James D. Fraser
    Elan N. Stone
    estone@lbbslaw.com
    Tel.: (213) 250-1800
    Fax: (213) 580-7942
    Attorneys for  Defendant
    THE GOODYEAR TIRE & RUBBER
    COMPANY

LA-534445 v1

RECYCLED PAPER

12cv03037