EXHIBIT M

Mar-05-04   10:54am   From-                                         T-411   P.018/075   F-244

AFFIDAVIT OF FREDERICK W. BOELTER
Transmission Electron Microscopy

STATE OF ILLINOIS          §
                           §
COUNTY OF COOK             §

I, Fred W. Boelter, being first duly sworn, deposes and states as follows:

1.    I am a Principal of Boelter & Yates, Inc. - Environmental Engineers and Scientists. Boelter & Yates, Inc.'s headquarters are located at 1300 Higgins Road, Suite 301, Park Ridge, Illinois.

2.    I am a licensed professional engineer and certified industrial hygienist. I have worked as an environmental engineer and industrial hygienist since 1973. I have anticipated, recognized, evaluated (by visual inspection, measurement, sampling and analysis), and controlled many different exposures and emissions including asbestos. A copy of my Curriculum Vitae is attached as Exhibit 1.

3.    All scientific fields, including engineering and industrial hygiene, rely upon reliable, reproducible, relevant, and accepted methodologies from which to draw sound conclusions.

4.    I have conducted a review of the various sampling and analytical methodologies regarding asbestos and I have also reviewed a number of documents prepared by Messrs. William Longo and Richard Hatfield on the subject of asbestos fibers.

5.    The US Department of Labor - Occupational Safety and Health Administration (OSHA) has established the Permissible Exposure Limit (PEL) of 0.1 fiber per cubic centimeter of air as an eight (8)-hour time-weighted average (TWA) or of 1.0 fiber per cubic centimeter air (1 f/cc) as averaged over a sampling period of thirty (30) minutes. [1,2]

6.    As specified in Appendix A of the OSHA regulations, the OSHA Reference Method for the collection of and analysis of personal airborne asbestos samples, is NIOSH Method 7

GARLOCK/ ANCHOR
EXHIBIT
"7"

Page 1 of 6

Mar-05-04  10:35am  From-                                        T-411  P.013/071  F-245

or OSHA method ID-160.  There is no OSHA or NIOSH method for the collection of area samples.

The OSHA Reference Method uses a technique known as Phase Contrast Microscopy (PCM).

7       OSHA Appendix A specifies "mixed cellulose ester filters membranes... in a 25-mm

cassette... collected at an air flow rate between 0.5 liters/min and 2.5 liters/min... to yield a fiber

density of between 100 and 1,300 fibers per square millimeter".[3]

8       Method 7400 provides an index of airborne fibers and may be used with Method

7402 to identify fibers.

- The method gives an index of airborne fibers.  It is primarily used for estimating asbestos
concentrations, though PCM does not differentiate between asbestos and other fibers. Use this method in
conjunction with electron microscopy (e.g., Method 7402) for assistance in identification of fibers.[4]

9       Method 7400 requires the direct preparation of the filter for analysis.

- Take care, however, not to overload the filter with background dust. If ≥ 50% of the filter surface
is covered with particles, the filter may be too overloaded to count and will bias the measured fiber
concentration.[5]
- Mount a wedge cut from the sample filter on a clean glass slide.[6]

10      NIOSH Method 7402 - Transmission Electron Microscopy (TEM) requires the direct

preparation of the filter for analysis.

- Remove circular sections from any of three quadrants of each sample and blank filter.[7]
- The TEM method, using the direct count of asbestos fibers, has been shown to have a precision
of 0.275 (s_r) in an evaluation of mixed amosite and wollastonite fibers. The estimate of the asbestos fraction,
however, had a precision of 0.11 (s_r). When this fraction was applied to the PCM count, the overall precision
of the combined analysis was 0.29.[8]

11      The Construction Industry OSHA regulations 1926.1101 also make reference to the

use of TEM analysis of air samples by the method specified by AHERA.[9]

- ... and perimeter area monitoring showing that clearance levels contained in 40 CFR Part 763,
Subpt. E, of the EPA Asbestos in Schools Rule are met, or that perimeter area levels, measured by Phase-
Contrast Microscopy (PCM) are no more than background levels representing the same area before the
asbestos work began.[10]

12      EPA AHERA requires the direct preparation of the TEM filter for analysis.[11]

- Direct preparation techniques are required. The object is to produce an intact film containing the
particulates of the filter surface which is sufficiently clear for TEM analysis.[12]

Mar-03-04   10:35am   From-                                                    T-411   P.026/071   F-246

13     The EPA AHERA method requires the collection of a total of thirteen high volume

area air samples (five inside the area and five outside the area plus three blanks of which two field

blanks are to be opened before sampling begins) by aggressive sampling techniques after a visual

assessment has determined that all asbestos has been removed. Consequently, it is anticipated

that there will be few, if any, fibers present in the air samples.[13]

"After the area has passed a thorough visual inspection, use aggressive sampling conditions to
dislodge any remaining dust."[14]

14     The sampling and analytical methods used Messrs. Longo and Hatfield do not

conform with specified regulatory procedures nor good industrial hygiene practice. For example:

"High volume pumps were used for area samples during the simulation. The four area air samples
were located around the work site." "The high volume pumps were calibrated to a flow rate of 10 liters per
minute for both background and area samples." "The two investigators were each fitted with two personnel
air sampling pumps, attached to each shoulder and within the breathing zone...." The air samples were
collected in accordance as described in NIOSH Method 7400... At the end of the study, two cassettes were
opened as field blanks."[15]

"Air samples for both area and personnel may be changed out approximately every 15 to 30 minutes
during the study depending on the concentration of airborne particulate."[16]

"For the TEM analysis, all samples will be analyzed by the indirect method. Samples will be
prepared using the ASTM D5755-95 method protocol."[17]

"For the TEM analysis, a modified Yamate EPA level II indirect air sample analysis was performed."
[18]

15     In determining an 8-hr time weighted average (TWA), two 4-hour consecutive

samples or one 8-hour full period sample is best in providing good precision. Ceiling and short-

term samples (i.e. the 30-minute STEL for asbestos) should be taken on employees who

infrequently engage in an activity involving handling materials for less than a full shift.[19]

16     ASTM D5755-95 method used by Dr. Longo is entitled "Standard Test Method for

Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for

Asbestos Structure Number Concentration". This method is unrelated to determining airborne

concentrations of asbestos fibers.

"This microvacuum sampling and indirect analysis method is used for the general testing of non-
airborne dust samples for asbestos. It is used to assist in the evaluation of dust that may be found on
surfaces in buildings."[20]

"This test method does not describe procedures or techniques required to evaluate the safety or habitability of buildings with asbestos-containing materials or compliance with federal, state, or local regulations or statutes."

17   Indirect preparation alters the nature of the asbestos fibers on the filter and the results generated by the use of indirect preparation do not represent either the concentration nor the form of the asbestos fibers in air.

"The procedure outlined in this test method employs an indirect sample preparation technique. It is intended to disperse aggregate asbestos into fundamental fibrils. However, as with all indirect sample preparation techniques, the asbestos observed for quantification may not represent the physical form of the asbestos sample... It may alter the physical form of the mineral fibers."

"The AHERA, NIOSH 7402, and Yamate Methods require or recommend direct transfer methods for sample preparation. That is, the original air sampling filter is prepared for analysis and examined in the microscope with minimal disruption of the particles that have collected on the surface. However, indirect transfer may break up asbestos bundles, clusters, and matrices into smaller units thereby giving a larger structure count."

"When TEM specimens were prepared from the same filter using the indirect-transfer procedure D5755-95, it was found that the calculated concentration of chrysotile structures was much higher than the concentration reported from analysis of specimens prepared by ISO/10312 (direct method). Considering chrysotile fibers and bundles only, the (indirect method) exceeded the (direct method) by approximately a factor between approximately 5 to 100."

18   There is no regulatory or consensus analytical protocol which calls for the use of the modified Yamate EPA level II method of TEM analysis.

"Use the criteria for fiber, bundle, cluster, and matrix identification, as described in the USEPA Asbestos-Containing Materials in Schools document". Record each AHERA structure identified, the length and width measurements."

"The Yamate Method was developed for non-occupational situations of interest to EPA. Although the Yamate Method was developed in 1984, it exists only as a draft document and has not been released as an official EPA Method. Both Yamate and the NIOSH 7400 Methods employ the concept of asbestos structures, although the specific definitions do not match exactly."

Further Your Affiant Sayeth Not.

DATE:

Subscribed and sworn to before me
this  17th  day of _____, 2000.

_____
Notary Public

OFFICIAL SEAL
ELISE E WRIGHT
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11/2003

Mar-03-04   10:35am   From-                                                          T-411   P.022/071   F-245

1.  29 CFR 1910.1001 – Asbestos, US Department of Labor Occupational Safety and Health Administration, General Industry Standards, (d)1.

2.  29 CFR 1926.1101 – Asbestos, US Department of Labor Occupational Safety and Health Administration, Construction Industry Standards, (f)(1).

3.  OSHA Reference Method – Mandatory – 1926.1101 Appendix A, US Department of Labor Occupational Safety and Health Administration, Construction Industry Standards.

4.  Manual of Analytical Methods INMAM), ASBESTOS and OTHER FIBERS br PCM, Method 7400, National Institute for Occupational Safety and Health (NIOSH), Fourth Edition, 8/15/94, Page 1, Applicability.

5.  Ibid. Page 4, Sampling, Paragraph 4.

6.  Ibid. Page 5, Sample Preparation, Paragraph 9.

7.  Manual of Analytical Methods INMAM), ASBESTOS  by TEM, Method 7402, National Institute for Occupational Safety and Health (NIOSH), Fourth Edition, 8/15/94, Page 1, Sample Preparation, Paragraph 7.

8.  Ibid. Page 7, Evaluation of Method.

9.  40CFR Part 763 – Asbestos, United States Environmental Protection Agency, October 30, 1987.

10. 29 CFR 1926.1101 – Asbestos, US Department of Labor Occupational Safety and Health Administration, Construction Industry Standards, (f)(4)(f)(5).

11. 40CFR Part 763 – Asbestos, United States Environmental Protection Agency, October 30, 1987.

12. Ibid. Appendix A, Mandatory Transmission Microscopy Method, Section B – Sample Preparation, Paragraph 5.

13. Ibid. Appendix A, Mandatory Transmission Microscopy Method, Section B – Sampling, Paragraph 17.

14. Ibid. Appendix A, Mandatory Transmission Microscopy Method, Section B – Sampling, Paragraph 19.

15. Gasket Removal Scraping and Hand Wire Brushing, Work Practice Study III, Materials Analytical Services, Inc., May, 2000, Study Design and Methodology.

16. Ibid. Section IV, Work Practice Study.

17. Ibid. Section IV, Laboratory Analysis.

18. Removal and Replacing Valve Packing Work Practice Study III, Materials Analytical Services Inc., October 30, 1988, Study Design and Methodology, Page 1.

Mar-05-44   10:35am   From-                                          T-411   P.023/071   F-246

19.   Occupational Exposure Sampling Strategy Manual, US Department of Health Education and
      Welfare, National Institute for Occupational Safety and Health, Nelson Leidel, Kenneth Busch,
      and Jeremiah Lynch, January 1977, NIOSH Contract CDC-99-74-75.

20.   D5755-95 Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by
      Transmission Electron Microscopy for Asbestos Structure Number Concentration, American
      Society for Testing and Materials, Section 5, Significance and Use, Paragraph 5.1

21.   Ibid., Section 5, Significance and Use, Paragraph 5.1.1

22.   Ibid., Section 1, Scope, Paragraph 1.4.1

23.   A Guide to Monitoring Airborne Asbestos in Buildings, Dale L. Keyes and Jean Chesson, 1989,
      Library of Congress Catalog Card Number 89-50764, Page 50.

24.   Advances in Environmental Measurement Methods for Asbestos, American Society for Testing
      and Materials, Michael E. Beard and Harry L. Rook, editors, ASTM Stock Number STP 1342,
      1999, Chapter entitled Correlated Measurements of Airborne Asbestos-Containing Particles and
      Surface Dust, E.J. Crankfield, Page 400.

25.   40 CFR Part 763, Asbestos, United States Environmental Protection Agency, October 30, 1987.

26.   D5755-95 Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by
      Transmission Electron Microscopy for Asbestos Structure Number Concentration, American
      Society for Testing and Materials, Section 16, Recording Data Rules, Paragraph 16.2.

27.   Methodological for the Measurement of Airborne Asbestos by Electron Microscopy, George
      Yamate, Satish Agarwal, and Robert Gibbons, Draft Report prepared under USEPA Contract No.
      68-02-3266, July 1984.

28.   A Guide to Monitoring Airborne Asbestos in Buildings, Dale L. Keyes and Jean Chesson, 1989,
      Library of Congress Catalog Card Number 89-50764, Page 49.

Mar-05-04  10:28am  From-                                              T-411  P.024/071  F-245



# Boelter & Yates
environmental engineers and scientists

CURRICULUM VITAE - June 1999

FREDERICK WILLIAM BOELTER, CIH, PE

Boelter & Yates
1300 Higgins F
Suite
Park Ridge, Il
60068-
847/ 692-
847/ 692-

Certified in Comprehensive Practice of Industrial Hygiene, ABIH, #1856
Registered Professional Engineer, State of Illinois, #062-042203
Qualified Environmental Professional, IFEP, #08830008
Diplomate of the American Academy of Environmental Engineers #93-20012
Illinois AHERA Accreditation #00111-C004, M004, D004
Florida Consultants License #IA0000038

EDUCATION:

Bachelor of Science – Environmental Engineering
Purdue University, West Lafayette, Indiana
June 1973

PROFESSIONAL EXPERIENCE:

December 1985        Principal
to Present           Boelter & Yates, Inc. (Boelter Environmental Consultants merged 3/97)
                     Park Ridge, Illinois

Responsibilities include the overall management of the firm's four practice areas (Real
Property Services; Air Quality Management; Environmental Health & Safety; Soil &
Groundwater). Other activities include consulting on environmental and occupational health
issues; designing and implementing engineering and administrative changes; conducting
investigations and control techniques research.

February 1988        President
to September         Start Analysis Corporation
1987                 Chicago, Illinois

Responsibilities include administrative management of the firm's analytical services. Other
activities include management of the quality control requirements. AIHA Accredited Lab #537.
and NVLAP Accredited Lab #1202 (formerly AHERA Lab #5137).

December 1985        President
to January 1987      The Asbestos Group, Inc.
                     Chicago, Illinois

Responsibilities include the overall management and development of the firm's environmental,
architectural and analytical services. Other activities include consulting on asbestos-related
issues. The Asbestos Group merged with Boelter Environmental Consultants in January
1987.

March 1983           Director, Environmental Services
to December 1985     Carnow, Conibear & Associates, Ltd.
                     Chicago, Illinois

Responsibilities included the overall management of industrial hygiene, environmental and

Mar-05-04   10:36am   From-                                                    T-411  P.025/071  F-246

Curriculum Vitae - Frederick W. Boelter
June 1999
Page 2

engineering programs; supervision of professional staff; consulting on engineering controls, pollution, and industrial hygiene; conducting research, i.e., epidemiologic studies related to integrating industrial hygiene and medical surveillance; and designing and implementing occupational and public health programs.

Boelter & Yates, I
N O T E

August 1980        Senior Industrial Hygiene Engineer
to March 1983      NATLSCO
                   Long Grove, Illinois

Responsibilities included consulting with clients on issues of industrial hygiene and engineering controls, organizing and leading teams on specific projects domestically and internationally, and instructing courses in Industrial Hygiene and Industrial Ventilation.

January 1978       Industrial Hygiene Engineer
to August 1980     Occupational Safety & Health Administration
                   Regional Office of Technical Support

Responsibilities included consulting with OSHA, industry and attorneys on the feasibility of controls at contaminants, biological and physical agents, and serving as an expert witness in ventilation and acoustics.

June 1976          Compliance Officer
to January 1978    Occupational Safety & Health Administration
                   Milwaukee Area Office

Responsibilities included conducting general schedule inspections and complaint inspections of facilities. Other duties included temporary assignments to the Regional and National Offices.

May 1973           Consulting Project Engineer
to June 1976       Enviro, Inc.
                   Milwaukee, Wisconsin

Responsibilities included consulting with industry to identify and eliminate workplace and environmental health hazards through ventilation and air pollution controls. Conducted pilot scale studies of air pollution control equipment in heavy industry. Conducted stack testing in the utility and other heavy industry.

CONTINUING EDUCATION:

"Chemical Accident Prevention & Risk Management Planning," LM-A&WMA Conference, Chicago, Illinois, April 2, 1998.

"Strategies and Tools for Successful EMS," LM-A&WMA Conference, Deerfield, Illinois, March 1998.

"USEPA Multimedia Enforcement & Industry Response," LM-A&WMA Conference, Chicago, Illinois, February 1998.

"Risk-Based Closures," LM-A&WMA Conference, Chicago, Illinois, November 1997.

"Ozone and PM₂.₅ Standards," USEPA Conference, Chicago, Illinois, December 1996.

"Preparing for Compliance with Your MACT Standards," A&WMA Conference, Nashville, Tennessee, June 1996.

Mar-03-04   10:56a   From-                                   T-411   P.025/071   F-256

Curriculum Vitae - Frederick W. Boelter
June 1999
Page 2

engineering programs; supervision of professional staff; consulting on engineering controls, pollution, and industrial hygiene; conducting research, i.e., epidemiologic studies related to integrating industrial hygiene and medical surveillance; and designing and implementing occupational and public health programs.

Boelter & Yates, In
N    O    T    E

August 1980         Senior Industrial Hygiene Engineer
to March 1983       NATLSCO
                    Long Grove, Illinois

- Responsibilities included consulting with clients on issues of industrial hygiene and engineering controls, organizing and leading teams on specific projects domestically and internationally, and instructing courses in industrial hygiene and industrial ventilation.

January 1978        Industrial Hygiene Engineer
to August 1980      Occupational Safety & Health Administration
                    Regional Office of Technical Support

- Responsibilities included consulting with OSHA, industry and attorneys on the feasibility of controlling air contaminants, biological and physical agents, and serving as an expert witness in ventilation and acoustics.

June 1976           Compliance Officer
to January 1978     Occupational Safety & Health Administration
                    Milwaukee Area Office

- Responsibilities included conducting general schedule inspections and compliance inspections of facilities. Other duties included temporary assignments to the Regional and National Offices.

May 1971            Consulting Project Engineer
to June 1976        Enviro, Inc.
                    Milwaukee, Wisconsin

- Responsibilities included consulting with industry to identify and eliminate workplace and environmental health hazards through ventilation and air pollution controls. Conducted pilot study studies of air pollution control equipment in heavy industry. Conducted stack testing in the pulp and other heavy industry.

CONTINUING EDUCATION:

"Chemical Accident Prevention & Risk Management Planning," LM-A&WMA Conference, Chicago, Illinois, April 2, 1998.

"Strategies and Tools for Successful EMS," LM-A&WMA Conference, Deerfield, Illinois, March 1998.

"USEPA Multimedia Enforcement & Industry Response," LM-A&WMA Conference, Chicago, Illinois, February 1998.

"Ticket-based Courses," LM-A&WMA Conference, Chicago, Illinois, November 1997.

"Ozone and PM₂.₅ Standards," USEPA Conference, Chicago, Illinois, December 1996.

"Preparing for Compliance with Your MACT Standards," A&WMA Conference, Nashville, Tennessee, June 1996.

Mar-05-04  10:37am  From-                                    T-411  P.027/071  F-246

Curriculum Vitae – Frederick W. Boelter
June 1999
Page 3

"Elements of a Product Stewardship Program," AIHA Conference, Washington, DC, May 1996.

"TACO, RBCA, RBLPEs, and Brownfields," LM-A&WMA Conference, Oak Brook, Illinois, February 1996.

"Continuous Emission Monitoring," A&WMA Conference, Chicago, Illinois, October 1995.

"Information Management for Compliance," LM-A&WMA Conference, Argonne National Laboratory, December 1994.

"Risk Communication," Leonard Rader Workshop, Rosemont, Illinois, October 1994.

"Innovative Technology Monograph," American Academy of Environmental Engineers, Arlington Heights, Illinois, September 1994.

"Hazardous Waste: The RCRA Requisitions," American Industrial Hygiene Conference Professional Development Course, Anaheim, California, May 1994.

"Resolving the IAQ Ambiguities," American Industrial Hygiene Symposium, Anaheim, California, May 1994.

"Strategic Assessment of Cleanup Alternatives," PHE/SFS Seminar, Washington, DC, April 1994.

"Asbestos Research Symposium," HEI-AR, Boston, Massachusetts, March 1993.

"RCRA Update: Using the CAMU," LM-A&WMA Conference, Chicago, Illinois, February 1993.

"Risk Assessment for Soil Contamination," University of Wisconsin Extension, Milwaukee, Wisconsin, May 1992.

"In-Situ Soil Remediation Techniques for Petroleum Products and Other Hazardous Waste," University of Wisconsin Extension, Denver, Colorado, April 1992.

"Pathway Analysis and Risk Assessment for Environmental Compliance and Dose Reconstruction," Radiological Assessments Corporation, Kiawah Island, South Carolina, March 1992.

"Biological Monitoring for Detection and Quantification of Chemical Exposures," American Industrial Hygiene Conference Professional Development Course, May 1991.

"Retrospective Epidemiology," National Cancer Institute, Leesburg, Virginia, March 1990.

"Asbestos Measurement Research and Laboratory Accreditation," ASTM Committee D-22 Symposium, Johnson State College, Johnson, Vermont, July 1988.

"Occupational Cohort Studies," American Industrial Hygiene Conference Professional Development Course, May 1988.

"Principles and Practices of Asbestos Abatement," University of Illinois, MAJC, Chicago, Illinois, March 1988.

"AHERA Building Inspection and Management Planning," University of Illinois, MAJC, Chicago, Illinois, March 1988.

Boelter & Yates
N O T E S

Mar-03-34   10:37am   From-

T-411   P.028/071   F-247

Curriculum Vitae - Frederick W. Boelter
June 1999
Page 4

"Indoor Air Quality," Air Pollution Control Association, Chicago, Illinois, November 1985.

"The Indoor Environment," American Institute of Architects, Chicago, Illinois, October 1985.

"Indoor Pollution – The Architect's Response," American Institute of Architects, San Francisco, California, November 1984.

"Hazardous Spill Cleanup," The Center for Professional Advancement, Chicago, Illinois, June 1984.

"Groundwater Compliance: Designing, Installing and Operating Groundwater Wells," Center for Energy and Environmental Management, Chicago, Illinois, September 1983.

"Industrial Ventilation," Michigan State University, East Lansing, Michigan, February 1980.

"Recognition, Evaluation and Control of Noise Hazards," OSHA Training Institute, Des Plaines, Illinois, September 1978.

"Respirator Training," OSHA Training Institute, Des Plaines, Illinois, June 1978.

"Radiation Safety," Northwestern University, Evanston, Illinois, June 1972.

"Energy Management for Manufacturing Plants," University of Wisconsin, Madison, Wisconsin, November 1977.

"Hazardous Materials and Compressed Gases," OSHA Training Institute, Des Plaines, Illinois, September 1977.

"Principles and Practices of Industrial Toxicology," Wayne State University, Detroit, Michigan, June 1977.


TEACHING AND SPEAKING ENGAGEMENTS:

June 1999   "Ventilation Changes Which Resolved IAQ, Energy, and Operational Difficulties in a Printing Facility," American Industrial Hygiene Conference & Exposition, Toronto, Canada.

June 1999   "Mansard-style Roof Parapets Create Turbulence and Airflow Restrictions – Which Can Allow Contaminant Reentry," American Industrial Hygiene Conference & Exposition, Toronto, Canada.

December 1998   "Design and Construction Tactics under TACO and Projected Costs," Air & Waste Management Association, Chicago, Illinois.

June 1998   "Update on Risk-Based Corrective Action Approaches," American Bar Association-Environmental Subcommittee Meeting, Chicago, Illinois.

May 1998   "Fiber Release Rates from Asbestos-Containing Gaskets and Packings Found in Select Industrial and Maritime Fixtures," American Industrial Hygiene Conference & Exposition, Atlanta, Georgia.

Boelter & Yates
N O T E

Curriculum Vitae – Frederick W. Boelter
June 1999
Page 5

June 1997        "Four Different Techniques for Projecting Costs of Environmental Unbiased
                 Preliminary Range, Comparison of Competing Alternatives, Task Analysis for
                 a Specific Objective, and Probabilistic Analysis of Alternatives," Air & Waste
                 Management Conference, Toronto, Ontario, Canada.

June 1997        "Using Risk-Based Cleanup Objectives as a Basis to Assess Financial Risk and
                 Negotiate a Real Property Transfer at a Former Industrial Site with DNAPL
                 Contaminated Soils and Groundwater," Air & Waste Management
                 Conference, Toronto, Ontario, Canada.

May 1997         "Conflict in Laboratory Ventilation Systems: Similarities in the Upgrade
                 Needs of Three Laboratories," American Industrial Hygiene Conference &
                 Exposition, Dallas, Texas.

May 1997         "Historical Asbestos Exposure Assessment Creating and Testing a 30 Year
                 Old, Discontinued Product," American Industrial Hygiene Conference &
                 Exposition, Dallas, Texas.

March 1997       "Brownfields Redevelopment," Air & Water Management Association,
                 Chicago, Illinois.

March 1997       "Environmental Issues in High Rise Buildings," CCHRB, Chicago, Illinois.

March 1997       "Managing an Environmental Crisis", ABA Toxic & Hazardous Substances
                 and Environmental Law Committee Meeting, Phoenix, Arizona.

February 1997    "Contaminated Site Remediation," Air & Waste Management Association,
                 Chicago, Illinois.

November 1996    "Cost Allocation & Analysis of Environmental Compliance," Chicago Bar
                 Association, Chicagoland Chamber of Commerce, Air & Waste Management
                 Association, Chicago, Illinois.

June 1996        "Evaluation of Chlorinated Solvents in Groundwater: Remediation Cost
                 Allocation and Redevelopment of an Industrial Site," A&WMA Conference,
                 Nashville, Tennessee.

March 1996       "Update on ISO 14000 and Risk Based Property Transfers," National
                 Association of Real Estate Investment Managers Symposium, Dallas, Texas.

January 1995     "Clean Air Act Amendments – Maximizing Flexibility in Federal Operating
                 Permits," ASHRAE Conference, Chicago, Illinois.

November 1994    "Operating Ventilation Systems," Navistar/UAW Conference, Indianapolis,
                 Indiana.

September 1994   "SEC Disclosure Rules: Using Alternative Engineering Costs," LM-A&WMA,
                 Chicago, Illinois.

March 1994       "RCRA Update: SACM SE/CA and NCP RI/FS Processes," Conference Chair
                 LM-A&WMA, Chicago, Illinois

November 1993    "Enforcement Trends Conference," Co-Chair LM-A&WMA, Chicago, Illinois.

Mar-02-04   10:37am   From-                                          T-471   P.030/071   F-246

Curriculum Vitae - Frederick W. Boelter
June 1999
Page 6

September 1993    "Applying Science to Environmental Solutions - Applying Innovative
October 1993      Technologies," EEI Seminar, Washington, DC and Chicago, Illinois.

April 1993        "Update on Environmental Issues," Three Rivers Manufacturers' Association,    Boelter & Yates
                  Joliet, Illinois.                                                            N O T E

January 1993      "Clean Air Act Amendments – Title V: Permitting," ASHRAE Conference,
                  Chicago, Illinois.

November 1992     "Developing a Corporate Environmental Policy," American Institute of
                  Architects – Chicago Chapter, Chicago, Illinois.

October 1992      "Indoor Air Quality by Design – Case Studies," Chicago Committee on High
                  Rise Buildings, Chicago, Illinois.

September 1992    "Design Considerations for Safety and Hazardous Conditions in
                  Laboratories," University of Wisconsin, College of Engineering, Novi,
                  Michigan.

April 1992        "Case Studies in Evaluating Remediation Alternatives and Assessing Financial
                  Risk," National Association of Real Estate Investment Managers Symposium,
                  Milwaukee, Wisconsin.

January 1992      "Environmental Engineering in the Former USSR," Air & Waste Management
                  Association Conference, Chicago, Illinois.

December 1991     "Visibly Underground," Jenkens & Gilchrist Seminar, Dallas, Texas.

November 1991     "Construction Contracts and Specifications," University of Wisconsin,
and 1992          College of Engineering, Madison, Wisconsin.

January 1991      "Environmental Update: OSHA, AHERA and NESHAP," Chicago Bar
                  Association, Chicago, Illinois.

November 1990     "Indoor Air Evaluations," International Council of Shopping Centers, Fort
                  Lauderdale, Florida.

November 1990     "Environmental Considerations in Real Estate Management," Institute of Real
                  Estate Management, New Orleans, Louisiana.

September 1990    "Indoor Environmental Problems and Solutions," Illinois Facility Managers
                  Association, Chicago, Illinois.

June 1990         "Industrial Hygiene Considerations during Auditing," Amoco Corporation,
                  Westmont, Illinois.

April 1990        "Advanced Commercial Loan Documentation," Illinois Bankers Association,
                  Urbana and Arlington Heights, Illinois.

February 1990     "Commercial Loan Workouts," Mortgage Bankers Association, National
                  Conference, Orlando, Florida.

February 1990     "Environmental Audit Trends in the Lending Community," Mortgage Bankers
                  Association, National Conference, San Diego, California.

Mar-03-04  10:38am  From-                                                    T-411  P.031/071  F-245

Curriculum Vitae - Frederick W. Boeker
June 1999
Page 7

| | |
|---|---|
| January 1990 and 1991 | "Current and Future Environmental Responsibilities," Office of Real Estate Research, University of Illinois, Hyatt Hotel, Oak Brook, Illinois. |
| August 1989 | "Indoor Air Quality Problems and Phased Investigations," BOMA, Chicago, Marriott Hotel, Chicago, Illinois. |
| May 1989 | "Investing in Properties with Environmental Risks," The Institute for Professional and Executive Development, Inc., Washington, D.C. |
| April 1989 | "Contaminated Real Estate: Keeping the Deal Alive," Midland Hotel, Chicago, Illinois. |
| March 1989 | "Quantifying Environmental Risks," Mortgage Servicing Workshop, National Council of Savings Institutions, Philadelphia, Pennsylvania. |
| February 1989 | "Environmental Audits: Case Studies," National Income Properties Conference, MBA Conference, Orlando, Florida. |
| November 1988, April 1989 | "Commercial Real Estate Construction Loan Disbursement," Executive Enterprises, Chicago, Illinois. |
| October 1988 | "Environmental Liability – Limiting the Lender's Exposure," Hyatt Regency, Chicago, Illinois. |
| September 1988 | "Environmental Audits – A Phased Approach," National Association of Savings Institutions, Washington, D.C. |
| July 1988, August 1988 | "Transmission Electron Microscopy: A Consumer's Guide," University of Illinois, MAIC, Chicago, Illinois. |
| June 1988 | "Indoor Air Quality – Case Studies," BOMA International, Cincinnati, Ohio. |
| June 1988 | "Environmental Audits," University of Chicago, Chicago, Illinois. |
| January 1987, March 1988 | "Economic Consequences of ACM in Buildings," BOMA International Symposium, Chicago, San Francisco, New York, Sacramento, Toronto. |
| November 1987 | "Developing an Operations and Maintenance Program," HBI Seminar, Chicago, Illinois. |
| November 1987 | "AHERA Compliance," Center for Energy and Environmental Management, Washington, D.C. |
| October 1987 | "Evaluating the Indoor Environment: Occupational Techniques in a Non-Occupational Environment," AIHA Tri-Valley Section Conference, Knoxville, Tennessee. |
| September 1987 | "Environmental Liabilities in Real Estate Transactions," New York University, New York, New York. |
| June 1987 | "Asbestos Recognition and Management," AWCI, Chicago, Illinois. |
| June 1987 | "Correlating PCM and TEM Data – A Statistical Comparison," AIHA Conference, Montreal, Canada. |

Mar-03-04  10:29am  From-                                              T-411  P.032/071  F-246

Curriculum Vitae - Frederick W. Boelter
June 1989
Page 8

| | |
|---|---|
| June 1987 | "Contaminant Migration via Stack Effect in High Rise Buildings," AIHA Conference, Montreal, Canada. |
| June 1987 | "Particulate in Operating Room Air and Nosocomial Infection-Rates," AIHA Conference, Montreal, Canada. |
| May 1987 | "Indoor Air Quality," CSUAIA Seminar, Chicago, Illinois. |
| March 1987 | "Stack Effect in High Rise Buildings," ASHRAE Conference, Washington, DC. |
| March 1987 | "Community Right-to-Know Programs," American Society of Safety Engineers, Rockford, Illinois. |
| February 1987 | "Implementing ACM Management Programs," AIHA Sectional Meeting, Knoxville, Tennessee. |
| January 1987 | "Industrial Hygiene Programs," Self Insurers Service, Phoenix, Arizona. |
| January 1987 | "Operation and Maintenance Programs: An Alternative to Removal," National Asbestos Council, Chicago, Illinois. |
| January 1987 | "OSHA Regulations, Air Sampling Techniques, and Laboratory Qualifications," AWCI World Congress, Washington, DC. |
| November 1986 | "Developing and Administering Right-to-Know Programs," Health Care Material Management Society, Elmhurst, Illinois. |
| November 1986 | "Asbestos Inspection and Abatement Options," Illinois Environmental Health Association, Springfield, Illinois. |
| September 1986 | "AIHA Inter-Committee Report on Asbestos," National Asbestos Council, New Orleans, Louisiana. |
| February 1986 | "Asbestos Evaluation and Management," AIHA Sectional Seminar, Chicago, Illinois. |
| 1986 and 1987 | "Identifying Asbestos Hazards and Preparing Contract Documents," MAIC, Chicago, Illinois. |
| August and September 1985 | "Asbestos Abatement," Veterans Administration, Engineering Training Center, North Little Rock, Arkansas. |
| July and December 1965 | "Hazardous Waste Sites: Respiratory and Other Protective Equipment," Clean Sites, Alexandria, Virginia. |
| January 1985 | "Asbestos Rules and Regulations," Illinois Institute of Technology, Chicago, Illinois. |
| December 1984 | "Asbestos Hazards and Abatement Techniques," Veterans Administration, Minneapolis, Minnesota. |
| Annually May 1983 thru 1991 | "Evaluating and Troubleshooting Exhaust Ventilation Systems," American Industrial Hygiene Association, Professional Development Course |

Boelter & Yates
N O T E

Mar-05-04   10:38am   From-                                                                T-411   P.035/071   F-245

Curriculum Vitae - Frederick W. Boelter
June 1999
Page 9

1980 to 1985          "Fundamentals of Industrial Ventilation," National Loss Control Service
                      Corporation, Long Grove, Illinois.

January to May        "Introduction to Industrial Hygiene", Joliet Junior College, Joliet, Illinois.
1979 and 1980

Boelter & Yat...
N O T E

PROFESSIONAL AFFILIATIONS:

- Air & Waste Management Association (A&WMA)
- American Academy of Environmental Engineers (AAEE)
- American Academy of Industrial Hygiene (AAIH)
- American Conference of Governmental Industrial Hygienists (ACGIH)
- American Industrial Hygiene Association (AIHA)
- American Society of Heating, Refrigerating and Air-Conditioning Engineers (ASHRAE)
- American Society of Testing Materials (ASTM)
- Association of Engineering Firms Practicing in the Geosciences (ASFE)
- Building Owners & Managers Association (BOMA)
- Council for Accreditation in Occupational Hearing Conservation (CAOHC)
- Environmental Information Association (EIA) (formerly National Asbestos Council (NAC))
- Institute for Professional Environmental Practice (IPEP)
- Mortgage Bankers Association (MBA)
- RBCA Leadership Council

COMMITTEE AND BOARD MEMBERSHIPS:

Air & Waste Management Association (A&WMA) (Lake Michigan Section)
    Board of Directors - 1992 to 1999
    Treasurer - 1994 to 1996
    Vice Chair - 1996 to 1997
    Chair - 1997 to 1998

American Industrial Hygiene Association (Chicago Section)
    Board of Directors - 1984 to 1986

American Industrial Hygiene Association (National)
    Engineering Committee - Member 1963 to 1968 - Chair 1966 to 1967
    Hazardous Waste Committee - Member 1983 to 1987
    Indoor Air Quality Committee - Member 1986 to 1988
    Intercommittee Asbestos Task Force - Co-Chair 1985 to 1986
    Laboratory H&S Committee - Member 1996 to 1998

American Institute of Architects (National)
    Environmental Committee

American Society of Heating, Refrigerating, and Air-Conditioning Engineers
    Environmental Committee
    ISO/TC 205 Building Environment Design

American Society of Testing Materials
    D-22.05 Committee on Indoor Contaminants

Building Owners and Managers Association (National)
    Indoor Air Quality Committee

Mar-03-04   10:38am   From-                                    T-411   P.034/071   F-246

Curriculum Vitae - Frederick W. Boelter
June 1999
Page 10

Mortgage Bankers Association (MBA)
    Executive Committee on Environmental Matters

Environmental Information Association (EIA) (formerly National Asbestos Council (NAC))
    Past Chair - Surface Sampling Committee

National Institute for Occupational Safety and Health
    1986 Peer Review Panel on Respiratory Protection for Asbestos Fibers

U.S. Environmental Protection Agency - Risk Reduction Engineering Laboratory
    1988 Peer Review Panel on Asbestos Issues

Boelter & Yates
N O T E

EXHIBIT N

Dr. Richard J. Lee, after being duly sworn upon his oath, say as follows:

1.    I am a microscopist and materials scientist.  A copy of my curriculum vitae is attached as Exhibit
A.

2.    I am the President of RJ Lee Group, Inc. located in Monroeville, Pennsylvania.  I have been
president of RJ Lee Group (formerly Energy Technology Consultants) since 1985.  RJ Lee Group is a
high technology company providing analytical and consulting services related to materials
characterization.

3.    In preparation for this statement, I have reviewed the following materials:

A.    Materials Analytical Services, Inc. (2000).  Gasket Removal Scraping and
Handwire Brushing Work Practice Study II, April 2000.

B.    Materials Analytical Services, Inc. (1999).  Removal and Replacing Valve
Packing Work Practice Simulation II, November 1999.

C.    Materials Analytical Services, Inc. (1999).  Removal and Replacing Valve
Packing Work Practice Simulation III, November 1999.

D.    Various videotapes of the above simulations and studies.

4.    The standard and adopted occupational exposure assessment methodologies require the use of
validated scientific air sampling and analytical methods.

5.    For the purposes of occupational exposure determination in asbestos, the Department of Labor's
Occupational Safety and Health Administration (OSHA) has established an 8-hour time weighted average
permissible exposure limit (PEL) of 0.1 f/ml.  This PEL is established for measuring fibers with the use of
the phase contrast microscope (PCM) in accordance with the OSHA Reference Method, NIOSH 7400, or
OSHA method ID 160.  These methods address air sampling, filter preparation, and fiber counting rules.

6.    In each method and as stipulated in OSHA regulations, air samples are collected on mixed
cellulose ester filters using known sample collection times and specified flow rates.  The samples are
prepared for analysis using "direct" preparation techniques.

7.    Under limited circumstances where fibers other than asbestos are suspected to be airborne,
OSHA permits the use of transmission electron microscopy to determine the percentage of airborne fibers

NIOSH method 7402, a "direct" preparation method.

8.      The sole use of the TEM method of counting asbestos fibers, either using the "direct" or "indirect" method of sample preparation, is not the appropriate method for occupational measurement of airborne asbestos fibers in the workplace and/or assessing risk in this regard.

9.      "Direct" sample preparation is defined as tacking a section of air filter membrane and placing it directly onto a microscope slide for PCM analysis and/or electron microscope grids for TEM analysis. This filter membrane is not diluted or placed into an aqueous suspension for re-filtration. Therefore, the membrane and any particles collected on its surface are viewed as they impacted on the membrane.

10.     No provisions are made in the OSHA methods for "indirect" sample preparation. "Indirect" sample preparation is defined as taking an air sample membrane and placing the collected airborne contents of the membrane and the contents itself into an aqueous suspension. The suspension is then ultrasonically treated to disassociate aggregated particulate (including asbestos bundles, clusters, and matrices) and disperse it throughout the suspension. An aliquot of the suspension with sampled particulate is then re-filtrated-deposited onto another filter membrane. This membrane is then mounted onto a microscope slide or TEM grid for analysis. Numerous other investigators have shown that the use of ultrasonication would break asbestos structures down into more discrete particles rendering the sample structure count higher than what is captured on the original filter. "Indirect" preparation changes the morphology of the structures resulting in an artificially higher structure or fiber count.

11.     The methods, using the required "direct" sample preparation technique, have been statistically validated and are deemed reliable and relevant to occupation exposure determinations. The "indirect" sample preparation technique has not been statistically validated and is not recognized by OSHA as a valid method for occupational exposure assessments.

12.     Acceptable industrial hygiene practice for the determination of fiber-in-air exposure is through collection of the airborne particulate on a membrane filter, followed by PCM analysis. The use of stage lighting or other artificial lighting techniques, including so-called Tyndall lights, provides no information concerning the size, type, or concentration of airborne particles. The use of these stage lights creates a buoyancy permitting particulate to remain airborne for a longer period of time, thereby artificially inflating fiber counts. These lights also do not selectively illustrate actual respirable particles.

13.     Acceptable industrial hygiene practice for the determination of fiber-in-air exposure requires air sampling, not the collection and analysis of surface dusts or clothing. There are no regulations governing asbestos on clothing, nor is there any correlation between airborne asbestos concentrations and the concentration of asbestos in either surface dusts or on clothing. The analysis of surface dusts and

NIOSH method 7402, a "direct" preparation method.

8.    The sole use of the TEM method of counting asbestos fibers, either using the "direct" or "indirect" method of sample preparation, is not the appropriate method for occupational measurement of airborne asbestos fibers in the workplace and/or assessing risk in this regard.

9.    "Direct" sample preparation is defined as exciting a section of air filter membrane and placing it directly onto a microscope slide for PCM analysis and/or electron microscope grids for TEM analysis. The filter membrane is not diluted or placed into an aqueous suspension for refiltration. Therefore, the membrane and any particles collected on its surface are viewed as they impacted on the membrane.

10.    No provisions are made in the OSHA methods for "indirect" sample preparation. "Indirect" sample preparation is defined as taking an air sample membrane and placing the collected airborne contents of the membrane and the contents fixed into an aqueous suspension. The suspension is then ultrasonically treated to disassociate aggregated particulate (including asbestos bundles, clusters, and matrices) and disperse it throughout the suspension.   An aliquot of the suspension with sampled particulate is then re-filtered/re-deposited onto another filter membrane. This membrane is then mounted onto a microscope slide or TEM grid for analysis. Numerous other investigators have shown that the use of ultrasonication would break asbestos structures down into more discrete particles rendering the sample structure count higher than what is captured on the original filter.   "Indirect" preparation changes the morphology of the structures resulting in an artificially higher structure or fiber count.

11.    The methods, using the required "direct" sample preparation technique, have been statistically validated and are deemed reliable and relevant to occupation exposure determinations. The "indirect" sample preparation technique has not been statistically validated and is not recognized by OSHA as a valid method for occupational exposure assessments.

12.    Acceptable industrial hygiene practice for the determination of fiber-in-air exposure is through collection of the airborne particulate on a membrane filter, followed by PCM analysis. The use of stage lighting or other artificial lighting techniques, including so-called Tyndall lights, provides no information concerning the size, type, or concentration of airborne particles.   The use of these stage lights creates a buoyancy permitting particulate to remain airborne for a longer period of time, thereby artificially inflating fiber counts. These lights also do not selectively illustrate actual respirable particles.

13.    Acceptable industrial hygiene practice for the determination of fiber-in-air exposure requires air sampling, not the collection and analysis of surface dusts or clothing. There are no regulations governing asbestos on clothing, nor is there any correlation between airborne asbestos concentrations and the concentration of asbestos in either surface dusts or on clothing.   The analysis of surface dusts and

cloning, as conducted by some of the parties in this case, both involve the "indirect" preparation procedure. The data generated by this procedure are not relevant to airborne fiber concentrations.

*Dr. Richard L. Lee*

Subscribed and sworn to before me this 9th day of June, 2000.

*Notary Public*

KATHERINE HIGGINS
Commission # 1213456
Notary Public - California
Los Angeles County
My Comm. Expires Jan 17, 2004

Appendix ...

Richard J. Lee

Affiliation:   RJ Lee Group, Inc.
               350 Hochberg Road
               Monroeville, PA 15146

Education:     Ph.D., Theoretical Solid State Physics, 1970, Colorado State University
               B.S. Physics, 1966, University of N. Dakota

Career/Employment:
- RJ Lee Group, Inc., President, 1986 - Present
- U. S. Steel Technical Center, Head - Physics, Electron Microscopy and Surface Analysis Section, 1972 - 1985
- Purdue University, Associate Professor, 1971
- Purdue University, Assistant Professor, 1970
- Lake Region Junior College, Instructor, 1966

Summary:
- Development and application of quantitative computer-controlled electron microscopy techniques
- Pioneered the use of quantitative electron diffraction techniques for the identification of asbestos
- Development of automated techniques for combined X-ray microanalysis and electron microscopy
- Development of automated electron diffraction pattern analysis techniques and applications to environmental problems, asbestos analysis, and mineral characterization, and quantitative crystallography.

Honors, Awards, Fellowships & Memberships:
- Microbeam Analysis Society (Board of Directors 1977 - 1980)
- Microscopy Society of America
- Air & Waste Management Association
- ASM International
- ASTM Committee D-22
- American Physical Society
- American Chemical Society
- American Concrete Institute
- Materials Research Society
- Society for Mining, Metallurgy, and Exploration, Inc.
- International Standards Organization
- Health Effects Institute's Asbestos Research Literature Review Panel
- EPA Scientific Review Panel on Air Chemistry and Physics (1983)
- EPA Select Panel for Development of Methodology for Asbestos Analysis by Transmission Electron Microscopy (1987-Present)
- Advisor on asbestos analysis to the Environmental Protection Agency
- External Advisory Committee for the College of Natural Sciences, Colorado State University
- National Defense Education Act Fellowship - 4 years
- Small Business Administration's 1981 Entrepreneurial Success Award
- 1981 Western Pennsylvania/Tri State Entrepreneur of the Year Award

Publications:
- Number of papers in refereed journals - 17
- Number of communications to scientific meetings - 76
- Books/Chapters - 3
- Invited Technical Papers - 16

Page 3

EXHIBIT O

RICHARD GREATHOUSE

Page 1

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2          FOR THE COUNTY OF LOS ANGELES (Central District)

3

4    RICHARD BOYD GREATHOUSE,      )(
     et al.,                        )(
5         Plaintiffs,               )(
                                     )(
6    VS.                            )(   CASE NO. BC328461
                                     )(
7    AMPCO-PITTSBURGH CORPORATION,  )(
     et al.,                        )(
8         Defendants.               )(
9

10

11            VIDEOTAPED ORAL DEPOSITION OF

                 RICHARD BOYD GREATHOUSE

12                  JUNE 27, 2005

13                   VOLUME 1

14

15

16

17         ORAL DEPOSITION OF RICHARD BOYD GREATHOUSE, produced as a

18   witness duly sworn by me at the instance of Plaintiffs, taken

19   in the above-styled and -numbered cause on the 27th day of

20   June, 2005, from 10:00 a.m. to 1:50 o'clock p.m., before

21   JENNIFER L. CALDWELL, Certified Shorthand Reporter No. 255 in

22   and for the State of Idaho, located at Caldwell Inn Suites, 908

23   Specht, Caldwell, Idaho, pursuant to the California Rules of

24   Civil Procedure and the provisions stated on the record or

25   attached therein.

RICHARD GREATHOUSE

Page 134

1    were tied up at dock, did you ever see any type of auxiliary

2    boiler used to provide heat or hot water or steam for either

3    your ship or any ships that might have pulled up alongside your

4    tender?

5        A.      No.

6        Q.      Sir, at any time that you were aboard the Nereus,

7    did you ever have to clean up areas where such equipment such

8    as a pump or a valve might be in operation?

9        A.      Not that I recall.

10        Q.      Any insulated surfaces would have been limited to

11   piping insulation, correct?

12        A.      Yeah, right.

13        Q.      Did you ever see anybody perform work -- Well,

14   strike that.

15              Did you ever perform any work to either a pump or a

16   valve or a compressor while you were on the Nereus?

17        A.      No.

18        Q.      Did you ever see anyone in your presence either

19   break down or make repairs to a pump on the Nereus?

20        A.      No.

21        Q.      While you were on the Nereus, did you ever see

22   anyone break down or make repairs to a valve?

23        A.      No.

24        Q.      While you were on the Nereus, did you ever see

25   anyone break down or make repairs to a compressor?

RICHARD GREATHOUSE

Page 135

1    A.    No.

2    Q.    Sir, do you know what gaskets are?

3    A.    Yep.

4    Q.    What is a gasket?

5    A.    Gasket is what they keep the water from leaking out.

6    Q.    Did you ever work with any gaskets?

7    A.    No.  It wasn't my rate.

8    Q.    Did you ever see anybody else working with gaskets

9    aboard the Nereus while you were there?

10   A.    No.

11   Q.    Sir, do you know what packing materials are?

12   A.    Yeah.  That's -- They go into valves.

13   Q.    Did you ever work with any packing material?

14   A.    No.

15   Q.    Did you ever see anyone in your presence aboard the

16   Nereus either remove, disturb, or install any packing

17   materials?

18   A.    No.

19   Q.    Sir, were there any turbines aboard that vessel?

20   A.    I have no idea.

21   Q.    Do you have any knowledge if there were any furnaces

22   aboard that vessel?

23   A.    What do you --

24   Q.    Any type of heat source other than a turbine.  I

25   don't think there would be one, but I've just got to ask you

RICHARD GREATHOUSE

Page 162

1

2                        C E R T I F I C A T E

3       I, JENNIFER L. CALDWELL, CSR NO. 255 in and for the State
of Idaho, do hereby certify:

4       That the foregoing deposition of RICHARD BOYD GREATHOUSE
was taken before me and completed on JUNE 27, 2005, and
5    thereafter transcribed under my direction; that the deposition
transcript is a full, true, and accurate translation of the
6    testimony of said witness, including all questions, answers,
objections, and exceptions;
7
        That the witness, before examination, was by me duly
8    sworn to testify the truth, the whole truth, and nothing but
the truth; that the witness reserved signature.
9
        That I am not a relative, employee, attorney, or  counsel
10   of any party to the action or a relative or employee of any
such attorney or counsel, and I am not financially interested
11   in the said action or the outcome thereof;
12      That I am herewith securely sealing the deposition
transcript of RICHARD BOYD GREATHOUSE and delivering the same
13   to SCOTT MORRISON of BARON & BUDD, counsel for Plaintiffs.
14      IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my official seal this 7th day of July, 2005.
15

16

17

18

19                  JENNIFER L. CALDWELL
                    Certified Shorthand Reporter in and for
                    the State of Idaho
20                  Expiration Date:  6/24/06
21                  HENJUM GOUCHER REPORTING SERVICES
                    Firm No:  Dallas, 69; Houston, 373
22                  2501 Oak Lawn Avenue, Suite 435
                    Dallas, Texas 75219
23                  (214) 521-1188, Office
                    (214) 521-1034, Fax
24                  1-888-656-DEPO, Toll Free
25

RICHARD GREATHOUSE

1    GREATHOUSE v. AMPCO-PITTSBURG, et al.      Page 163

       Cause Number:  BC3328461

2    Deponent:  RICHARD BOYD GREATHOUSE

       Reporter:  Jennifer L. Caldwell, ID CSR 255

3

4                  SIGNATURE

5    I declare, under penalty of perjury under the laws of the
State of Idaho, that I have read my within deposition and the
6    same is true and accurate except for changes and/or
corrections, if any, as indicated by me below.

7

       Signed in              , Idaho, on the
8           day of            , 2005.

9

10          RICHARD BOYD GREATHOUSE

11

          CHANGES AND/OR CORRECTIONS

12

13  Page No. Line No.      Change and/or Correction

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 1

Mar-02-04 '10:18am From-                                   T-410  P.034/064  F-244

## In The Matter Of:

*RUSSELL SMITH & PATSY SMITH, et al. v.*

*ABLE SUPPLY CO., et al.*

*RICHARD L. HATFIELD*
*December 5, 2000*

*BROWN REPORTING, INC.*
*ATLANTA, AUGUSTA, ROME & SAVANNAH*
*1740 PEACHTREE STREET, N.W.*
*ATLANTA, GA  USA  30309*
*(404) 876-8979   or   (800) 637-0293*

Original File 1205EATEASC, 273 Pages
Min-U-Script® File ID: 0577129378

**Word Index included with this Min-U-Script®**

EXHIBIT
"2"

Mar-03-04   10:19am   From-                                    T-410  P.035/054  F-244

RUSSI L SMITH & PATS SMITH, et al. v.
ABLE SUPPLY CO., et al.

Page 79

[1]      A: Yes.

[2]      Q: What was that reason?

[3]      A: In general, we don't provide PCM counts

[4] for clients or persons in general. The PCM work

[5] that we have done generally has been for our own

[6] work and not for outside people, and we just haven't

[7] been providing that, so we didn't have that as an

[8] integral part of our QC.

[9]      Q: So it is safe to say that with respect to

[10] all the Work Practice Studies involving gaskets and

[11] packing, nobody has double-checked those counts as

[12] part of your quality assurance program, correct?

[13]      A: I don't believe that that was part of our

[14] program at that time.

[15]      Q: And neither you nor Dr. Longo — well,

[16] let me rephrase that.

[17]      Neither you nor Dr. Longo have gone back

[18] and conducted any recounts of the PCM slides for the

[19] Work Practice Studies involving gaskets or packing,

[20] correct?

[21]      A: That is correct.

[22]      Q: Although you would regard Dr. Longo as a

[23] microscopist capable of conducting a PCM count?

[24]      A: I guess so. I don't know that he has

[25] done that routinely, so I don't know. I reserve

Mar-05-04   10:19am   From-                                          T-418   P.035/054   F-344

272

CERTIFICATE

STATE OF GEORGIA:
COUNTY OF FULTON:

I hereby certify that the foregoing
transcript was taken down, as stated in
the caption, and the questions and answers
thereto were reduced to typewriting under
my direction; that the foregoing pages 1
through 271 represent a true, complete, and
correct transcript of the evidence given
upon said hearing, and I further certify
that I am not of kin or counsel to the
parties in the case; am not in the regular
employ of counsel for any of said parties;
nor am I in anywise interested in the result
of said case.

This, the 10th day of December, 2000.

_Frances Buono_
FRANCES C. BUONO, CCR-B-791
My commission expires on the
25th day of April, 2003.

Mar-05-04   10:19am   From-                                        T-410   P.037/064   F-244

273

1                    COURT REPORTER DISCLOSURE

2    DEPOSITION OF: RICHARD L. HATFIELD

3          Pursuant to Article 8.B. of the Rules and
4    Regulations of the Board of Court Reporting of the
     Judicial Council of Georgia which states: "Each
5    court reporter shall tender a disclosure form at the
     time of the taking of the deposition stating the
6    arrangements made for the reporting services of the
     certified court reporter, by the certified court
7    reporter, the court reporter's employer, or the
     referral source for the deposition, with any party
8    to the litigation, counsel to the parties or other
     entity. Such form shall be attached to the
9    deposition transcript," I make the following
     disclosure:

10         I am a Georgia Certified Court Reporter. I am
     here as a representative of Brown Reporting, Inc.
11         Brown Reporting was contacted by the offices of
     Whittenburg, Whittenburg & Schachter, P.C.
12   to provide court reporting services for the
     deposition. Brown Reporting will not be taking this
13   deposition under any contract that is prohibited by
     O.C.G.A. 15-14-37(a) and (b).
14         Brown Reporting has no contract/agreement to
     provide reporting services with any party to the
15   case, any counsel in the case, or any reporter or
     reporting agency from whom a referral might have
16   been made to cover this deposition. Brown Reporting
     will charge its usual and customary rates to all
17   parties in the case, and a financial discount will
     not be given to any party to this litigation.

18   /s/ *Frances Bueno*

19   /s/ Frances Bueno, CCR-B-791          12/5/00

20   Signature of attorneys present:       Date:

21   _____        _____

22   _____        _____

23   _____        _____

24   _____        _____

25   Return this form after review and/or signatures to
     the court reporter for inclusion in the record.
     Please use reverse side for additional signatures.

EXHIBIT P

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK:TRIAL TERM PART 2
 2   ---------------------------------------
 3   RUTH HOSK, as personal representative
 4   of the estate of GENE HOSK, Deceased.

                            Plaintiff,
 5
                 -against-
 6
     ALLIEDSIGNAL, INC., RAPID-AMERICAN   :Index No.
 7   CORPORATION, RAYMRK FRICTION COMPANY.:117057-97
     RAYMARK INDUSTRIES, INC., U.S.
 8   MINERAL PRODUCTS COMPANY, AND W.R.
     GRACE & CO., CONN. UNIVERSAL
 9   FRICTION COMPOSITES, INC., (As
     Successor to RAYMARK FRICTION COMPANY,
10   and RAYBESTOS-MANHATTAN, INC.).

11                           Defendants.
12   ---------------------------------------
13                            80 Centre Street
14                            New York, New York
                              March 16, 1999
15
16                   Excerpt of Testimony
                     Edward Longo, Ph.D.
17
     B E F O R E :
18
          THE HON. LOUIS B. YORK, JSC
19
                  and Jury
20

21

22

23
     Sara C. Stanley, CSR RPR
24   (212) 374-8133

25
```

```
                        Dr  Longo-Plaintiff-Cross

 2   would be the rosins?

 3         A.     Yes, sir.

 4         Q.     Binders?

 5         A.     If present, yes, sir.

 6         Q.     The fillers?

 7         A.     Yes, sir.

 8         Q.     And what other material?

 9         A.     And the asbestos.

10         Q.     And what else?

11         A.     That's about it.

12         Q.     That's about it.  All right.  Would

13   you agree, Dr. Longo, that the video that was

14   shown to this jury does not differentiate the

15   asbestos dust from the dust created by the

16   binders, versus the dust created by the fillers,

17   versus the dust created by the rosins, versus the

18   dust created by the graphites, and the dust

19   created by whatever else is in there?

20         A.     At this point we have not tried to

21   differentiate it.

22         Q.     So the answer is, no?

23         A.     Well, the answer is, no, we haven't

24   differentiated yet, if we can.  But what you're

25   seeing is a mixture of it all and I've admitted
```

A.W. CHESTERTON COMPANY

1     *Richardson v. A.P. Green Industries, Inc., et al.*, Superior Court of San

2     Francisco County, California, March 19, 2003 (Attached hereto as

Exhibit Y.)

3      Judge Diane Elan Wick, in Department 611 of this court has issued standing

4 orders regarding issues frequently raised in asbestos cases, including Order No. 54,

5 which specifically excludes the introduction of the "[v]ideotape demonstrations of

6 work practice simulations performed by the witness or his company." (Attached

7 hereto as Exhibit ZZ.)

8                **III. ARGUMENT**

9      These videotapes will in no way assist the jury in understanding the evidence

10 or resolving the factual issues in this case; in fact, they will only confuse and mislead

11 the jury. The jury will be left with the image of men in spacesuits using improper

12 work practices to manipulate gaskets or packing material under artificial lighting

13 techniques to create as much dust as they possibly can. The jury will more than likely

14 be unable to disregard such a presentation. For the reasons set forth herein, the MAS

15 videotapes must be excluded from evidence at trial as they are scientifically unreliable,

16 irrelevant and because their prejudicial impact far outweighs any probative value from

17 their admission.

18 Dated: July 13, 2003

                               JACKSON & WALLACE LLP

19

20                  By

21                      Allan D. Gutsche

22                      C.J. Manoli

Michele C. Barnes

23                      Attorneys for Defendant

CRANE CO.

24

25

26   V:\2503\Voen-Event-compile-videotapes.wpd

27

28

                                 10

*Motion in Limine to Exclude Videotapes of MAS Work Practice Simulations*

EXHIBIT Q

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CHERYL D. LANDERT          )
                           )
            Plaintiff      )
                           )
                           )   CAUSE NO. IP 94-1540-C-B/G
        -v-                )   Indianapolis, Indiana
                           )   September 11, 2000
JOHN CRANE, INC.           )   10:11 a.m.
                           )
            Defendant      )

Before the
HONORABLE SARAH EVANS BARKER

OFFICIAL REPORTER'S TRANSCRIPT OF HEARING

APPEARANCES:

For the Plaintiff:        Richard P. Myers
                          Paul, Reich & Myers, P.C.
                          1608 Walnut Street, Ste. 500
                          Philadelphia, PA 19103
                                 and
                          Mark Dudley
                          Young, Riley & Dudley
                          277 East 12th Street
                          Indianapolis, IN 46202

For the Defendant:        Daniel J. O'Connell
                          Margaret O'Sullivan Byrne
                          Daniel J. O'Connell & Assoc.
                          217 N. McLean Blvd., Ste. 2C
                          Elgin, IL 60123
                                 and
                          Thomas W. Kayes
                          Law Office of William M. Koziol
                          1 Kemper Drive
                          Long Grove, IL 60049-0001

Court Reporter:           Kathleen Andrews, RPR
                          218 U.S. Courthouse
                          Indianapolis, IN 46204

[Dt (1001)]

LONGO, PH.D.-DIRECT                                    45

1    resuspension of dust from that clothing, correct?

2    A. I don't believe anybody has ever done it, no., but we used

3    an EPA protocol for measuring the contamination on the

4    clothing. So the technique is there to measure it and to get

5    that number, but I don't believe any scientist has now looked

6    at it as we have, as to what gets on the clothing and what is

7    gets to the breathing zone.

8    Q. But you haven't looked at what gets on the clothing and

9    what gets in the breathing zone of anybody who utilizes these

10   gaskets and packing?

11   A. Not in gaskets and packing.  Other materials.

12   Q. In your cases, you utilized what is called a Tyndall beam

13   or Tyndall light?

14   A. Yes, sir.

15   Q. There is no governmental standard indicating that the use

16   of a Tyndall beam or Tyndall light or Tyndall effect is

17   proper to quantitate or qualify asbestos fiber release in an

18   occupational setting?

19   A. No, sir.  I wouldn't expect there to be one.

20   Q. In fact, with respect to this Tyndall beam, which to

21   describe it for the Court is when you do your workplace

22   simulation, you initially do it under what we call room

23   light, regular light?

24   A. That's correct.

25   Q. And then you have theater lights?

(911 XX:X)

LONGO, PH.D.-DIRECT

47

1   A. I don't know if they are theater lights.  They are high

2   intensity lighting, I think somewhere, 750 watts, to get a

3   strong visible light beam.

4   Q. So what you do is turn off the room lights and turn on

5   the high intensity lights?

6   A. Yes, sir.

7   Q. And you've never tested the beam, what's in the beam to

8   determine what the composition of the beam is in terms of the

9   particulate matter that's seen, have you?

10  A. I'm not following your question.

11  Q. Well, the beam will show particulate matter in the beam,

12  correct?

13  A. Correct.

14  Q. And you have not sampled what's in the beam to determine

15  whether or not that's one percent asbestos, zero percent

16  asbestos, 100 percent asbestos, whatever percent?

17  A. No, we have not done a mass weight balance, because you

18  are going to get both asbestos and nonasbestos particulates

19  in there.

20      We've obviously taken air samples in our breathing zone

21  in which the beam is illuminated, and we can tell you if the

22  product releases asbestos, what concentration is in that

23  beam.  But we have not done a mass balance to determine if

24  it's -- say the product is 70 percent chrysotile.  We haven't

25  done a mass balance to see if it's 65 percent by weight in

[ 91(old)]

EXHIBIT R

AUG-29-2001 16:47 FROM:          5182334594          1415 982 6700     P.002/015
FAX NO    14 651 6116                               P. 02

JIM D. LOVETT
DISTRICT JUDGE
6TH JUDICIAL DISTRICT

P.O. BOX 504 • CLARKSVILLE, TEXAS 75426-0504 • 903/427-2274 • FAX 903/427-9004

July 3, 2001

OFFICE OF THE DISTRICT CLERK
LAMAR COUNTY COURTHOUSE
PARIS, TEXAS 75426

RE:   MASTER ASBESTOS LITIGATION FILE

      ORDER RELATING TO DAUBERT/ROBINSON HEARING

Please file the enclosed ORDER with EXHIBIT "A" attached and furnish a copy of the order and exhibit to WATERS & KRAUS for distribution to all parties. A copy order with exhibit should also be furnished to RAY HARRISON, attorney for DEFENDANTS.

Thanks.

Sincerely yours,

LUCILLE LOLLAR
Secretary and Court Coordinator for
JIM D. LOVETT, 6th District Judge

IN THE 6TH DISTRICT COURT IN AND FOR LAMAR COUNTY TEXAS

IN RE: LAMAR COUNTY ASBESTOS LITIGATION CASES FILED OR TO BE FILED BY WATERS & KRAUS IN LAMAR COUNTY, TEXAS

ORDER
Relating to Garlock, Inc. Motion to Suppress Testimony of
Dr. William Longo and Mr. Richard Hatfield
with
Findings of Fact and Conclusions of Law

On June 20, 2001 this matter came on before the court upon a motion filed by Garlock, Inc. to strike Dr. William Longo and Richard Hatfield (Longo-Hatfield) of Materials Analytical Services, Inc. (MAS) from plaintiff's list of expert witnesses. Plaintiff's joined issue and the court on April 23, 2001 issued its Order setting the date for "... a hearing qualification of William Longo and Richard Hatfield under the Daubert/Robinson standards to provide expert testimony involving various products involved in the Lamar County Asbestos Litigation ... all parties affected by the testimony of such witnesses will be bound by the results of the hearings and rulings of the court..."

After announcements of ready the court proceeded with the hearing. The parties waived opening statements, the court received testimony and exhibits from the parties together with final arguments, Plaintiffs tendered the testimony of Dr. Longo for both Dr. Longo and for Mr. Hatfield.

Based upon the testimony, documents and photographs admitted at the hearing and the subsequent review of all the evidence, the court makes the following findings of fact and conclusions of law. Each finding of fact shall also be considered a conclusion of law and each conclusion of law shall also be considered a finding of fact insofar as they in any case clearly delineated as one or the other or possibly involve both.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.    Government and professional association standards promulgated by the Occupational Safety and Health Administration (OSHA), the United States Environmental Protection Agency (EPA), National Institute of Occupational Health and Safety (NIOSH) and the American Society of Testing Materials (ASTM) for measuring airborne asbestos fibers for human exposure, are minimum standards that do not provide a defense for compliance. Such standards do, however, provide reliable source evidence for the intent in understanding generally accepted scientific methodologies and the judicial reliability standards of Daubert/Robinson[1] *fn-unit Rules 401, 402, 403, 702 and 703 of the Texas Rules of Evidence.

2.    The tests conducted at Materials Analytical Services, Inc (MAS) by Dr. William Longo and Mr. Richard Hatfield (Longo-Hatfield) on removal, scraping, hand wire brushing and electric wire brushing of gaskets compounds, sawing Kayla products and mixing and sanding Kelly-Moore joint compounds and the tests of MAS on ... 12, 14, 15, 14 and 15, are not scientifically reliable and are not admissible.

3.    The MAS tests constitute "junk science."

4.    The MAS tests do not meet the requirements of Rules 401 and 402 Texas Rules of Evidence in that the tests are not sufficiently tied to the facts of any individual case in a manner to aid the finder of fact in resolving a factual dispute.

5.    The MAS tests fail to account for reasonably foreseeable conditions and pathways of exposure that could be experienced with respect to the removal, scraping, hand wire brushing and electric wire brushing of gaskets, sawing Kayla products and mixing and sanding Kelly-Moore joint compounds so as to render the MAS tests little more than speculation.

6.    If this court has misunderstood the testimony and exhibits admitted during the Daubert/Robinson hearing so as to be incorrect in its findings of facts and conclusions of law, the error(s) was caused by the confusing, misleading and prejudicial presentation of the evidence to the finder of fact.

7.    A judge does not have to be trained in Science to evaluate the reliability of a scientific theory or technique. Although the details of science may be complex, the characteristics of valid scientific knowledge and the kind of reasoning that produce it are not difficult to grasp. Judges are capable of understanding and evaluating scientific reliability.

8.    The court makes no finding upon the truth or falsity of the opinions expressed in this case by Dr. Longo individually or on behalf of Mr. Hatfield concerning exposure or pathways of injury.

_____

[1] The abbreviation Daubert/Robinson is used to indicate the following decisions: Daubert v. Merrell Dow Pharmaceuticals, Inc. 509 U. S. 579 (1993) and E. I. Du Pont de Nemours v. Robinson, 923 S. W. 549 (Tex. 1995).

AUG-29-2001 16:47 FROM:                    5102334594              TO:415 952 6700              P.004/015

JUL-11-2001 WED 04:29 PM  N, KACAL  DALLAS          FAX NO. 1 651 8110              P. 04

9.      These findings of fact and conclusions of law are binding upon all parties affected by the testimony of the witnesses, Longo-Hatfield, concerning the products about which they testified, to wit: scraping and removal of compressed asbestos gasket by hand and electric wire brushing, pouring joint compound, sawing Kayle product and mixing and sanding Kelly-Moore joint compounds.

10.     Exhibit "A", attached hereto and made a part hereof for all purposes, contains the factual analysis by the court of the relevant exhibits and testimony.

        The Motion by Gerlock, Inc. to Suppress the testimony of Dr. William Longo and Mr. Richard Hatfield is granted. This order is binding as to Gerlock, Inc. and all other defendants in the Lamar County Asbestos Litigation cases filed by Waters & Kraus using the testimony of Longo-Hatfield and used by MAS against parties who market or produce gaskets (removing), hand wire brushing, electric wire brushing), including cement (pouring), Kayle products (sawing) and Kelly-Moore joint compound (mixing and sanding.)

                                        Entered this ___ day of _____, 2001.

                                        _____
                                        Judge Jim D. Lovett

AUG-28-2001 16:42 FROM:

JUL-11-2001 WED 04:30 PM   DR. RACAL  DALLAS        FAX NO. 14 851 8116            P. 05

EXHIBIT A

Exhibit A
Fact Analysis Of Relevant Exhibits And Testimony
(Summaries, paraphrases and comments are italicized)

RULE 702 REQUIREMENTS

(1)    The witness must be qualified.
       *The court is of the opinion that Dr. William Longo and Mr. Richard Hatfield are qualified by both education and experience in relevant subjects to be allowed to testify.*

(2)    The proposed testimony must be "scientific knowledge"
       *The court is of the opinion that the tests conducted by Longo-Hatfield on the products involved in this hearing are scientifically unproven and not accepted by a respectable community within the relevant sciences.*

(3)    The testimony must assist the trier of fact to understand the evidence or to determine a fact in issue.
       *The court is of the opinion that the Longo-Hatfield testimony is neither relevant nor reliable, that it is confusing and thus it will not assist the trier of fact.*

RELEVANT EXHIBITS

DX Garlock 1, Asbestos and Other Fibers by PCM.
       This is the NIOSH Method 7400 from the Manual of Analytical Methods, Fourth Edition, 8/15/94. The MAS test claimed to have followed this Method.
       "APPLICABILITY: .... The method gives an index of airborne fibers. It is primarily used for estimating asbestos concentrations, though PCM does not differentiate between asbestos and other fibers. Use this method in conjunction with electron microscopy (e.g., Method 7402) for assistance in identification of fibers...."
       *Note that PCM is to be used with this method. TEM is to be used only for "identification" of fibers, not for counting the fibers as was improperly done in the MAS tests. Furthermore, MAS selected Method 7400 instead of Method 7402 for assistance in identification of fibers, rendering the results scientifically unreliable.*
       "CALIBRATION AND QUALITY CONTROL:
11.    Document the laboratory's precision for each counter for replicate fiber counts.
       Maintain as part of the laboratory quality assurance program a set of reference slides to be used on a daily basis... The Quality Assurance Officer should maintain custody of the reference slides and should supply each counter with a minimum of one reference slide per workday.
       Change the labels on the reference slides periodically so that the counter does not become familiar with the samples."
       *The MAS laboratory was not certified as required and the reference slides were not handled in conformity to requirements of this Method.*
13.    Perform blind recounts by the same counter on 10% of filters (slides relabeled by a person other than the counter).
       *The MAS tests failed to conform to this recount standard as well as the instructions to discard samples that exceeded the specified limits.*
       *Further, the MAS tests failed to use the calculations, evaluation and reporting methods required by NIOSH Method 7400.*

PX LONGO 15, Garlock Industrial Products Catalog
       *The Garlock, Inc. catalog provides an abundance of information about the variable specifications, models, types and conditions that should be considered and then eliminated or otherwise accounted for through application of proper scientific methodologies. The MAS tests failed even to consider the following variables:*
       Pg 61 - Gasketing Compound No. 100-S, A non-hardening plastic compound used as a surface leveler on flanged joints and for temporary repair of torn or blown gaskets. Bakes on which it is used do not "freeze" and are easy to disassemble at any time. Recommended for use at temperatures ranging from below 0° to +500° F on pipelines or other equipment handling water, steam, air, oil, gasoline, gas, weak acids or alkalies.
       Pg 21 - shows eight different "compressed asbestos gaskets" available from Garlock, Inc. in style numbers 900, 7021, 7122, 7701, 8714, 7818, 7917 and 5500. These eight models contain varying characteristics, to wit:
       -they are made from two types of asbestos, white chrysotile asbestos and blue crocidolite asbestos:
       -tensile strengths vary with the grain from a low of 5,000 p.s.i. to a high of 9,500 p.s.i. and across grain from a low of 2,000 p.s.i. to a high of 4,500 p.s.i.:
       -variances in oil resistance after 5 hrs. in ASTM #3 at 300° F with thickness increase ranging from 1% to 45% and a tensile losses ranging from a low of 10% to a high of 76%:
       -fuel resistance after 5 hrs. in ASTM Ref. Fuel B at R.T. Thickness increases as low as 1% and as high as 26%:

AUG-28-2001  12:48 FROM:                    5102334554                    '.:3 262 4700           P.862-315
JUL-11-2001 WED 04:30 F    NR. KACAL  DALLAS        FAX R :   14.651 8116                P. 06

EXHIBIT A

-density variations from as low as .25 oz, to as high as 1.0 oz,
-16 sheet sizes (inches) ranging from 40 x 40 to 150 x 150
-wide variations in tolerances on thicknesses and specifications;
-style numbers 900, 7021, 3224 and 3705 are branded with Garlock name and style number thru 60". Over 60" sht. is unbranded unless otherwise specified

pg 14 – warns that the basic factors surrounding any application (fluid, temperature, pressure, speed and type of sealing) added to the age and condition of equipment make concrete recommendations very difficult based only on type of equipment and field involved.

pg 24. (not shown on the exhibits) – located on the page next to the page entitled "Garlock Materials vs. various media under typical conditions" has the following information in fine print at the top of the page:

"This chart indicates the general reliability of basic materials commonly used in packings and gaskets against various media and is intended only for the general information of the packing user. Obviously the subject of the interaction of packing materials with the several liquids listed is too complex to be covered adequately in a few words. Although chemical considerations are important in the selection of packings, the mechanical properties of the packing itself usually are of greater importance. Packings rarely are fully exposed to the gas or liquid and, therefore, do not necessarily react in the same degree as indicated for the bare material. For these reasons packings or packing pattern should not be accepted or rejected for any application solely on the basis of chemical consideration."

The catalog lists the following materials: graphite yarn, viton and flaored, phenolic resins, TFE fluorocarbon, white asbestos, blue asbestos, cotton, flax, vitreous rayon, paper and leather.

pg 24 – Garlock CHEMSEAL jacketed gaskets with 8784 TFE jacket (often called envelope) are claimed to be ideal for applications where corrosion, contamination or other undesirable effects must be eliminated. "Good examples are glass-lined piping and food processing equipment or reactors, kettles, conductors, heat exchangers and extracts.

The MAS invokes listed specific and generally accepted methodologies claimed to have been utilized in the short term. These included Tyndall lighting, NIOSH Method 7400 and the indirect method of sample preparation by the ASTM D3711-91.

After the hearing the court read and studied the exhibits. It then became clear that the methodologies and the MAS tests were not followed. Further, the tests were deficient in their failure to account for variable but reasonably foreseeable conditions in the possible pathways of exposure. Dr. Longo's testimony was at best disingenuous.

The MAS tests improperly mixed direct and indirect methods of sample preparation, utilized and misrepresented TEM analyses and application of Tyndall light. The reports failed to mention that there was no index to convert TEM data to PCM data to enable the size of the index of exposure in the OSHA epidemiological studies. Additionally, Dr. Longo's testimony improperly claimed that the tests covered all pathways of exposure ("one size fits all")

As to the ASTM Method D 3711-91 claimed in the MAS tests, the following deviations by MAS disprove the reliability of the test:

1)  the Method is entitled "Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations", this method was utilized to measure airborne airborne fibers;

2)  test results were reported in structures/cc rather than structure/cm² – this is a misrepresentation of acceptable results.

As to NIOSH Method 7400 claimed in the MAS tests, the following deviations by MAS disprove the reliability of the test:

1)  MAS used the indirect sample preparation method instead of the required direct sampling method;

2)  MAS failed to report as unmeasurable the fiber counts above 1100 fibers/cm² as required.

The test reports failed to explain the failure of the MAS tests to utilize the direct means for NIOSH 7401 Method that states, "That method is used to determine asbestos fibers in the optically visible range and is intended to complement the results obtained by phase contrast microscopy (Method 7400). "The court assumes the reason to be the claim of Dr. Longo that the fibers were too heavily loaded with fibers to use the direct method of sample preparation required by NIOSH 7401. Additionally, the provenance of the flanges and gaskets used in the tests were inadequately explained in the test reports. The test reports should have explained these matters but failed to do so.

Furthermore, the MAS tests cannot be duplicated from the information contained in the reports or in Dr. Longo's testimony. There is no established rate of error, insufficient information was furnished on the angle, construction and location of Tyndall light, the videotaping was deceptively out of focus, misrepresents asbestos exposure samples due to shutterings in the airflow, fact-throughs located in the ECL walls and the April 21 and April 25 tests fail to report decontamination of the ECL chamber prior to testing. Indeed, the three results provide suspiciously wide and unexplained variations considering that they were conducted in identical conditions in the ECL.

AUG-28-2001 10:45 FROM:                    5102331654        *415 XX 6766        P.007-815

JUL-11-2001 WED 04:31 P.     RNK KACAL DALLAS        FAX N .14 651 8116        P. 07

EXHIBIT A

Such lapses and unverified variance in the test methodologies cast doubt on the efficacy of the MAS tests and specifically reflect on the violation of standards for the lack of Quality Assurance Certification of the MLS laboratory.

It is apparent that the MAS tests started with the assumption that persons had been exposed to airborne asbestos fibers from work place activities involving Gurlock and other brands of gaskets (removing, hand wire brushing), hardsetting cement (pouring), Kaylo products (sawing) and Kelly-Moore joint compound (mixing and sanding) and thus selected methods to achieve the desired results stated in the MAS reports and testimony of Longo-Hatfield. This is not permitted.

The limitations of the MAS tests become even more apparent when compared to standards set for and methodologies followed by the Environmental Protection Agency studies currently being conducted in Libby, Montana FX Longo 3, Phase 2 Sampling and Quality Assurance Project Plan, Revision 5 for Libby, Montana.

An open pit vermiculite mine near Libby, Montana is suspected as a source of ongoing asbestos exposure to current and future residents in the Libby area. The United States Environmental Protection Agency is engaged in the first known study by non-litigation scientists in which a combination of Phase Contrast Light Microscopy (PCM) and Transmission Electron Microscopy (TEM) as an analytical technique for counting airborne asbestos fibers and dust and converting the counts to the OSHA index of exposure that will convert TEM for the first time to the generally accepted analytical studies. Up to this time the scientific community has used and recommended TEM as a method of identifying asbestos fibers, not as a method of counting them. No responsible community of scientists has used TEM for counting asbestos fibers.

In Phase 1 of this study EPA gathered samples from multiple indoor and outdoor locations around the community, along with samples of different potential sources of asbestos fibers in air (tests by experts that the MAS samples were of from only one site and tested under only one controlled environment).

The EPA results indicate that amphibole-type asbestos fibers are present in a number of environmental samples, including indoor air, dust, soil, and insulation. The report notes that the human health risk is indicated by inhalation exposure and outdoor stationary air monitors located in the principal living areas of various homes to gather samples. TEM has been used to estimate the concentration of these fibers. The report states at pp. 1. "However, there are issues facts to recognize this level.) with regard to both the collection technique and the analytical technique (TEM) (note by contrast that MAS

EPA notes that the collection technique may have acceptably measured "passive" activity in homes but may underestimate exposure if the people directly engaged in activities, which do generate dust containing asbestos fibers. The EPA report continues.

Therefore, the first objective of this sampling effort (Phase 1 of the environmental characterization project plan) is to measure asbestos levels in the breathing zone of individuals engaged in routine and special activities in and about Libby, and to compare those measurements to data collected from co-located stationary air monitors. This information will be helpful in deciding what type of air sampling method is needed to evaluate risks to individuals engaged in both routine and special activities in the home." (note by contrast that no such considerations were discussed in the MAS tests and all the data comes from only fifteen tests conducted by MAS under only one set of conditions; no temperature tests were conducted in any other location or under any other condition, although each sample purports that the MAS SEL could have been programmed to test a variety of conditions; no satisfactory explanation is offered by MAS or Dr. Longo as to why tests were not conducted under a variety of test conditions).

With regard to the analytical technique, the issue is that air samples have historically been analyzed for asbestos using Phase Contrast Light Microscopy (PCM) and the EPA current slope factor for quantifying lung cancer risk from asbestos is the is expected in units of risk per PCM fiber per cc et al (USEPA 2000a). Thus, even though it is widely recognized that TEM analyses are more accurate and more powerful than PCM analyses, measurements of asbestos concentration based on TEM are difficult to convert to an equivalent concentration by PCM (this is referred to as PCM equivalence, or PCME). Thus the second objective of this sampling effort is to analyze a series of different air samples by both the TEM and PCM methods in order to derive a site-specific relationship between the two, and to help judge which type of measurement is most appropriate." (note by contrast that the MAS tests failed to measure the conversion problem and the lack of a reliable method to measure (PCME)

As noted above, the chief reason for collecting data on asbestos fiber levels in air is to support risk assessment and risk management decision-making. That, the third objective of the study is to collect the data collected to derive preliminary assessments of the potential health risk to people who engage in the types of exposure conditions and all exposure locations, the data will be used to help estimate the range of different levels (and hence health risks) that residents of Libby may experience from both routine and special activities." (note by contrast that the MAS tests fail to recognize and test for reasonably foreseeable conditions of exposure

AUG-22-2001 15:45 FROM

JUL-11-2001 WED 04:31     JAN. KACAL  DALLAS        FAX NO. 214 651 8116

5198334954

415 882 6790

P.002/015

P. 08

EXHIBIT A

*further, the MAS tests are not reliable even to estimate ranges of different levels of airborne asbestos generated while wire brushing a gasket.)*

The EPA developed a seven-step plan Data Quality Objectives (DQO) procedure designed to ensure that sampling and analysis plans are carefully thought out and that results of the effort will be adequate to meet basic objectives of the program. The seven-step plan is applied to each of the three main objectives of the project and is as follows:

- Step 1. State the Problem;
- Step 2. Identify the Decision;
- Step 3. Identify Inputs to the Decision;
- Step 4. Define the Study Boundaries;
- Step 5. Develop a Decision Rule;
- Step 6. Specify Limits of Decision Error;
- Step 7. Optimize the Design for Obtaining Results.

*The details of the EPA test contrast sharply with the generalizations and non-specific plans of the MAS test.*

PX. Lange 17, United States Environmental Protection Agency publication EPA 560/5-85-004, "Comparison of Airborne Asbestos Levels Determined by Transmission Electron Microscopy (TEM) Using Direct and Indirect Transfer Techniques."

At page 3, II. Conclusion and Recommendations." This study, from the ... (EPA's seven studies - including one by Dr. Eric John Chatfield, whose affidavit is considered below) ... leads to the following conclusions:

Results (analysis of air samples using indirect transfer methods tends to provide estimates of total airborne asbestos structure concentration that are higher than those obtained using direct transfer methods. This conclusion is consistent with general opinion and implies that airborne asbestos levels estimated by one method are not directly comparable to those estimated by the other.

Evidence. A review of available data (seven studies) revealed this relationship in every study despite variations in sampling, analytical, and counting protocols.

There is no single factor that can be applied to convert measurements made using an indirect transfer method to a value that is comparable with measurements made using a direct transfer method. The quantitative relationship between estimates obtained by the two transfer methods is expected to depend on sampling and analytical protocols as well as the nature of the asbestos structures in the air.

PX. Lange 18, 41984 Federal Register Vol 59, No. 131, Wed., August 11, 1994

This federal regulation states as follows:

"(i)(A) If a gasket is visibly deteriorated and unlikely to be removed intact, removal shall be undertaken within a glovebag as described in paragraph (g)(10)(ii) of this section. (B) The gasket shall be thoroughly wetted with amended water prior to its removal. (C) The wet gasket shall be immediately placed in a disposal container. (D) Any scraping to embrace residue must be performed wet."

This OSHA Federal Regulation provided that "possible" asbestos exposure be avoided but also reasonably implied that asbestos in the form of rust, snow ice, fog, mist and humidity "possibly" affect the manner in which asbestos becomes airborne in the workplace while scraping or breathing a gasket. The MAS tests fail to test or account for such reasonably foreseeable conditions.

DX. Gerlock 2, OSHA 1910.1001 Asbestos

(a) Scope and Application. (i) This section applies to all occupational exposures to asbestos in all industries covered by the Occupational Safety and Health Act, except as provided in paragraph (a)(2) and (3) of this section.

The exception in para (a)(2) refers to construction work and para. 3 to shipbuilding and related activities.

It is the understanding of the court that OSHA does not regulate potential airborne asbestos exposure relating to gaskets since they contain asbestos binding material.

PX. Lange 21, letter from Colt Industries relating to handling Gerlock products contains asbestos in general and compressed asbestos sheet in particular.

Although not required by OSHA, asbestos regulation 51910.1001 to place warning labels on its gaskets, Gerlock, Inc. nevertheless did so voluntarily and notified its dealers concerning the possible release of excess amounts of asbestos under extreme conditions. The letter says "The user should, therefore, refer to TSCFR 1910.1001 for information on handling asbestos and monitoring the release of asbestos fibers."

It appears that even though OSHA did not require its gaskets, Gerlock voluntarily sent this notice of possible release of excessive airborne asbestos under some extreme condition. This is not a confession of fault by Gerlock, Inc. From the evidence offered and admitted in this hearing it appears to be reasonable, voluntary action by this manufacturer to warn its dealers and end users.

AUG-28-2031 16:50 FROM:                    5133334554              1425 992 2700        P.009/015

JUL-11-2001 WED 04:32 PM   JOHN, KACAL   DALLAS        FAX NO. J 651 8116              P. 09

EXHIBIT A

DX Gerlock 3, ASTM D 5755-95, Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations[1]

1.1    This microvacuum sampling and indirect analysis method is used for the general testing of non-airborne dust samples for asbestos. It is used to assist in the evaluation of dust that may be found on surfaces in buildings such as ceiling tiles, shelving, electrical components, duct work, carpet, etc. This test method provides an index of the concentration of asbestos structures in the dust per unit area analyzed as derived from a quantitative TEM analysis.

1.1.1    This test method does not describe procedures or techniques required to evaluate the safety or habitability of buildings with asbestos-containing materials, or compliance with federal, state, or local regulations or statutes. It is the user's responsibility to make these determinations.

1.1.2    At present, a single direct relationship between asbestos-containing dust and potential human exposure does not exist. Accordingly, the user should consider these data in relationship to other available information in their evaluation.

1.2    This test method used the definition, respirable particulate material, found in Test Method D 1739 as the definition of dust. This definition accepts all particles small enough to pass through a 1 mm (No. 18) screen. Thus, a single, large asbestos containing particle(s) (from the large end of the particle size distribution) dispersed during sample preparation may result in anomalously large asbestos concentration results in the TEM analysis of that sample. It is, therefore, recommended that multiple independent samples are secured from the same area, and a minimum of three samples analyzed by the entire procedure.

The above requirements were violated in the MAS Tests as follows:

1)    the Method is entitled "Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations", this method was utilized to measure airborne asbestos fibers;

2)    the test results were reported in structures/cc rather than structures/cm² - this is a misrepresentation of a reportable result;

3)    the tests attempt to provide results in a single direct relationship between asbestos-containing dust and potential human exposure, which does not exist

4)    the tests ignored the warning that sample preparation may result in anomalously large asbestos concentration results in the TEM analysis of that sample.

PX Longo 19, Exposure to Airborne Asbestos Associated with Simulated Cable Installation Above a Suspended Ceiling, December 1991, American Industrial Hygiene Association Journal.

_____    Asbestos Exposure During and Following Cable Installation in the Vicinity of Fireproofing, _____ 1993 American Industrial Hygiene Association Journal.

_____    These litigation studies were sponsored in part by the Plaintiff's Executive Committee of the National Schools Asbestos Cost Recovery. The eight co-authors included three of the witnesses in this cause: Dr. William Longo (his address at Georgia), Richard Hatfield of Materials Analytical Service, Inc. (address in Norcross, Ga.) and Dr. James R. Millette of Same Environmental Services, Inc. (address in Norcross, Ga.) and Millette, Vander Wood and Associates, _____ in Norcross, Ga.), also see PX Longo 30, immediately below, that appears to be closely related to PX 19 and 22.

_____    This studies properly awarded a warning that workers should wear respirators while performing their work place activities because of the "possibility" of improper exposure to airborne asbestos fibers.

In both these articles, however, it is clearly recognized and acknowledged that their purpose was not to compare exposure levels to current or previous OSHA PEL, adding that "...Further research is still necessary to standardize dust and air sampling techniques, including the number of samples necessary to characterize a given surface area, recovery efficiency from various surfaces and the analytical technique employed when heavy concentrations of asbestos and other particles are encountered."

Some of the testimony of plaintiffs' witnesses Longo (and through him, Hatfield) and Millette is either at a variance with their opinions expressed in these two articles or involved faulty memories and adverse recollections. Furthermore, plaintiffs failed to cite the court to correctly performed scientific studies or properly peer reviewed scientific publications to justify any changes of their opinion as expressed in PX Longo 19 and 22. These articles, while peer reviewed, fail to fulfill plaintiffs' burden in the peer reviewed published articles in support of their current scientific position.

_____
[1] This test method is under the jurisdiction of ASTM Committee D-22 on Sampling and Analysis of Atmospheres and is the direct responsibility of Subcommittee D22.07 on Sampling and Analysis of Asbestos. Dr. Eric John Chatfield, whose evidence is considered below, claims he is a member of the D-22 committee and was honored by it in 1997 "... in recognition of outstanding contributions in development of ASTM and International Standard analytical methods for determination of asbestos." Dr. Chatfield further claims that all his analytical standard development activities were, and continue to be, relevant.

EXHIBIT A

In any event these studies would have very limited use when attempting to apply them to the varied indoor, outdoor, internal and external conditions experienced in the work place while sampling and brushing gaskets, pouring joint compound, sawing Kaylo products and mixing and sanding Kelly-Moore joint compounds.
PX Lange 20, Brazilian Studies of Asbestos Exposure During Operations and Maintenance Activities, November 1994 Appl. Occup. Environ. Hyg. 9(11)

This study appears to be closely related to the studies shown in PX Lange 19 and 33. Immediately above. Its co-authors include the same three plaintiff's witness but only one of the other authors, having lost three co-authors without explanation. Further, Mr U3 study was not sponsored by the Plaintiff's Committee of the National Schools' Class Action for Cost Recovery. New sponsors included Diez, Oles and Henderson (Orange, Texas) and the West Virginia State Attorney General's Office (Charleston, W.V)

The purpose of the study was to provide evidence of "possible" exposure to dangerous levels of asbestos asbestos while performing certain maintenance duties in the work place. This study was designed to provide information to the authors so they could design an O&M (Operations & Maintenance) program "... based upon our extensive experience (estimated at 30 man-years) in designing, implementing, and evaluating O&M programs for buildings with ACM."

It was not the purpose of this study to provide information that could be converted to the OSHA index of exposure. It pointed stated. "Statistical Analysis were applied to the log-values (base 10) of the measured concentrations. The log transformation tends to equalize variances and permit the use of standard statistical tests that would otherwise be inappropriate. Previous studies of air pollution data have demonstrated that air pollution data tend to be lognormally distributed."

No other evidence of "lognormal distribution" was submitted to the court, or, if it was, is not recalled and not located by the exhibits at this point. Although not specifically mentioned in the Libby, Montana study by EPA when currently conducted (PX Lange 4, see above), the first objective of the EPA Libby study indicates that there is no method of conversion from the TEM-direct analysis methods used in these studies to the PCM index of asbestos exposure. The court assumes that if the lognormal distribution is correctly understood by the court to be the conversion method used in this study (PX Lange 20), that the plaintiffs would have submitted appropriate supporting material. Absent such material the court finds that plaintiffs have failed to discharge their burden of proof under existing this as a substantiating study in satisfaction Daubert/Robinson standards.

In any event this study (PX Lange 20) would have very limited use when attempting to apply it to the varied indoor, outdoor, internal and external conditions experienced in the work place while sampling and brushing gaskets, pouring joint compound, sawing Kaylo products and mixing and sanding Kelly-Moore joint compounds.
DX Garlock 1, ASTM D 6231 - 98, Standard Test Method for Airborne Asbestos Concentrations in Ambient and Indoor Atmospheres as Determined by Transmission Electron Microscopy Direct Transfer (TEM)
1.1      This test method[*] is an analytical procedure using transmission electron microscopy (TEM) for the determination of the concentration of asbestos structures in ambient atmospheres and included measurement of the dimension of structures and of the asbestos fiber found in the structures from which aspect ratio are calculated.
1.2      This test method is suitable for determination of asbestos in both ambient (outdoor) and building atmospheres.
1.3      The direct analytical method cannot be used if the general particulate matter loading of the sample collection filter as analyzed exceeds approximately 10% coverage of the collection filter by particulate matter.
ASTM 6231-98 is not mentioned in the MAS reports. It appears it was not utilized because of the 10% coverage limitation but, if so, this should have been mentioned in the MAS reports as as to explain its methodologies.
Other Exhibits Not Specifically Reviewed
Exhibits not reviewed above by the court are deemed either not to relate to the Daubert/Robinson issue of reliability or relevancy or are considered to be unnecessarily duplicative of other cited exhibits.

RELEVANT TESTIMONY AND AFFIDAVITS

William Jockes, transcript of testimony, June 28, 2001.
William Jockes is an environmental engineer, a certified industrial hygienist/consultant, 1971 graduate of Purdue University with B.S. degree and a former OSHA compliance officer in Milwaukee and Chicago from 1976 through 1980 supporting various regional offices as well as the national office. He was called to testify for the defendants as wit

---

[*] This test method was adapted from International Standard ISO 10312 "Air quality - Determination of asbestos fibres - Direct transfer transmission electron microscopy method."
Note that Dr. Eric John Chatfield, whose affidavit is set forth below, is the author of ISO 10312. He is also author of ISO 13794 which is a corresponding indirect-transfer analytical method, both of which were affirmed by International Dallas and published as International Standards.

AUG-29-2001 16:51 FROM:                    5:02337594              T  415 922 6703          P.011-015

JUL-11-2001 WED 04:33 PM DURN, RACAL  DALLAS        FAX NO. 214 651 8116              P. 11

EXHIBIT A

71616:
"... I wasn't really sure what (light) he (Dr. Longo) used (in the test). There was not really a specific reference made to the type of light and consequently I selected based on what I saw in the video a similar looking theater light and a wattage that I believe was what was being used, but I wasn't really sure what was used."

71621:
"... Tyndall lighting is not used in the industrial hygiene community. It may have been accepted at various times for various occupations but it is not widely used -- I don't know anybody that uses it with the exception of Doctor Longo."

72210:
"... The EPA historical data is mass based, whereas OSHA's historical data and the epidemiology is based on fiber sizes and inhalation. The EPA data mass base has no relationship no epidemiological data. It is an air quality issue independent of epidemiology."

73150:
Q. (By the Court) Let me ask you, would you think it would be safe to work without respirators or special clothing in the atmosphere and in what you saw in the videotape Doctor Longo ran? (PX Longo 14 and 15)
A. Yes. As a matter of fact, I do my tests without respiratory protection.
Q. (By the Court) So you would go into that environment as shown in Dr. Longo's videotape without special breathing equipment?
A. Yes sir.

71919:
Q. You're not an electron microscopist like Doctor Longo, is that correct?
A. I thought he described himself as a material scientist.
Q. And who has more expertise in electron microscopy, you or Dr. Longo?
A. That may be a draw.
Q. Do you work an electron microscope?
A. I used to own a laboratory that we had an electron microscope. We were NAVLAC certified, as well as AIHA.
Q. Did you prepare the samples?
A. I prepared them, yes.

73088:
Q. You knew that some of those PCM levels (in the SEM test) were as high as 20 fibers per cc, is that correct?
A. I don't believe that numbers?

71921:
Q. ... If you're in an environment where an activity is producing more fiber per cc, you're supposed to protect yourself, is that correct?
A. That's not what an excursion limit is.
Q. Why don't you tell us what it is.
A. An excursion limit is where an infrequent activity which cannot be valued on a time-weighted average basis is conducted where the concentration would exceed one fiber per cc on a 30-minute sample.
Q. Fair enough and those levels reported in the study by MAS would exceed the excursion limit. Correct?
A. They weren't excursion samples. That's not -- when I'm trying to explain is industrial hygiene. The samples were not collected in the way to compare against the excursion limit. It wasn't an excursion activity and therefore to compare them against an excursion limit would be improper.

74092:
Q. So you think Doctor Longo just lied when he got up here and said he opened the flange and that was the way he gasket was?
A. I have known Dr. Longo a long time and I am simply saying that I do not know what the conditions were of those gaskets. But I have been in the industrial environment for a very long time and I have never seen the conditions that are demonstrated in that video.
Q. Are you suggesting to the court that Dr. Longo somehow doctored those flanges and throws gaskets before performing those tests, that he lied to the court?
A. I did my own tests involving 30 fittings and I have never encountered a gasket of that type.

74511:
"I have a long history of being around pipe, plumbers, pipe fitters. My father was a plumbing contractor and I have been around the piping trades for my entire life and I have done considerable work in industrial environments, which include pipe fitters."

AUG-28-2001 16:31 FROM:                    5102334594                    415 984 6798                    P-012-015

JUL-11-2001 WED 04:33 PM DUNN, LACAL  DALLAS          FAX NO. 214 651 8116                P. 12

## EXHIBIT A

74/19:

"The travels cited in a study (such as the MAS studies) which involved ten different types of removals and replacements of gaskets and packing, the highest concentration that I received on an eight hour time-weighted average was .06. Most of the results were in the .01 to .04 range."

110/2:

Q. And OSHA has never passed a standard (relating to airborne asbestos) with respect to the industry standards? (as opposed to construction standards relating to airborne asbestos)
A. That's correct.

The court finds that William Rochter is qualified as an expert in a relevant science to render his opinions expressed in his testimony set forth above, that such testimony is properly corroborated and is both relevant and reliable in accordance with Daubert/Robinson standards.

Eric John Chatfield, PhD, affidavit dated January 4, 2001.

Dr. Chatfield is a Canadian citizen and a world-class scientist with M.S. in Natural Sciences and Ph.D. in Colloid Science from Cambridge University. He has more than 25 years experience in identification and analysis of asbestos fibers and their behavior in air and water through both optical and electron microscopes. He has written and published more than 60 peer-reviewed scientific articles relating to asbestos analysis, has been actively involved in the creation of recognized standards and has also by being chosen as the chairman of various prestigious organizations relating to asbestos science.

Dr. Chatfield's credibility is on issue since he has testified extensively and exclusively for defendants in asbestos cases. His affidavit states:

pr. 3, par. 11:

"Other than to determine whether fibers found in the air are asbestos fibers, TEM is not generally used to measure occupational exposure to asbestos."

"World-wide, occupational exposure to airborne asbestos is measured by phase contrast optical microscopy (PCM)... To my knowledge, no country has used, or is proposing to use, transmission electron microscopy (TEM) for routine monitoring of occupational exposure to airborne asbestos..."

"... the (PCM) measurement represents an index of exposure to asbestos. This index is directly relatable to past measurements which are associated with the epidemiology."

pr. 4, par. 11:

"In the studies made by Mr. Hatfield and Dr. Longo, NIOSH Method 7402 (as opposed to NIOSH Method 7400) should have been used for the analysis of the air samples. This would have yielded data directly comparable with the epidemiological database. Instead, they elected to use an indirect-transfer TEM specimen preparation, and thereby generate data of no value because there are no scientific standards against which these data can be compared."

pr. 5, par. 12:

"The method chosen by Mr. Hatfield and Dr. Longo to analyze the air fibers from their studies is stated as ASTM Method D 5755-95....(this method) does not include application to the analysis of air samples, and it is an improper use of the ASTM standards, given that airborne particulate rather than the surfaces that was being analyzed. The results of ASTM D 5755-95 are specified to be reported in structures/cm², not structures/cc as used in the studies by Mr. Hatfield and Dr. Longo."

"Indirect-transfer TEM specimen preparation of airborne asbestos or asbestos-containing surface dust (as done by Longo-Hatfield in the MAS tests) causes large changes to occur in the fiber size distributions, particularly in the case of chrysotile, and the measure fiber size distribution derived from such a preparation bears little resemblance to that which existed in the original sample..."

pr. 6, par. 13:

"The indirect-transfer TEM measurements made by Mr. Hatfield and Dr. Longo therefore do not provide reliable information about the actual exposures during their experiments."

pr. 6, par. 14:

"Moreover, if the width distribution of the asbestos structures reported in Mr. Hatfield and Dr. Longo's indirect dust measurements were really those that existed in the original airborne material, the results reported would contradict conventional physics."

pr. 7, par. 16:

"Comparison of indirect-transfer and direct-transfer TEM specimens preparation of air samples collected from airborne particulates derived by disturbance of asbestos-containing materials shows that the majority of the asbestos structures reported by the indirect-transfer method (improperly used in the MAS studies by Longo-Hatfield) did not exist as separate entities in the original airborne particulate material (Chatfield, 2000)."

EXHIBIT A

16. [ PAGE 17

"Tyndall illumination used in the video recordings by Longo-Hatfield in the MAS studies -PX Loops 14, 35— are misleading for the following reasons: (a) — the Tyndall effect does not discriminate between asbestos fibers and other types of particle. The contribution of asbestos to the dust depicted in the video recordings, and whether the particles are respirable or non-respirable, are therefore unknown; (b) ... the focusing creates an extended illumination source from each point source, giving the overall effect of a mirror haze. This type of demonstration greatly misrepresents the actual amount and size of the dust particles, and it is therefore misleading."

Dr. Chatfield's opinions are corroborated by details and annotations to independent, peer reviewed and generally accepted scientific publications and standards that provide a level of confidence for the court to his credibility. Furthermore, his opinions are fortified by similarly corroborated opinions by other experts who are deemed credible by this court. The court finds that Dr. Chatfield is qualified in a relevant science to reach the opinions quoted above and that such opinions are both relevant and reliable in accordance with Daubert/Robinson standards.

John W. Spencer affidavit dated June 6, 2000 (attached as Exhibit A to Garlock's Motion to Strike William Longo and Richard Hatfield as Plaintiffs' Experts

Mr. Spencer is a certified industrial hygienist whose affidavit states that his CV is attached. The CV was not included with the copy furnished to the court, so the only knowledge of the court on the requirements of being a certified industrial hygienist is contained in the testimony of Mr. Frederick William Boelter, another certified industrial hygienist who testified that the court at page 220 line 7 of the court transcript of Boelter's testimony is the following:

Q.   What are the requirements to become a certified industrial hygienist?
A.   You have to have a degree in the sciences, as well as five years of experience doing industrial hygiene work, and then sit for a two-part examination.
Q.   And you completed all that in 1990?
A.   Yes.
Q.   Does the examination for certified industrial hygienist — does the industrial hygiene exam require that you demonstrate mastery on the collection of analysis of air samples for occupational exposure?
A.   In particular, occupational exposure is not only in particular. It is a very broad test besides its a comprehensive certification. It encompasses sampling and analytical procedures broadly for the industrial hygiene field.

It is for the purpose of these findings and conclusions the court assumes that Mr. Spencer fulfilled these three requirements.

1.   The following is a summary and paraphrased version of the Spencer affidavit.
     The tests conducted at Materials Analytical Services, Inc (MAS) by Dr. William Longo and Mr. Richard Hatfield on gasket removal, scraping, hand wire brushing and electric wire brushing, as reflected in PX Loops 1, 6, 34 and 35 in April and June 2000, failed to use standard or generally recognized test procedures or any combination of such procedures that are recognized by any substantial number of the relevant scientific community or that have been peer reviewed and published.

2.   The Spencer opinions are annotated with a wealth of references that are generally recognized within the relevant scientific community and by peer-reviewed articles that have been published in recognized and generally accepted scientific journals.

3.   In Spencer's opinion the tests conducted at Materials Analytical Services, Inc (MAS) by Dr. William Longo and Mr. Richard Hatfield on gasket removal, scraping, hand wire-brushing and electric wire brushing, as reflected in PX Loops 1, 6, 34 and 35 in April and June 2000, failed to follow the requirements of the NIOSH 7400 and ASTM D3155-95 tests that are cited for support in the MAS reports. Specifically the MAS tests omitted the direct and indirect methods of sample preparation required by each test. The methods used in the MAS tests are not generally recognized within the relevant scientific community, are not recognized within a reputable portion of the relevant scientific community and are not recognized by peer reviewed articles that have been published in recognized and generally accepted scientific journals.

4.   The methods used in the MAS tests are demonstrably incorrect.

5.   All laboratories that determine fiber-in-air concentrations are required to have active and quality control programs to monitor the proficiency of the laboratory against the methods criteria.

6.   Although TEM is used in connection with NIOSH 7402, it is only for the purpose of identifying asbestos fibers above 5 microns in length. 0.25 microns in width and less than 3:1 length to width aspect ratio, not for counting asbestos fibers as was improperly done in the MAS tests.

7.   The use of Tyndall lighting in the MAS tests is not an acceptable industrial hygiene practice and is not relevant to reliable for the quantification of airborne asbestos fibers.

The above cited facts and opinions contained in the Spencer affidavit are detailed, cite a wealth of easily verifiable and generally accepted standards and peer-reviewed publications. These along with the testimony of other

AUG-22-2001 16:52 FROM:                                          3102134564

JUL-11-2001 WED 04:34 PM JUNK. LACAL DALLAS          FAX NO. 214 651 8116                    P. 14

EXHIBIT A

experts deemed competent by the court corroborate Spencer's opinion, Mr. Spencer is found to be qualified in a relevant science to testify to the opinions shown above and that those opinions are both relevant and reliable under Daubert/Robinson standards.

Dr. William Longo testimony at Daubert/Robinson hearing on June 20, 2001.

Dr. Longo presented at the hearing with testimonial charisma and convincing demeanor. His educational qualifications and experience were impressive. He claims to have conducted bulksats and testified fairly for both plaintiffs and defendants. Dr. Longo's testimony sounded reasonable and this court accepted it at face value until completing a review of all the exhibits, affidavits and testimony.

After considerable study by the court, it became clear that the methodologies claimed to be used by MAS in the test reports were not followed. Further, no respectable community of scientists in the relevant professions recognizes the methods used by MAS. And although Dr. Longo claimed that the tests covered the pathways of exposure ("one tile file at [?] for gasket removing, hand wire brushing, sleeve tile wire brushing, insulating cement (pouring), and Kelly-Moore joint compound (mixing and sanding), the MAS tests were also deficient in their failure to account for variable but reasonably foreseeable conditions in the possible pathways of exposure.

Neither the MAS tests nor Dr. Longo offer a satisfactory explanation as to why tests were not conducted under a foreseeable variety of test conditions.

×  Re-reading Dr. Longo's testimony reveals it to be practiced and to employ misdirection and evasiveness. It is at best disingenuous, not credible and unsupported by any respectable community of scientists.

James R. Millette, Ph.D., deposition dated June 7, 2001; affidavit dated May 22, 2001.

Dr. Millette is an educator and scientist who describes himself as an Environmental Scientist. He has worked and written extensively about asbestos. He gave his videotaped deposition in this case for the plaintiffs on June 7, 2001. He claims that he had testified in the past for other plaintiffs but not for any defendants. His affidavit consist of less than one and one-half pages of opinions with sixteen pages of attached CV.

Dr. Millette opines that the use of Tyndall lighting is not misleading and that the MAS tests describe the results by both TCM and TEM. He then cites to a series of his co-authored articles concerning levels of asbestos fiber released from gaskets "depending on the type of activity to which the gasket are subjected." He further opines that the results of the MAS test "...are not very different from the values reported in the scientific literature." He further describing the MAS test results as "... useful in understanding the release of asbestos fibers from gasket material." He concludes that "... TEM asbestos values are not new or novel and are generally accepted by the scientific community."

The court is disturbed by the lack of proper scientific corroboration, explanations and annotations in support of Dr. Millette's opinions. He fails to reconcile the mixing of procedures under NIOSH 7400 and ASTM D-5557-95 and does not cite any respectable scientific sources in support of such novel procedures. The entire body of work of OSHA, EPA, NIOSH and ASTM are ignored. Neither does he cite any more authority than his anecdotal experience on the use of Tyndall lighting.

Indeed, the court assumes that if there was proper scientific report shown for the novel procedures utilized by MAS that the plaintiffs would have submitted a copy of the corroboration cited by Dr. Millette in his own article in the ELI technical journal 10:10-15, 1991 relating to air sampling results for gasket activities. The court premised that Dr. Millette's article was not offered into evidence because it would not have been supportive of plaintiffs' position.

Dr. Millette also presented in his videotaped deposition with testimonial charisma much in the same fashion as Dr. Longo. In the early part of his testimony Dr. Millette could not remember enough about the MAS test details to be credible. Later, when confronted by cross-examination concerning the details of NIOSH 7400, ASTM D 5755-95 and Tyndall lighting, his answers were consistently evasive and disingenuous at best, and unlike the performance of Dr. Longo during the hearing.

In Robinson at page 559 the supporting testimony of plaintiffs expert, Dr. Warde that there was a "... 59% probability that Dr. Whitcomb's conclusion ...was correct" was considered and rejected by the court.

The court likewise rejects the testimony of Dr. Millette as being insufficiently corroborated by peer reviewed publications and lacking in corroboration with any respectable community of scientists who accept the methodologies of the MAS tests. When combined with his faulty memory and evasive answers, his opinions are not credible.

LAMAR COUNTY ASBESTOS LITIGATION          Garlock, Inc. Daubert Order                    12

EXHIBIT S

```
 1
 2             IN THE COURT OF COMMON PLEAS
             FOR THE COUNTY OF NORTHAMPTON
 3

 4
     ARMITT GILBERT AND        : NO.  1996-C-3469
 5   M. DORIS GILBERT

 6            v.

 7   BENDIX CORPORATION,
     RAPID-AMERICAN CORP.,
 8   ABEX CORPORATION,
     OWENS-CORNING FIBERGLAS
 9   CORPORATION,
     GEORGIA-PACIFIC
10   CORPORATION, CERTAINTEED
     CORP., UNIROYAL, INC.,
11   BORG WARNER CORPORATION,
     CHRYSLER CORPORATION,
12   FORD MOTOR COMPANY,
     GENERAL MOTORS
13   CORPORATION AND AMERICAN
     MOTORS CORPORATION,
14

15
     MACK TRUCKS, INC.,
16   INTERNATIONAL HARVESTER
     COMPANY, AND THE BABCOCK
17   AND WILCOX COMPANY

18

19          Philadelphia, Pennsylvania
20            August 21, 1996

21

22      DEPOSITION OF WILLIAM LONGO, Ph.D.

23

24          Frank Frontino
        Court Reporting Service
25       133 North 4th Street
       Philadelphia, Pennsylvania 19106
     (215) 922-2111        (609) 268-3114

     Frank Frontino Court Reporting Service

[LONGO1]
```

255

1                         W. E. Longo

2   BY MR. FRIESTEDT:

3        Q.   I don't think I have all that more to

4   discuss with you before passing.

5        A.   Yes, sir.

6        Q.   The Tyndall light videography, is it

7   your opinion, shows brake dust suspended in the

8   air?

9        A.   Yes.

10       Q.   Do you agree that the high-wattage

11  bulbs or the bulbs that you used, which you

12  described the wattage of in your Fuller

13  deposition, produced heat?

14       A.   They do.

15       Q.   And you would agree that hot air

16  rises?

17       A.   I would agree.

18       Q.   And that particles suspended in hot

19  air rising would be wafted upward?

20       A.   Yes, sir.

21       Q.   When the brakes that were sent to you

22  for purposes of use in the simulation arrived,

23  were they wrapped in a plastic wrap?

24       A.   No, they were not wrapped inside the

25  box.

                Frank Frontino Court Reporting Service

[LONGO:1]

EXHIBIT T

In The Matter Of:

*HARRY COOK, et al   v.*
*ACandS, INC., et al.*

---

*RICHARD L HATFIELD*
*Vol 1, January 20, 2000*

---

BROWN REPORTERS, INC.
*ATLANTA, AUGUSTA, CARROLLTON, LaGRANGE, ROME*
*1740 PEACHTREE STREET, NW*
*ATLANTA, GA  USA  30309*
*(404) 876-8979  or  (800) 637-0293*

Original File 0120HATEASC, 140 Pages
Min-U-Script® File ID: 2689821538

Word Index included with this Min-U-Script

A.Clouds, INC., et al.                    MARRIOTT ...                    Vol. I, January 30, 201

[1] moment — which will be blowing air into the room,
[2] and — let's see. There's actually three of them in
[3] here, four of them in here, I'm not sure whether
[4] they're all supplies or not, but there will be a way
[5] for the air to return so there can be some pass to
[6] the air. And it also depends on whether there's
[7] movement in the room. If you get up and walk
[8] around, you will actually move the air around
[9] yourself.

[10] Q: Assuming that the ventilation is on in
[11] this room, what's the typical air exchange rate for
[12] a room like this?

[13] MR. VANSANT: Objection.

[14] THE WITNESS: Most buildings are
[15] designed at about four air changes an hour,
[16] give or take.

[17] Q: (By Mr. Radcliffe) Do you know how many
[18] cubic feet a minute that works out to be?

[19] A: That would depend on the size of the
[20] room. That's why they design it that way. The
[21] bigger the room, the more the reacts, the more air
[22] that's going to flow in, so you get the four air
[23] changes an hour per see.

[24] Q: Do you know how many cubic feet per
[25] minute per regular water out to be?

[1] A: No, and that's usually — that usually
[2] varies depending upon the design of the building.
[3] Sometimes the design people will want more air,
[4] more air coming out of the register that's closer
[5] to the exterior walls than the interior walls, so
[6] some may blow, let's say, 200 cubic feet per minute,
[7] and another one may flow at 150. But while you do it
[8] you calculate the total as compared to the volume of
[9] the room, and you want to put in there roughly four
[10] times enough air to fill the room four times in an
[11] hour.

[12] Q: What's the purpose of using the high
[13] intensity lights is your stimulation?

[14] A: To allow you to see — better see the
[15] dust that's generated.

[16] Q: All the dust that's being generated is
[17] not asbestos-containing dust, correct?

[18] A: No, that's not correct. I believe all
[19] the dust that you see is asbestos-containing dust.

[20] Q: All the dust that is generated is not
[21] asbestos, correct?

[22] A: That is correct.

[23] Q: When you show dust under a high intensity
[24] light, not all of that dust would be counted under
[25] PCM counting rules, correct?

[1] A: Correct.

[2] Q: When you show dust under high intensity
[3] lights, not all of that dust is respirable, correct
[4] ... it wouldn't say is all respirable?

[5] A: No.

[6] Q: Have you made any determination in any of
[7] the simulations to determine of the dust that is
[8] shown under the high intensity light, what
[9] percentage of that dust would actually be counted
[10] under PCM counting rules?

[11] A: I haven't done it as a percentage of what
[12] you see. That, we have not calculated. I'm not
[13] sure I know how to calculate that.

[14] Q: If you had the high intensity light on
[15] for a simulation but were able to somehow remove all
[16] of the nonasbestos material and all of the asbestos
[17] fibers that were not at least 5 microns in length,
[18] and at least 25 microns in diameter, would you be
[19] able to see anything?

[20] MR. VANSANT: Objection.

[21] THE WITNESS: I would certainly believe
[22] that you would.

[23] Q: (By Mr. Radcliffe) And what's your basis
[24] for that opinion?

[25] A: Because there's still a substantial

[1] amount of particulate in the air.

[2] Q: But you don't know what percentage of the
[3] particulate that would be?

[4] A: That's right, I couldn't tell you the
[5] percentage.

[6] MR. VANSANT: I thought you said you
[7] remove anything but the — all the
[8] nonasbestos fibers, all the asbestos fiber
[9] shorter than 5 microns and .25 diameter.

[10] MR. RADCLIFFE: That's right.

[11] MR. VANSANT: So what's left is the
[12] asbestos. What's that part of your
[13] question?

[14] MR. RADCLIFFE: Greater than a certain
[15] size, that's right.

[16] MR. VANSANT: Okay.

[17] Q: (By Mr. Radcliffe) You understood that?

[18] A: I understood it, I thought.

[19] Q: And you did, right?

[20] A: I believe I did. And I said I believe
[21] you'd still see it. I don't know how miraculously
[22] you could do that, but I believe you'd still be able
[23] to see dust.

[24] Q: You did a simulation on a carborundum
[25] grinding wheel, correct?

ACandS, INC., et al                                     MARRIOTT 141

                                                        Vol. 2, January 21, 20

Page 170

[1]  my work with gaskets, and I would also draw on time
[2]  that has been reported in some of the other studies
[3]  about removing gaskets and the overall length of
[4]  time that is cited to remove a gasket.
[5]      Q:  What studies are you referring to?
[6]      A:  I'm trying to remember now, but one
[7]  sticks in my mind that they were talking about the
[8]  typical length of time to scrape and remove a gasket
[9]  was 30 minutes or so.
[10]     Q:  And you can't now sitting here identify
[11] which study it was or when?
[12]     A:  I can't remember which one it was, but I
[13] do remember reading one that the comment was that
[14] the evidence took approximately 30 minutes to
[15] remove. It may have even been 30 to 45 minutes. I
[16] just remember reading that.
[17]     Q:  And in any event, you have no specific
[18] information relating to Mr. Gallagher, how long he
[19] may have taken to remove the gasket residue from the
[20] face of a flange?
[21]     A:  That's correct.
[22]     Q:  Okay. Let me ask you a few questions
[23] about the lighting that was used during the course
[24] of the study. I think I have read from other
[25] depositions that the lighting was designed to

Page 171

[1]  demonstrate the movement of particulate matter
[2]  within the chamber; correct?
[3]      A:  To be able to visualize it.
[4]      Q:  Okay. You would agree with me first that
[5]  light demonstration does not show how much of the
[6]  dust that is visible is respirable dust?
[7]      A:  No, it does not identify asbestos from
[8]  nonasbestos.
[9]      Q:  Okay. And it does not identify, even if
[10] there is asbestos there, how much of that asbestos
[11] may be respirable?
[12]     A:  The lighting itself doesn't size
[13] particles. However, particles that you see that are
[14] floating in the air are certainly potential
[15] particles to be respirable size particles, and the
[16] lighting allows you to see respirable size
[17] particles.
[18]     Q:  Okay. My question to you was the
[19] lighting demonstration does not permit you to
[20] determine how much of the particulate matter that's
[21] observable is respirable asbestos fibers?
[22]     A:  That is correct, it doesn't size the
[23] particles.
[24]     Q:  Are you familiar with the NIOSH testing
[25] method 0600?

Page 0

[1]      A:  No, I'm not.
[2]      Q:  In other studies that you've conducted,
[3]  have you ever blank tested the equipment used to
[4]  determine that it was not contaminated in any way?
[5]      A:  I think the only time we did that was
[6]  with a valve testing. I think we did that on one
[7]  valve testing project I can't think of any others
[8]  that we've done that on.
[9]      Q:  Why did you choose to do it in that
[10] instance?
[11]     A:  Well, because the valve may have at one
[12] time had asbestos materials on it or near it, and we
[13] had cleaned it up and wanted to just make sure that
[14] that was cleaned up.
[15]     Q:  And you did no such — other than the
[16] background tests of the chamber, you did no blank
[17] testing of the equipment used in this test?
[18]     A:  That's correct.
[19]     Q:  Okay.
[20]     A:  I mean, the equipment was brand new.
[21]     Q:  Let me direct you to the air
[22] results, please. Have you got those in front of
[23] you?
[24]     A:  I have them.
[25]     Q:  Okay. The air samples that were taken

Page 1

[1]  are reported on this table that's contained in the
[2]  report; correct?
[3]      A:  Correct.
[4]      Q:  These are not time-weighted averages, are
[5]  they?
[6]      A:  No. They are the measurements made
[7]  during the testing time.
[8]      Q:  And they represent a snapshot of whatever
[9]  the period of time was for the duration of the
[10] test — question of the sampling?
[11]     A:  Well, they represent — they were
[12] collected for 15 minutes, and they measured the
[13] concentration in the air at that time.
[14]     Q:  Okay. And the filters were removed and
[15] then were analyzed by means of an indirect
[16] preparation for TEM analysis?
[17]     A:  Correct.
[18]     Q:  Okay.
[19]     A:  For the TEM, yes.
[20]     Q:  You would agree with me, would you not
[21] that the NIOSH procedures require a direct
[22] preparation for analysis?
[23]     MR. VANSANT:  Objection. Are you
[24] referring to method 0600?
[25]     MR. TRUFFER:  No. 7400 and 7402.

**EXHIBIT U**

Jones and Highsmith vs. OCF, et al.                                    3/12/01 - Richard L. Hatfield

```
 1              IN THE SUPERIOR COURT OF FULTON COUNTY
                          STATE OF GEORGIA
 2
 3    LAILA A. JONES, Individually   )
      and as Executrix of the ESTATE )
 4    of ROBERT H. JONES, Deceased,  )
 5                    Plaintiff,     )    CIVIL ACTION FILE
                                     )
 6    vs.                            )    NO. E-53257
                                     )
 7    OWENS-CORNING FIBERGLAS        )
      CORPORATION, et al.,           )
 8                                   )
 9                    Defendants.    )
                                     )
10    JAMES F. HIGHSMITH,            )
                                     )
11                    Plaintiff,     )    CIVIL ACTION FILE
                                     )
12    vs.                            )    NO. E-56394
                                     )
13    OWENS-CORNING FIBERGLAS        )
      CORPORATION, et al.,           )
14                                   )
15                    Defendants.    )
16
17
18         The deposition of RICHARD HATFIELD, taken on
      behalf of the Defendant John Crane, Incorporated,
19    pursuant to Notice and agreement of Counsel, in
      accordance with the Georgia Civil Practice Act before
20    Daniel M. Gershwin, Certified Court Reporter and
      Notary Public, at 1600 Northside Drive, Suite 250,
21    Atlanta, Georgia, on the 12th day of March, 2001,
      commencing at the hour of 1:26 p.m.
22
23
24              WHEELER REPORTING COMPANY, INC.
                1600 Northside Drive, Suite 250
25                   Atlanta, Georgia  30318
                        (404) 351-4577
```

WHEELER REPORTING COMPANY, INC.

Jones and Highsmith vs. OCF, et al.

Richard L. Hatfield



**EXHIBIT V**

58

1    Plaintiff's counsel regarding lighting and

2    what it means to an industrial hygienist to

3    evaluate the potential exposure, you don't

4    understand the relevance of that?

5    MR. COLEMAN:  You are misusing the term

6    "reviewed."

7    Q.   (By Ms. Byrne)  Okay.  Mr. Ewing, did you

8    or did you not review that material after your

9    conversation Monday night with the Warrick

10    attorneys, Steve Tigarman and Gary Cohen?

11    A.   The next morning I went through and

12    looked at Spurney's book, I looked at Vincent's

13    book, I looked at the Carter Study, and I looked at

14    Chissick's book.

15    In Chissick's book I found really what I

16    was looking for, and that is what I copied and sent

17    to Mr. Cohen, but I will be glad to try and pick out

18    the pages that I looked at in the other ones and

19    send that, too.

20    MR. BERFIELD:  This is Frank Berfield.

21    Mr. Ewing, I would ask that you do that,

22    please.

23    Q.   (By Ms. Byrne)  Do any of the materials

24    that you have reviewed since your last deposition

25    indicate that lighting and viewing particles in a

59

1  light source is a way to quantify asbestos

2  exposure?

3      A.    I would say not.  They really don't talk

4  about quantification.  It is really more useful for

5  looking at sources and pathways of exposure, not

6  really the quantity that is in there.

7      Q.    Are you aware of any published literature

8  which indicates that it is appropriate to use

9  lighting to determine the quantity of asbestos dust

10  in the air?

11      A.    I think the answer to your question as I

12  think you are asking it is no, but I do recognize

13  that there are instruments, for example, the fibrous

14  aerosol monitor is an instrument that uses lighting

15  to measure asbestos fibers in the air.  But I don't

16  think that that is what you are asking me.

17      Q.    Well, in Dr. Longo's Value Parking

18  Study II, that instrument was not used, correct?

19      A.    No, it was not.

20      Q.    All right.  And would you agree with me

21  that in order to determine the level of respirable

22  asbestos fibers in the air from any given operation

23  at any given time, that air monitoring needs to be

24  done?

25      A.    Yes.

194

Q.   Do you then agree -- do

you agree that when looking at the videotapes while

the Tyndall beam is on, there is no way to quantify

the percentage of respirable asbestos fiber in the

air as depicted by the videotape?

A.   Well, that is a different question than

what you had asked me earlier.

Q.   I know.

A.   You can't quantify the amount of asbestos

in the air.  I know that some of the particles that

you will see are of a respirable size, and I think

on one of the pages that I will send you from

Spurney's book, it explains that.

MR. BERNFIELD:  I am going to move to

strike as nonresponsive.

MR. BYRNE:  I am going to ask the court

reporter to read back my original question

and ask the witness if he can answer that.

THE WITNESS:  Well, I remember your

question, and you are right, you asked me

to -- could I quantitate it and I didn't

answer that.

And I think my answer is no, I could

not be able to quantitate and say a

particular percentage is respirable and

```
                                                          105

 1      ... .. .. .. . .. .. ..

 2      videotapes alone.

 3      Q.    (By Ms. Byrne)  Okay.  Are you able to --

 4      strike that.

 5            Would you agree that those videotapes

 6      show airborne matter other than asbestos?

 7      A.    Yes, it does.

 8      Q.    And do you know the composition of the

 9      airborne matter depicted in the videotape in terms

10      of what other materials you see floating in the

11      air?

12      A.    Well, I would expect it to have graphite

13      where the graphite -- I think graphite packing was

14      used in both of those.  I would have to look back

15      and see.  But it would basically be the other

16      materials that were in the packing.

17            In this instance, the valves themselves

18      had been thoroughly cleaned and painted, so there

19      really wasn't anything -- there shouldn't have been

20      anything else but the packing.  There may be small

21      amounts of dust that results from the way that was

22      used.  But that is about it.

23      Q.    I didn't hear -- I heard you say there

24      may be small amounts of dust that result from, and

25      then it cut off.
```

115

1    book; is that right?

2         A.   Yes, that is right.

3         Q.   All right.  We are up to the subject of

4    the Tyndall beam.  You told me it is not possible to

5    quantify the percentage of respirable asbestos

6    fibers that can be seen in the videotape.

7              Is it possible to discern, as far as the

8    airborne particulate matter shown in the videotape,

9    what percentage is asbestos versus nonasbestos

10   material?

11        A.   Just looking at the videotape you could

12   not do that.

13        Q.   Has anything else been done in relation

14   to the Valve Packing II Study to allow you to do

15   that?

16        A.   Well, I know that the -- there was air

17   sampling going on throughout the -- all of the

18   studies, and I don't know whether Dr. Longo could go

19   back and look at those samples and look at the

20   nonasbestos portion, and in that way give you a

21   pretty good estimate of what percentage of what is

22   being seen would be asbestos and what percent would

23   be nonasbestos.

24        Q.   Have you tried to do that?

25        A.   No, I haven't.

117

1
2  Do you have a copy of all of the backup data from
3  the study?

4      A.   I believe so.

5      Q.   All right.  Do you believe that the
6  appropriate backup data exists for somebody to
7  attempt such a quantification based on the materials
8  you have been provided?

9      A.   I don't think so.  I think you would have
10  to do further analysis on the samples, and I don't
11  know whether it would be possible on the samples as
12  they exist now or not.

13      Q.   What type of further analysis would you
14  need to do?

15      A.   Well, the analysis that has been done
16  tells you the concentration of asbestos in each
17  sample.  What you would need to answer the question
18  you have asked would be the concentration of
19  nonasbestos particles.

20           Now, I am not sure whether you are asking
21  other fibrous materials or all other particles.

22      Q.   Well, if I am looking at the video and I
23  see airborne particulate matter, when I am watching
24  it, how am I supposed to know how much of that is
25  respirable asbestos fiber?

125

MR. COTTER:  To avoid I'm sure you can straighten it out.

THE WITNESS:  Well, based on I guess this is Mr. Gay's description, Dr. Gay's description, he knows that there was, as he said, considerable, I am not sure exactly how considerable is, but Anchor Packing, some of it may very well have been Anchor Packing and I guess probably was based on what he said.

But I am just saying I can't say with any certainty specifically what came out of those valves.

I would have to leave it up to, perhaps, someone like, again, Dr. Longo or Dr. Millette if they have the ability based on looking at the removed material to narrow something down and say, well, it couldn't have been Anchor or it must have been Anchor or something based on a particular type of characteristic of the removed material.

I am not aware that anything like that has been done or can be done or will be done.

Q.    (By Ms. Byrne)  Okay   Is cellulose a fibrous material that could be seen as particulate matter in a Tyndall beam?

135

1     A.    Yes.

2     Q.    What percentage of the airborne

3 particulate shown in the Tyndall beam on the

4 videotape is cellulose?

5     A.    I don't know.

6     Q.    What percentage of the airborne

7 particulate matter seen in the Tyndall beam on the

8 videotape is graphite?

9     A.    I don't know.

10     Q.    Now, when I was asking you earlier about

11 the residue in the stuffing box after packing

12 removal, are you familiar with lime or calcium

13 composing part of that residue from the valve

14 itself?

15     A.    That would be possible, depending on what

16 was going through the line that the valve was in.

17     Q.    Now, you understand these to be valves

18 that were used on steam lines at a wood processing

19 mill in Oregon, correct?

20     A.    Yes.

21     Q.    Is it your understanding that these were

22 steam valves?

23     A.    I am sorry, I misunderstood that.

24     Q.    Is it your understanding that these were

25 steam valves?

126

A.    Yes

Q.    If steam was going through these valves when they were on-line, would you expect that there may be some calcium or lime or other material in the composition of the residue in the stuffing box after packing removal?

A.    Well, I guess it would be possible.  I can't imagine there would be very much, though.

Q.    And you have never undertaken such an analysis, have you?

A.    No, I haven't.

Q.    So getting back to the composition of the airborne particulate matter in the Tyndall beam on the video, what percentage of that would be lime?

A.    Well, I don't even know that there is any lime there, so I don't know.

Q.    Assuming that there was lime in the residue in the stuffing box, based on the work practices that were used in this study, is it possible that some lime could become airborne and depicted in the Tyndall beam?

A.    Well, if you are making an assumption that there is some lime there to begin with, then it is possible that some would become airborne.

Q.    All right.  Is it fair to say for any

127

1    [illegible] ... a Tyndall ...

2    on the videotape, given the data that has been

3    collected so far, it is not possible to quantify the

4    percentage for any given particulate matter that is

5    seen in the videotape?

6        A.    I would agree with that.

7        Q.    All right.  As far as fibers -- well,

8    strike that.

9            Do you have an opinion regarding how

10   large an asbestos fiber has to be in order to be

11   depicted in a Tyndall beam?

12       A.    I would have to look that up to be

13   certain.  And it is not going to be a simple answer

14   because it is -- fiber length doesn't matter, it is

15   the diameter that matters.

16           MR. BERFIELD:  This is Frank Berfield.

17   I missed the last part.  Fiber length doesn't

18   matter, fiber width does; is that what you

19   said?

20           THE WITNESS:  Fiber diameter is what

21   would be the controlling factor.

22           MR. BERFIELD:  Okay.  Thank you.

23       Q.    (By Ms. Byras)  So fibers in order to be

24   depicted -- strike that.

25           In order for a fiber to be seen in a

55

1   light source is a way to quantify asbestos

2   exposure?

3        A.   I would say not.  They really don't talk

4   about quantification.  It is really more useful for

5   looking at sources and pathways of exposure, not

6   really the quantity that is in there.

7        Q.   Are you aware of any published literature

8   which indicates that it is appropriate to use

9   lighting to determine the quantity of asbestos dust

10  in the air?

11       A.   I think the answer to your question as I

12  think you are asking it is no, but I do recognize

13  that there are instruments, for example, the fibrous

14  aerosol monitor is an instrument that uses lighting

15  to measure asbestos fibers in the air.  But I don't

16  think that that is what you are asking me.

17       Q.   Well, in Dr. Longo's Value Parking

18  Study II, that instrument was not used, correct?

19       A.   No, it was not.

20       Q.   All right.  And would you agree with me

21  that in order to determine the level of respirable

22  asbestos fibers in the air from any given operation

23  at any given time, that air monitoring needs to be

24  done?

25       A.      Yes.

104

1    Q.    ... .... .....

2    you agree that when looking at the videotapes while

3    the Tyndall beam is on, there is no way to quantify

4    the percentage of respirable asbestos fiber in the

5    air as depicted by the videotape?

6    A.    Well, that is a different question than

7    what you had asked me earlier.

8    Q.    I know.

9    A.    You can't quantify the amount of asbestos

10    in the air.  I know that some of the particles that

11    you will see are of a respirable size, and I think

12    on one of the pages that I will send you from

13    Spurney's book, it explains that.

14    MR. BERFIELD:  I am going to move to

15    strike as nonresponsive.

16    MS. BYRNE:  I am going to ask the court

17    reporter to read back my original question

18    and ask the witness if he can answer that.

19    THE WITNESS:  Well, I remember your

20    question, and you are right, you asked me

21    to -- could I quantize -- and I didn't

22    answer that.

23    And I think my answer is no, I could

24    not be able to quantitate and say a

25    particular percentage is respirable and

105

```
 1      --- -- -- --- --- -- -- ---  ---
 2      videotapes alone.
 3          Q.   (By Ms. Byrne)  Okay.  Are you able to --
 4      strike that.
 5               Would you agree that those videotapes
 6      show airborne matter other than asbestos?
 7          A.   Yes, it does.
 8          Q.   And do you know the composition of the
 9      airborne matter depicted in the videotape in terms
10      of what other materials you see floating in the
11      air?
12          A.   Well, I would expect it to have graphite
13      where the graphite -- I think graphite packing was
14      used in both of those.  I would have to look back
15      and see.  But it would basically be the other
16      materials that were in the packing.
17               In this instance, the valves themselves
18      had been thoroughly cleaned and painted, so there
19      really wasn't anything -- there shouldn't have been
20      anything else but the packing.  There may be small
21      amounts of dust that results from the rag that was
22      used.  But that is about it.
23          Q.   I didn't hear -- I heard you say there
24      may be small amounts of dust that result from, and
25      then it cut off.
```

216

1    book, is that right?

2        A.    Yes, that is right.

3        Q.    All right.  We are up to the subject of

4    the Tyndall beam.  You told me it is not possible to

5    quantify the percentage of respirable asbestos

6    fibers that can be seen in the videotape.

7              Is it possible to discern, as far as the

8    airborne particulate matter shown in the videotape,

9    what percentage is asbestos versus nonasbestos

10   material?

11       A.    Just looking at the videotape you could

12   not do that.

13       Q.    Has anything else been done in relation

14   to the Valve Packing II Study to allow you to do

15   that?

16       A.    Well, I know that the -- there was air

17   sampling going on throughout the -- all of the

18   studies, and I don't know whether Dr. Longo could go

19   back and look at those samples and look at the

20   nonasbestos portion, and in that way give you a

21   pretty good estimate of what percentage of what is

22   being seen would be asbestos and what percent would

23   be nonasbestos.

24       Q.    Have you tried to do that?

25       A.    No, I haven't.

117

1

2    Do you have a copy of all of the backup data from

3    the study?

4        A.   I believe so.

5        Q.   All right.  Do you believe that the

6    appropriate backup data exists for somebody to

7    attempt such a quantification based on the materials

8    you have been provided?

9        A.   I don't think so.  I think you would have

10   to do further analysis on the samples, and I don't

11   know whether it would be possible on the samples as

12   they exist now or not.

13       Q.   What type of further analysis would you

14   need to do?

15       A.   Well, the analysis that has been done

16   tells you the concentration of asbestos in each

17   sample.  What you would need to answer the question

18   you have asked would be the concentration of

19   nonasbestos particles.

20            Now, I am not sure whether you are asking

21   other fibrous materials or all other particles.

22       Q.   Well, if I am looking at the video and I

23   see airborne particulate matter, when I am watching

24   it, how am I supposed to know how much of that is

25   respirable asbestos fiber?

124

1    MR. COTKIN:  Go ahead.  I'd trying you
can straighten it out.

2

3          THE WITNESS:  Well, based on I guess
4    this is Mr. Gay's description, Dr. Gay's
5    description, he knows that there was, as he
6    said, considerable, I am not sure exactly how
7    considerable is, but Anchor Packing, some of
8    it may very well have been Anchor Packing and
9    I guess probably was based on what he said.

10         But I am just saying I can't say with
11   any certainty specifically what came out of
12   those valves.

13         I would have to leave it up to,
14   perhaps, someone like, again, Dr. Longo or
15   Dr. Milhette if they have the ability based
16   on looking at the removed material to narrow
17   something down and say, well, it couldn't
18   have been Anchor or it must have been Anchor
19   or something based on a particular type of
20   characteristic of the removed material.

21         I am not aware that anything like that
22   has been done or can be done or will be done.

23         Q.   (By Ms. Byrne)  Okay.  Is cellulose a
24   fibrous material that could be seen as particulate
25   matter in a Tyndall beam?

125

1    A.   Yes.

2    Q.   What percentage of the airborne

3  particulate shown in the Tyndall beam on the

4  videotape is cellulose?

5    A.   I don't know.

6    Q.   What percentage of the airborne

7  particulate matter seen in the Tyndall beam on the

8  videotape is graphite?

9    A.   I don't know.

10   Q.   Now, when I was asking you earlier about

11  the residue in the stuffing box after packing

12  removal, are you familiar with lime or calcium

13  comprising part of that residue from the valve

14  itself?

15   A.   That would be possible, depending on what

16  was going through the line that the valve was in.

17   Q.   Now, you understand these to be valves

18  that were used on steam lines at a wood processing

19  mill in Oregon, correct?

20   A.   Yes.

21   Q.   Is it your understanding that these were

22  steam valves?

23   A.   I am sorry. I misunderstood that.

24   Q.   Is it your understanding that these were

25  steam valves?

126

1    A.    Yes.

2    Q.    If steam was going through these valves
3  when they were on-line, would you expect that there
4  may be some calcium or lime or other material in the
5  composition of the residue in the stuffing box after
6  packing removal?

7    A.    Well, I guess it would be possible.  I
8  can't imagine there would be very much, though.

9    Q.    And you have never undertaken such an
10  analysis, have you?

11    A.    No, I haven't.

12    Q.    So getting back to the composition of the
13  airborne particulate matter in the Tyndall beam on
14  the video, what percentage of that would be lime?

15    A.    Well, I don't even know that there is any
16  lime there, so I don't know.

17    Q.    Assuming that there was lime in the
18  residue in the stuffing box, based on the work
19  practices that were used in this study, is it
20  possible that some lime could become airborne and
21  depicted in the Tyndall beam?

22    A.    Well, if you are making an assumption
23  that there is some lime there to begin with, then it
24  is possible that some would become airborne.

25    Q.    All right.  Is it fair to say for any

127

```
          ...                    ... Tyndall ...
 2   on the videotape, given the data that has been
 3   collected so far, it is not possible to quantify the
 4   percentage for any given particulate matter that is
 5   seen in the videotape?
 6       A.   I would agree with that.
 7       Q.   All right.  As far as fibers -- well,
 8   strike that.
 9            Do you have an opinion regarding how
10   large an asbestos fiber has to be in order to be
11   depicted in a Tyndall beam?
12       A.   I would have to look that up to be
13   certain.  And it is not going to be a simple answer
14   because it is -- fiber length doesn't matter, it is
15   the diameter that matters.
16            MR. BERFIELD:  This is Frank Barfield.
17       I missed the last part, fiber length doesn't
18       matter, fiber width does; is that what you
19       said?
20            THE WITNESS:  Fiber diameter is what
21       would be the controlling factor.
22            MR. BERFIELD:  Okay.  Thank you.
23       Q.   (By Ms. Byrne)  So fibers in order to be
24   depicted -- strike that.
25            In order for a fiber to be seen in a
```