EXHIBIT W

```
 1
 2              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 3              IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO
 4                             ---oo---
 5
 6       HON. IDA LEVIN GYEMANT, JUDGE                ROOM 502
 7                             ---ooo---
 8
 9       JOHN CARLSON, ET AL.,            )
10                       PLAINTIFF,       )
11       VS.                             )         NO.  979593
12       LEAR SIEGLER, ET AL             )
13                       DEFENDANT.      )
14       _____

15
16       REPORTER'S TRANSCRIPT OF TESTIMONY OF DOCTOR WILLIAM LONGO
17                        AUGUST 13, 1996
                             ---ooo---
18       FOR THE PLAINTIFF:      BRAYTON, HARLEY & CURTIS
                                 ATTORNEY AT LAW
19                               BY: BRUCE JACKSON
                                 BY: STEPHEN FISHBACK
20
21       FOR THE DEFENDANT:      KESSAL, YOUNG & LOGAN
                                 ATTORNEY AT LAW
22                               BY: THOMAS M. MCALLISTER

23                               HARDIN, COOK, LOPER, ENGEL,
                                 & BERGEZ, LLP
24                               ATTORNEY AT LAW
                                 BY:  JAMES A. MIKACICH
25                               BY:  EUGENE BROWN

26                               LISA GREGG
                                 ATTORNEY AT LAW
27                             ---ooo---
28
```

TABLE OF WITNESSES

FOR THE PLAINTIFF:

WILLIAM EDWARD LONGO                                           1

DIRECT EXAMINATION
CROSS EXAMINATION BY MS. OBERG                                12
CROSS EXAMINATION BY MS. ADAMS                               13
CROSS EXAMINATION BY MR. BROWN                               15
EXAMINATION BY THE COURT                                      15
CROSS EXAMINATION BY MS. ADAMS                               23
EXAMINATION BY THE COURT                                     24
CROSS EXAMINATION BY MR. BROWN                               37
DIRECT EXAMINATION BY MR. JACKSON                            45
VOIR DIRE EXAMINATION BY MR. BROWN                           45
DIRECT EXAMINATION BY MR. JACKSON                            65
CROSS EXAMINATION BY MR. BROWN                               44
CROSS EXAMINATION BY MS. ADAMS                               92
RE-DIRECT EXAMINATION BY MR. JACKSON                         93
RECROSS EXAMINATION BY MR. BROWN                             94
RE-CROSS EXAMINATION BY MS. OBERG                            95
RE-DIRECT EXAMINATION BY MR. JACKSON                         97
EXAMINATION BY THE COURT                                    120
RE-CROSS EXAMINATION BY MR. MCCALLISTER                     121
EXAMINATION BY THE COURT                                    122
DIRECT EXAMINATION BY MR. JACKSON                           121
CROSS-EXAMINATION BY MR. CAMPAGNE                           139
RE-DIRECT EXAMINATION BY MR. JACKSON                        133


INDEX OF EXHIBITS

FOR THE PLAINTIFF:

NO.     DESCRIPTION                         IDENT.    ZVED.

B. TEST RESULTS                               69
C. TEST RESULTS                               69
D. TEST RESULTS                               69
F-1 STUDY                                     57
F-2 STUDY                                     57
E. FINDINGS, TRANSITE PIPE                   130
G. JOINT COMPOUND FINDINGS                   130

---oOo----

120

1    YES, YOUR HONOR.

2    Q.  DOCTOR LONGO, DID YOU ALSO DO DUST SAMPLES FOR THE

3    BRAKE PRODUCTS, THE AUTOMOTIVE BRAKE PRODUCTS, DURING THE

4    CLEAN-UP?

5    A.  YES, WE DID.

6    Q.  YES, YOU DID?

7    A.  YES, WE DID.

8        MR. JACKSON:  YOUR HONOR, RATHER THAN TAKING DOCTOR

9    LONGO THROUGH THIS PROCEDURE -- I THINK I MIGHT HAVE

10    DONE THIS THIS MORNING -- IF THERE ARE ANY FOUNDATIONAL

11    CONCERNS YOU WOULD WANT ME TO ADDRESS, I WILL CERTAINLY

12    DO THAT.

13        I THINK AT LEAST WITH RESPECT TO THE

14    CROSS-EXAMINATION ISSUES, I THINK I AM SATISFIED THAT

15    THEY HAVE BEEN TALKED ABOUT AND COVERED.  THE SIZE OF THE

16    CHAMBERS, I DON'T THINK DOCTOR LONGO HAS TESTIFIED ABOUT

17    THAT.  IT COULD MAKE A DIFFERENCE ON HIS AIR SAMPLING, IF

18    IT WAS A BIGGER LOCATION.

19        THE COURT:  I GUESS THE QUESTIONS IS:  DO YOU HAVE

20    ANY MORE QUESTIONS.

21        MR. JACKSON:  YES.  I AM ASKING YOU, I SUPPOSE, IF

22    THERE IS AN OBJECTION THAT COUNSEL IS STATING, SINCE I

23    HAVE NOTHING IN WRITING AS TO WHAT THOSE OBJECTIONS ARE,

24    I WOULD LIKE TO HAVE THOSE SPECIFIED SO AT LEAST I HAVE

25    AN OPPORTUNITY TO ADDRESS THEM BEFORE YOU MAKE A RULING.

26        THE COURT:  OKAY.  I JUST HAVE A COUPLE OF

27    QUESTIONS.

28            EXAMINATION BY THE COURT

111

1   Q.  WHAT WAS THE METHOD YOU USED TO DEVELOP --

2   A.  WE USED AN IN THE FIELD TECHNIQUE.

3   Q.  DID YOU INTERVIEW PEOPLE THAT WORKED ON BRAKES?

4   A.  YES.

5   Q.  WHAT WERE THE TOOLS THEY TOLD YOU THEY DID BEVELING

6   WITH?

7   A.  WITH HAND FILES.  MORE LIKELY THAN NOT WITH A HAND

8   FILE.  THE OTHER TECHNIQUES WERE USING AN ELECTRIC

9   GRINDER WHICH WAS A STONE WHEEL AND OCCASIONALLY THEY

10  WOULD USE SAND PAPER.

11      THE COURT:  OKAY, DO YOU HAVE ANYTHING ELSE?

12      MR. MCCALLISTER:  I HAVE A COUPLE OF MORE QUESTIONS

13  ON THE STUDY ON THE CLEAN UP.

14      RE-CROSS EXAMINATION

15  Q.  DID THE DUST YOU WERE STUDYING ON THE CLEAN UP

16  INCLUDE ANY DUST THAT MAY HAVE BEEN THERE DUE TO THE

17  ORIGINAL FILING DOWN OF THE BRAKES ON NEW PRODUCTS YOU

18  COULD I.D.?

19  A.  THAT IS ALL IT WAS.

20  Q.  THAT IS ALL IT WAS, WAS NEW PRODUCTS YOU COULD I.D.?

21  A.  YES.

22  Q.  NOT ON USED BRAKES?

23  A.  NO, SIR.

24  Q.  WHEN YOU WERE DOING THIS CLEAN UP STUDY, DID IT

25  INVOLVE -- WHAT I AM ASKING IS DID THE CLEAN UP STUDIES

26  INVOLVE DUST THAT WAS ONLY FROM THE ORIGINAL FILING OF

27  THE BRAKES; IS THAT CORRECT?

28  A.  THAT IS CORRECT.

MARRIOTT 651

222

1  Q.  DO YOU HAVE ANY IDEA WHAT PERCENTAGE OF THE DUST, IF

2  ANY, OF MR. CARLSON'S GARAGES CONSISTED OF OLD BRAKE DUST

3  VERSUS NEW BRAKE DUST.

4  A.  NO, SIR, I DON'T.

5      MR. MCCALLISTER:  THAT IS ALL I HAVE.  THANK YOU.

6      MR. JACKSON:  NOTHING FURTHER, YOUR HONOR.

7      THE COURT:  I HAVE JUST ONE QUESTION.

8        EXAMINATION BY THE COURT

9  Q.  FROM MY MEMORY FROM THE VIDEO TAPE I WATCHED BEFORE

10  OF THE TRUCK SHOES --

11  A.  IN CARLSON'S, YES.

12  Q.  IN CARLSON'S, WAS THAT IT WASN'T A HAND FILE THAT WAS

13  USED.  SOMETHING ELSE WAS USED?

14  A.  NO.  ACTUALLY, THAT WAS A HAND FILE.

15  Q.  THAT WAS A HAND FILE?

16  A.  YES, MA'AM.

17      ATTORNEY NO. 2:  YOUR HONOR, I BELIEVE WE WATCHED

18  THE CARLISLE VIDEO.  IT WAS A LARGE BLOCK WITH AN

19  INDUSTRIAL SIZED SIZE PIECE OF EQUIPMENT AND THERE WAS A

20  BIG RASP THEY WERE USING ON IT, IF I AM NOT MISTAKEN.

21      MR. JACKSON:  I THINK DOCTOR LONGO CAN EXPLAIN IT.

22      I WILL ONCE AGAIN STATE, FOR THE RECORD, THAT HIS

23  STUDIES WITH RESPECT TO THE CARLISLE VIDEO, I AM NOT EVEN

24  GOING TO ASK HIM ABOUT OR EVEN REFER HIM TO THE

25  AUTOMOTIVE.  I CAN'T SPEAK.  IT IS GETTING LATE.

26      THE AUTOMOTIVE BRAKE ASBESTOS COUNT IS WHAT I AM

27  GOING TO BE OFFERING HIM AS A WITNESS FOR.  I WAS MORE

28  CONCERNED ABOUT THE METHOD USED IN THE TEST.

THE WITNESS:  THERE ACTUALLY WAS A FILE

EXAMINATION BY THE COURT

THE COURT:   Q.   BUT DID YOU USE A RASP ON THE OTHER ONE?

A.   WE USED A RASP AND A FILE ON THE AUTOMOTIVE.  THAT IS HOW THEY USED TO DO IT.

Q.   SO NOW I THINK IT IS NOT CLEAR?

A.   ON THE CAR, LIKE THE BRAKES, THIS WAS JUST FILED BECAUSE THEY USED TO JUST FILE THE EDGE ON THE AUTOMOTIVE WHERE THEY HAD HIGH SPOTS.  TO FILE DOWN THEY WOULD TYPICALLY USE EITHER A RASP AND FILE OR JUST A FILE.

Q.   AND YOU USED HEAT, A RASP AND A FILE IN YOUR STUDIES?

A.   YES.

Q.   AND DID YOU DISTINGUISH BETWEEN THE AMOUNT OF ASBESTOS YOU WOULD GET USING A RASP AND WHEN YOU WERE USING THE FILE?

A.   NO, MA'AM.  WE INTERVIEWED OR READ TESTIMONY THEY WOULD USE BOTH.  THEY WOULD USE ONE AND THEN THE OTHER TO SORT OF TAKE OFF THE THE MATERIAL, THEN SMOOTH IT UP WITH THE FILE SO WE JUST WANTED TO REPEAT WHAT THE INDIVIDUALS DID.

Q.   DID THEY TELL YOU HOW LONG THEY USED THE RASP OR HOW LONG THEY USED THE FILE?

A.   THIS USUALLY WAS ALWAYS BETWEEN THREE AND FOUR MINUTES PER SHOE AND THAT IS WHAT HE DID.

Q.   I DON'T WANT TO BELABOR THIS BUT THE 3 OR 4 MINUTES USING WHAT?

USING BOTH THE RASP AND THE FILE.  SO THE WAY I

```
 1    MEASURE. IF YOU HAVE ONE SHOE THAT YOU SAID TO LEVEL AND
 2    FIT INTO A WHEEL DRUM AND IT TOOK THEM BETWEEN THREE AND
 3    FOUR MINUTES USING BOTH TOOLS.
 4        OKAY.  ANYTHING ELSE?
 5        MR. MCCALLISTER:  NO, YOUR HONOR.
 6        MR. JACKSON:  NO, YOUR HONOR.
 7        MR. MCCALLISTER:  I WOULD SUBMIT THAT HE IS NOT
 8    QUALIFIED OR THIS TESTIMONY IS NOT COMPETENT TO GO BEFORE
 9    THE JURY BECAUSE THIS IS NOT ANY WHERE CLOSE TO
10    SUBSTANTIALLY SIMILAR TO THE ENVIRONMENT THAT JOHN
11    CARLSON WORKED IN OR THE ISSUES THAT ARE INVOLVED IN THE
12    CASE.  I THINK WHAT IS A BIG POINT HERE IS THAT THEY'RE
13    MEASURING EXPOSURE FROM NEW IDENTIFIABLE BRAKE PRODUCTS.
14        OUR CASE IS ONLY ABOUT EXPOSURE TO PRODUCTS THAT
15    ARE BEING REMOVED FROM CARS AFTER THEY HAVE BEEN USED
16    THAT ARE NOT GROUND WITH A RASP OR NOT GROUND WITH A FILE
17    OF ANY SHORT.  THAT IS WHAT THIS WHOLE MARKET SHARE
18    THEORY IS ABOUT.  THIS IS NOT ABOUT NEW PRODUCTS BECAUSE
19    THEY CAN IDENTIFY THOSE AND MR. CARLSON IDENTIFIED
20    SEVERAL PRODUCTS THAT HE ACTUALLY WORKED WITH EARLIER IN
21    THE CASE AND THOSE PEOPLE ARE NOT IN THE CASE ANYMORE.
22        SO THE MARKET SHARE THEORY FOR MY CLIENT ONLY DEALS
23    WITH. BECAUSE MARKET SHARE DOES NOT APPLY WHEN YOU HAVE A
24    IDENTIFIABLE PRODUCT. THIS IS A THEORY THAT IS ONLY
25    BASED UPON WHEN YOU CAN'T IDENTIFY PRODUCTS. THE ONLY
26    PRODUCTS THEY CAN'T IDENTIFY ARE THE ONES THAT ARE TOO
27    OLD.  ALL OF THE MARKINGS HAVE COME OFF.  SO WE ARE ONLY
28    DEALING WITH DUST FROM USED BRAKES.  THAT IS THE ONLY
```

125

1   THING THAT IS APPLICABLE IN A CASE WITH NO LITTLE EXPOSURE

2   FROM THOSE BRAKES.

3       THE COURT:  ARE YOU SAYING MR. CARLSON DIDN'T PUT

4   ON NEW BRAKE PADS.

5       MR. MCCALLISTER:  I AM SURE HE DID THAT BUT THAT IS

6   NOT THE ISSUE IN THIS CASE BECAUSE THE MARKET SHARE

7   THEORY. THE ONLY REASON WE ARE IN THIS CASE. IS BASED

8   UPON ONLY USED PRODUCTS.  THAT IS THE WHOLE THEORY OF

9   THIS CASE IS THEY CAN IDENTIFY ALL THE PRODUCTS MAKERS

10   BECAUSE HE HAS A SUPERVISOR.  HE KNEW ALL THE PRODUCTS

11   THAT WERE COMING INTO HIS STORE.

12       SO WHEN YOU HAVE A PRODUCT I.D., THIS DOES NOT

13   APPLY TO MARKET SHARE BECAUSE HE HAS A WAY TO GET A

14   RECOVERY.  MARKET SHARE IS ONLY IF YOU CAN'T IDENTIFY

15   ANYBODY LIKE IN THE SINDEL CASE WHERE THEY COULDN'T

16   IDENTIFY WHICH PILL THEY WERE TAKING.

17       SO WHAT THE PLAINTIFFS HAVE DONE IS CARVE OUT THIS

18   LITTLE AREA WHERE YOU TAKE OFF THE BRAKE.  YOU CAN'T

19   IDENTIFY THEM AND THEN THEY GET THIS DUST FROM THOSE

20   BRAKES, NOT THE NEW ONES, NOT DUST THAT IS COMBINED WITH

21   THAT DUST. IT IS ONLY EXPOSURE FROM THE FOSTER-RITE STUFF

22   THAT WE ARE TALKING ABOUT AND HE DOES NOT HAVE ANY

23   INFORMATION THAT IS RELEVANT TO THIS CASE BASED UPON

24   THAT.

25       SO HE SHOULD BE EXCLUDED FROM THIS CASE AND ALL OF

26   HIS STUDIES DEALING WITH BRAKES THAT WERE BRAND NEW.  YOU

27   DON'T FEAR NEW BRAKES.  YOU DON'T GRIND THEM.  YOU DON'T

28   DO ANYTHING TO THEM EXCEPT FOR TAKING THEM OFF AND

```
 1   THROWING THEM AWAY.  THAT IS WHY I ASKED HIM THAT
 2   QUESTION.  SO HIS STUDY WOULD BE IRRELEVANT TO THIS CASE.
 3        MR. JACKSON:  WELL, WHAT MR. MCCALLISTER IS DOING
 4   HERE IS ESSENTIALLY COMBINING AN ARGUMENT OF CAUSATION
 5   WITH THE ARGUMENT OF THE LIABILITY PORTION OF IT WITH
 6   RESPECT TO WHAT SOMEONE CAN PROCEED UNDER, WHAT TYPE OF
 7   EXPOSURE, UNDER MARKET SHARE.
 8        AT THIS POINT WE ARE OFFERING THIS EVIDENCE TO
 9   ESTABLISH THAT MR. CARLSON WAS EXPOSED TO ASBESTOS
10   FRICTION MATERIALS AND THAT HAS CAUSED HIM TO SUSTAIN
11   INJURIES.  NOW, THE SECOND QUESTION IS WHAT LEAR
12   SIEGLER'S LIABILITY IS.
13        THAT GOES TO PLAINTIFF'S MARKET SHARE THEORY OF
14   LIABILITY IN THE FIRST SHARE; ALL EXPOSURES TO BRAKE
15   FRICTION PRODUCTS, WHICH CAUSED MR. CARLSON'S INJURIES.
16   CAUSATION AS TO DAMAGES IS ABSOLUTELY RELEVANT.
17        NOW, MR. MCCALLISTER IS STILL ENTITLED TO PUT ON
18   EVIDENCE ABOUT LEAR SIEGLER'S PRODUCTS, THAT HE WASN'T
19   EXPOSED TO LEAR SIEGLER'S PRODUCT AND THAT GETS US TO
20   MARKET SHARE.  THAT IS A DIFFERENT QUESTION.  WE HAVEN'T
21   EVEN RESOLVED THAT ISSUE YET.
22        I BELIEVE THE STANDARD IS IF A PRODUCT IS FUNGIBLE
23   AND AND A SUBSTANTIAL AMOUNT OF A PERSON'S EXPOSURE IS
24   THROUGH REPAIR, THIS DOES NOT MEAN THAT HE CAN'T HAVE ANY
25   EXPOSURE TO NEW BRAKE PRODUCTS.  IN FACT MR. CARLSON DID
26   TESTIFY THAT HE ARCED AND GROUND BRAKES AND HE DID
27   TESTIFY THIS WAS DUSTY.  HE JUST TESTIFIED TO THAT
28   YESTERDAY.  AS TO NEW PRODUCTS, IF HE CAN'T IDENTIFY
```

1   THOSE, AND THOSE CAUSED HIS EXPOSURE. I THINK STILL HE

2   WOULD BE ENTITLED, AS LONG AS THERE IS A SUBSTANTIAL

3   AMOUNT OF EXPOSURE THAT IS STILL COMING FROM REPAIR JOBS

4   ON NONE INDENTIFABLE OR UNIDENTIFABLE BRAKES PRODUCTS,

5   THIS IS STILL RELEVANT.

6       THE COURT:  SO YOU'RE GOING TO ASK THIS JURY TO

7   DISTINGUISE -- FIRST, YOU'RE GOING TO ASK THEM WHAT IS

8   THE MR. CARLSON'S TOTAL ASBESTOS DAMAGE AND THEN YOU'RE

9   GOING TO ASK THEM TO DISTINGUISE BETWEEN HOW MUCH HE GETS

10  FROM BLOWING OUT THE OLD RESIDUE AND HOW MUCH HE GOT FROM

11  FILING AND BEVELING THE NEW SHOES AND THEN FROM THERE WE

12  GO INTO OF THE OLD DUST, WHAT IS HEAR SIEGLER'S MARKET

13  SHARE OF THAT, AND THEN THAT THAT WILL DETERMINE HOW MUCH

14  THEY ARE GOING TO PAY.

15      MR. JACKSON:  UNDER WHEELER I THINK THE STANDARD IS

16  IS A SUBSTANTIAL AMOUNT OF THE EXPOSURE IS FROM REPAIR

17  WORK, IN OTHER WORDS, NONE IDENTIFABLE PRODUCTS AND

18  CROSS MATERIALS ARE FUNGIBLE AND THE OTHER STANDARDS ARE

19  MET FOR PROCEEDING UNDER MARKET SHARE.  I DON'T THINK THE

20  JURY HAS TO MAKE THAT DETERMINATION.  I THINK THEY JUST

21  HAVE TO FIND IF THERE IS A SUBSTANCIAL AMOUNT OF

22  EXPOSURE.  THEY HAVE TO MAKE A DETERMINATION THAT THE

23  MAJORITY OF THE EXPOSURE WAS DUE TO BRAKE PRODUCTS OR NEW

24  BRAKE PRODUCTS.  THEY DO HAVE TO DO THAT.  I DON'T THINK

25  THEY HAVE TO COME UP WITH ANY EXACT PERCENTAGE.

26      THE COURT:  WHAT IS THE RELEVANCE OF THIS TESTIMONY

27  UNLESS YOU HAVE DOCTOR LONGO DO A STUDY OF THE AMOUNT OF

28  ASBESTOS DUST THERE IS IN BLOWING OUT THE OLD PRODUCT?  I

126

1   DON'T SEE HOW THIS TESTIMONY ALONE IS RELEVANT IN THE
2   CARLSON CASE.
3        MR. JACKSON: BECAUSE AT STEP ONE WE HAVE -- STILL
4   HAVE THE INITIAL BURDEN, THAT IS, TO PROVE THAT ASBESTOS
5   HAS CAUSED -- ASBESTOS HAS CAUSED MR. CARLSON'S INJURIES,
6   CAUSATION AND DAMAGES. THE 3RD LEVEL IS WHO IS
7   RESPONSIBLE FOR THE LIABILITY. THAT IS A SEPARATE ISSUE
8   BUT AT SOME POINT WE'RE GOING TO ASK HIM TO DISTINGUISH
9   BETWEEN THE OLD DUST AND NEW BEVELING.
10       THE COURT: WHEN ARE YOU GOING TO DO THAT?
11       MR. JACKSON: THAT IS A FACTUAL DETERMINATION THAT
12   THE JURY HAS TO MAKE.
13       THE COURT: WHEN ARE THEY GOING TO DO THAT.
14       MR. JACKSON: IN THE LIABILITY PHASE, WHAT LEAR
15   SIEGLER'S LIABILITY IS.
16       THE COURT: SO THEN YOU'RE GOING TO HAVE AN EXPERT
17   IN TO SAY HOW MUCH OF THE ASBESTOS CAME FROM THE DUST
18   FROM THE OLD. WHAT INFORMATION ARE YOU GOING TO GIVE THE
19   JURY UPON WHICH THEY ARE GOING TO BASE THIS DECISION.
20       MR. JACKSON: TO DETERMINE THE PERCENTAGE OF
21   EXPOSURE TO NEW BRAKE TERMS AS OPPOSED TO USED?
22       THE COURT: RIGHT.
23       MR. JACKSON: I THINK THE ONLY QUESTION THAT WILL
24   BE PUT TO THEM IS WAS THIS WHETHER A SUBSTANTIAL SHARE OF
25   HIS EXPOSURE WAS DUE TO USED MATERIALS. I THINK THAT IS
26   THE STANDARD THEY DO HAVE TO MEET.
27       THE COURT: WHAT EVIDENCE ARE THEY GOING TO HAVE TO
28   BASE A DECISION ON?

MR. JACKSON:  MR. CRELSON'S TESTIMY /

THE COURT:    BUT THIS '? TRE STUFF     YOU JUST SAID IS LOP-SIDED.  YOU'RE NOT GIVING THEM ANY INFORMATION ON THE FIBER COUNT OF BLOWING OUT THE OLD DUST?

MR. JACKSON:  THAT IS TRUE.  I DO NOT HAVE THAT INFORMATION.  THAT IS CORRECT.  I DO NOT HAVE THAT INFORMATION TO OFFER.

THE COURT:  OKAY.  DO YOU ANYTHING ELSE.

MR. MCCALLISTER:  JUST TO SUM UP.  THAT ALONE SHOWS THAT THE PREJUDICE OF HAVING DOCTOR LONGO TESTIMONY MAKES THE PROBATIVE VALUE OF THIS SO FAR OUTWEIGHED BY THE PREJUDICE HERE, BECAUSE OF THAT STATEMENT ALONE.  THAT IT DO IT SHOULD BE EXCLUDED.

THIS IS NOT HELPFUL TO THE JURY IN ANY WAY AND I SPECIFICALLY ASKED HIM IF HE HAD AN OPINION ABOUT THE PERCENTAGE OF ASBESTOS EXPOSURE FROM THE NEW STUFF VERSUS THE OLD STUFF AND HE DOES NOT HAVE AN OPINION ON THAT.  SO HE CAN'T HELP THIS JURY IN ANY WAY.  ALL HE CAN DO IS PREJUDICE MY CLIENT AND CONFUSE THE ISSUES.

THE COURT:  OKAY.  ANYTHING ELSE.

MR. JACKSON:  I THINK I HAVE STATED EVERYTHING I HAVE TO SAY ON THAT ISSUE.

THE COURT:  OKAY.  SO SHALL WE MOVE TO THE JOINT COMPOUND.

MR. JACKSON:  YES.  AND I WILL TRY TO SPEED THINGS UP.

DIRECT EXAMINATION

Q.  WHAT AIR SAMPLING, IF ANY, HAVE YOU DONE ON

```
 1    ASBESTOS-CONTAINING JOINT COMPOUND.
 2        AT HIGH SPEEDS WITH JOINTS ... THE JOINT COMPOUND
 3    AS WELL AS AT THE SANDING OF JOINT COMPOUNDS THAT CONTAIN
 4    ASBESTOS. OF COURSE.
 5    Q.  AND DID YOU MAKE A WRITTEN RECORD OF THOSE FINDINGS?
 6    A.  YES, SIR, I DID.
 7    Q.  DID YOU BRING A COPY OF THOSE WITH YOU TODAY?
 8    A.  YES, SIR.
 9        MR. JACKSON:  I ASK A COPY OF THESE WRITTEN
10    FINDINGS BE MARKED AS PLAINTIFF'S NEXT IN ORDER?
11        (THEREUPON THE AFOREMENTIONED DOCUMENT WAS MARKED
12    AS PLAINTIFF'S PLAINTIFF'S G FOR IDENTIFICATION
13    PURPOSES.)
14        MR. JACKSON:  Q.  DOCTOR LONGO, I WILL SHOW YOU
15    PLAINTIFF'S EXHIBIT G.  JUST SO WE ARE CLEAR FOR THE
16    RECORD. THIS IS A COPY OF THE WRITTEN FINDINGS FROM YOUR
17    THESE STUDY WHICH YOU DID ON ASBESTOS JOINT COMPOUND
18    MATERIALS STUDIES?
19    A.  YES.
20    Q.  DID YOU ANALYZE THE CONTENT OF THE ASBESTOS JOINT
21    COMPOUND MATERIALS BEFORE YOU DID THE SAMPLING?
22    A.  YES.
23    Q.  WHAT DID YOU FIND TO BE THE ASBESTOS CONTENT OF THE
24    JOINT COMPOUND.
25    A.  TEN PERCENT.
26    Q.  TEN PERCENT.  TEN PERCENT BY WEIGHT OR VOLUME?
27    A.  THIS WAS BY VOLUME, BUT THAT IS PRETTY CLOSE TO THE
28    WEIGHT PERCENTAGE.
```

GIVEN THAT HYPOTHETICAL, WOULD THAT PUT MR. PACHECO
IN A WORKING CONDITION WHICH WOULD BE SIMILAR OR
SIMILAR AS TO THOSE CONDITIONS WHICH WERE PERFORMED BY
YOU IN TAKING OR DOING THIS AIR SAMPLE ON THE JOINT
COMPOUND?

A.   WELL, IF HE WAS IN THE SAME ROOM OR THE NEXT ROOM HE
WOULD HAVE BY-STANDER EXPOSURE.

     MS. CAMPAGNE:   YOUR HONOR...I AM GOING TO OBJECT AS
NON-RESPONSIVE?

     THE COURT:   NO, I AM OVERRULING THE OBJECTION.

     MR. JACKSON:   Q.   HOW DOES THAT WORK.

A.   WELL, BY-STANDER EXPOSURE IS TYPICALLY SOMEBODY WHO
WORKS IN A DIFFERENT TRADE BUT WORKS IN AND AROUND AREAS
WHERE OTHER INDIVIDUALS ARE USING ASBESTOS.   THE ASBESTOS
FIBER GETS INTO THE AIR AND WILL CONTAMINATE THE
SURROUNDING AREAS.   THIS IS ESPECIALLY TRUE OF JOINT
COMPOUND BECAUSE OF THE DUST.   THE EXTREMELY DUSTY NATURE
OF THIS ACTIVITY OF SANDING JOINT COMPOUND.   IT TENDS TO
GET EVERYWHERE.   SO IF YOU'RE IN THE SAME ROOM OR IN THE
SAME VICINITY YOU WOULD HAVE THE SAME EXPOSURE.

     MR. JACKSON:   I BELIEVE THAT IS ALL I HAVE, YOUR
HONOR.

                    CROSS EXAMINATION

     MS. CAMPAGNE:   Q.   I WILL TRY TO MAKE IT BRIEF,
DOCTOR LUNDY?

A.   THAT IS FINE.

Q.   YOU HAVE NO INFORMATION WITH REGARD TO MR. PACHECO'S
PARTICULAR WORK HISTORY YOURSELF, DO YOU?

155

```
 1    A.  I DO NOT.

 2    Q.  DO YOU HAVE ANY INFORMATION AS TO WHETHER MR. PACHECO

 3    EVER EMPLOYED JOINT COMPOUND OR SANDED JOINT COMPOUND

 4    HIMSELF?

 5    A.  I DO NOT KNOW.

 6    Q.  DO YOU KNOW THAT -- DO YOU HAVE ANY INFORMATION AS TO

 7    WHETHER THE JOINT COMPOUND THAT MR. PACHECO ALLEGES HE

 8    WAS AROUND WAS A POWDERED JOINT COMPOUND OR PRE-MIXED

 9    JOINT COMPOUND?

10    A.  I DON'T KNOW.

11    Q.  AND IN YOUR STUDY YOU ONLY USED A POWDERED JOINT

12    COMPOUND.  IS THAT NOT CORRECT?

13    A.  THAT IS CORRECT.  DURING THE MIXING THAT WOULD MAKE A

14    DIFFERENCE.  BUT ONCE APPLIED AND SANDED IT WOULD BE NO

15    DIFFERENT BETWEEN POWDER AND PRE-MIXED.

16    Q.  BUT THIS WOULD HAVE A SUBSTANCE DIFFERENT DURING THE

17    MIXING OF THE PRODUCT; IS THAT CORRECT?

18    A.  ABSOLUTELY.  YOU OPEN A CONTAINER AND TAKE IT OUT AND

19    APPLY IT.  ONE OF THE PRIMARY REASONS TO MAKE THE PRE-MIX

20    IS TO STOP PEOPLE FROM MIXING IT WITH ASBESTOS IN IT.

21    Q.  WITH REGARD TO YOUR SIMULATION OF THE JOINT COMPOUND

22    APPLICATION, I JUST WANT TO GET STRAIGHT EXACTLY HOW YOU

23    DID THAT.  YOU DIDN'T PARTICIPATE, PERSONALLY, IN THE

24    APPLICATION.  THIS WAS THE PROFESSIONAL DRY-WALLER THAT

25    YOU HIRED; IS THAT CORRECT?

26    A.  THAT IS CORRECT.

27    Q.  AND YOU HUNG THE SHEET ROCK OR HE HUNG THE SHEET ROCK

28    AND PUT A COAT OF JOINT COMPOUND OVER THE SHEET ROCK?
```

```
 1   A.  HE TAPED AND -- ESSENTIALLY HE TAPED THE JOINT.  HE
 2   ... THE FIRST COAT ON.  HOW THAT IS DONE.  YOU PUT THE
 3   FIRST COAT ON.  THEN YOU USE A TROWEL.  A SPECIAL JOINT
 4   COMPOUND TROWEL.  WHAT WE USED TO CALL A SKIM BAR.  PUT
 5   THAT ON.  BUT THE PAPER IN AND THEN RUN ANOTHER SKIM COAT
 6   OVER THAT AND LET IT DRY.
 7   Q.  YOU PUT A PIECE OF TAPE, ESSENTIALLY.  OR PAPER, OVER
 8   THE JOINT.  THEN YOU PUT ANOTHER COAT ON IT.  THEN YOU
 9   LET IT DRY?
10   A.  CORRECT.
11   Q.  YOU DIDN'T SAND OR HE DIDN'T SAND BETWEEN WHEN HE PUT
12   ON THE FIRST COAT AND THE TAPE, CORRECT?
13   A.  NO.  THE TAPE GOES ON WITH THE FIRST COAT.  THAT IS
14   HOW YOU --
15   Q.  ANOTHER COAT IS EMPLOYED OVER THAT?
16   A.  WELL, HOW YOU DO IT IN THE FIRST STEP.  IS YOU GO OVER
17   THE JOINT.  YOU PUT THE TAPE IN.  THEN YOU RUN A SKIM
18   COAT RIGHT OVER IT.  RIGHT?  WHEN YOU DID THAT.  THEN YOU
19   LET THAT DRY.  THAT IS CONSIDERED THE FIRST COAT.  YOU
20   SAND THAT AND THEN GO BACK AND DO YOUR SECOND COAT AND
21   SOMETIMES YOUR THIRD COAT.
22   Q.  TELL ME WHAT BRAND OF JOINT COMPOUND YOU USED IN YOUR
23   --
24   A.  WE USED KAISER GYPSUM JOINT COMPOUND.  WE ALSO USED
25   U.S. GYPSUM PERF-A-TAPE FOR THE PAPER.
26   Q.  DOCTOR, YOU DIDN'T USE ANY EMULSION PRODUCTS IN ANY
27   OF YOUR TESTING, DID YOU?
28   A.  I DID NOT.
```

Q.  DO YOU HAVE ANY UNDERSTANDING OF WHAT THE ASBESTOS

CONTENT IS IN ...........

A.  YES.  I DO.

Q.  AND HOW IS THAT?

A.  I HAVE BEEN PROVIDED IN THE PAST WITH HAMILTON

INDUSTRY FORMULAS.  THEY'RE UNDER A PROTECTIVE ORDER.

UNLESS YOU'RE GOING TO WAIVE THAT PROTECTIVE ORDER FOR

ME, I CAN'T ANSWER THAT, I GUESS.

Q.  WELL, WHY DON'T I ASK YOU MORE SPECIFIC QUESTIONS.

DO YOU HAVE ANY INFORMATION AS TO THE ASBESTOS

CONTENT OF THE HAMILTON TOPPING COMPOUND?

A.  I READ A DEPOSITION FROM THE FOUNDER OF HAMILTON BUT

HE WAS -- I DON'T BELIEVE HE SAID WHAT ACTUALLY THE

AMOUNT IN IT WAS.  I GUESS I HAVE TO ANSWER YOUR QUESTION

I DON'T HAVE DIRECT KNOWLEDGE OF THE TOPPING COMPOUND.

Q.  LET ME ASK YOU A HYPOTHETICAL QUESTION.  IF THE TOP

LAYER OF COMPOUND OR THE TOPPING COMPOUND THAT WAS BEING

SANDED WAS A NONE ASBESTOS CONTAINING MATERIAL, THAT WOULD

MARKEDLY CHANGE THE DUST COUNT IN THE AIR, WOULDN'T THIS?

A.  IF YOU SAND A NON-ASBESTOS MATERIAL, I WOULD EXPECT

YOU NOT TO FIND ANY ASBESTOS IN THE AIR.

MS. CAMPAGNE:  YOUR HONOR, I AM GOING TO LEAVE THIS

AT THAT.  I HAVE NO FURTHER INQUIRY OF DOCTOR LONGO.

I WILL REPRESENT TO YOU, FOR THE RECORD, BOTH

HAMILTON GOBS AND HAMILTON PATCHING COMPOUND HAS BEEN A

NON-ASBESTOS CONTAINING MATERIAL.  THAT IS THE MATERIAL

THAT MR  PACHECO ALLEGED DURING THE DEPOSITION WAS

SANDED.  THEREFORE, I WOULD OBJECT TO THE JOINT COMPOUND

138

```
 1   STUDY AS DOCTOR LONGO DISCUSSED AND AS BEING STILL
 2   IRRELEVANT.
 3                    RE-DIRECT-EXAMINATION
 4        MR. JACKSON:  ONE QUICK QUESTION TO DOCTOR LONGO.
 5        Q.  WITHOUT REFERENCE TO THE SPECIFIC ASBESTOS CONTENTS
 6   OF THE JOINT COMPOUND FOR HAMILTON.  CAN YOU GIVE US AN
 7   OPINION.  YOU DID DO AN ANALYSIS OF THE ASBESTOS CONTENT
 8   FOR THE KAISER GYPSUM JOINT COMPOUND, CORRECT?
 9        A.  YES, SIR.
10        Q.  YOU SAID THIS WAS ABOUT 10 PERCENT.
11        A.  THAT IS CORRECT.  NO. 10 PERCENT WAS TYPICAL IN THE
12   INDUSTRY.
13        Q.  CAN YOU AT LEAST GIVE AN OPINION THAT HAMILTON'S
14   JOINT COMPOUND MATERIALS WOULD BE SUBSTANTIALLY SIMILAR
15   IN ASBESTOS CONTENT TO THE KAISER GYPSUM?
16        A.  THAT PUTS ME IN A DIFFERENT POSITION.
17        MS. CAMPAGNE:  I WILL REPRESENT TO THE COURT CG23
18   WILL SUPPORT THAT THE HIGHEST ASBESTOS CONTENT IN JOINT
19   COMPOUND, I BELIEVE, WAS 3.3 PERCENT.
20        MR. JACKSON:  Q.  OKAY.  I WILL NOT PUT YOU IN THAT
21   POSITION, EITHER.
22        THEN, LET ME ASK YOU THIS:  ASSUME THAT MR. PACHECO
23   WILL TESTIFY THAT HE HAS WORKED IN CLOSE PROXIMITY TO
24   DRYWALL SANDERS SANDING JOINT COMPOUNDS.  DOES THAT PUT
25   HIM IN A POSITION SIMILAR TO WHAT YOU HAVE DESCRIBED AS
26   THE CONDITIONS BEING IN THE AIR SAMPLING YOU DID FOR THE
27   JOINT COMPOUND?
28        A.  YES.  IT WOULD BE BYSTANDER EXPOSURE.
```

MR. JACKSON: THAT IS ALL I HAVE.

THE COURT: THANK YOU.

OKAY ANY OTHER ARGUMENT?

MR. JACKSON: NONE...YOUR HONOR.

THE COURT: WELL, MY RULING THEN WOULD BE, FOR THE JOINT COMPOUND, THAT DOCTOR LONGO'S TESTIMONY WOULD NOT BE ADMITTED. I DON'T THINK THIS IS RELEVANT. THIS DOESN'T SEEM TO HAVE ANY PROBATIVE VALUE WHATSOEVER.

IT CERTAINLY WOULD BE OUTWEIGHED BY THE UNDUE CONSUMPTION OF TIME AND CONFUSION OF THE ISSUES BUT IT REALLY DOES NOT SEEM TO HAVE ANY PROBATIVE VALUE.

WITH RESPECT TO THE THE BRAKES MR. CARLSON WORKED ON, I AM ALSO GOING TO RULE THAT DOCTOR LONGO'S TESTIMONY WOULD NOT BE ADMISSIBLE. I BELIEVE THAT WHATEVER PROBATIVE VALUE IT WOULD HAVE IN THAT CASE IS CLEARLY OUTWEIGHED BY THE CONFUSION OF THE ISSUES BEFORE THE JURY.

MR. MCCALLISTER: YOUR HONOR IS THERE ALSO A RULING THAT THE TESTS PERFORMED WERE SUBSTANTIALLY SIMILAR WITH REGARD TO DOCTOR LONGO'S TESTIMONY IN THE CARLSON CASE?

MR. JACKSON: SUBSTANTIALLY SIMILAR TO WHAT?

THE COURT: RIGHT.

MR. MCCALLISTER: AS FAR AS THE OBJECTION THEY ARE NOT TESTS WHERE THEY ARE SUBSTANTIALLY SIMILAR TO THE WORK ENVIRONMENT THAT MR. CARLSON WORKED IN.

THE COURT: YOU'RE ONLY IN THE CASE FOR MR. CARLSON'S EXPOSURE TO ASBESTOS DURING OFF MILL BRAKE

03/14/2005 14:43 FAX 4106914...                EXHIBIT 1-3                        @024

PRODUCTS.

MR. MCALLISTER:  RIGHT.

THE COURT:  NOT WORKING ON NEW BRAKE PRODUCTS.  THEN I DON'T THINK THE TESTS DOCTOR LONGO DID WOULD BE PROBATIVE AT ALL IN MR. JACKSON'S CASE.

MR. JACKSON:  CAN I ASK FOR CLARIFICATION WITH RESPECT TO THE JOINT COMPOUND.  YOUR RULING TO EXCLUDE THAT.  YOUR UNDERSTANDING OF WHY IT LACKS PROBATIVE VALUE.

THE COURT:  WHY?  BECAUSE THERE WAS NO ASBESTOS IN THEIR TOPPING COMPOUND.

MR. JACKSON:  WELL, THERE CERTAINLY WAS ASBESTOS IN THE JOINT COMPOUND MATERIALS SIMILAR IN NATURE TO THE JOINT COMPOUND MATERIALS WHICH HE DID TESTING ON AND MR. PACHECO WILL TESTIFY THAT HE WORKED IN CLOSE PROXIMITY TO PERSONS WHO SANDED JOINT COMPOUND.

THE COURT:  THE TOPPING MATERIAL WAS THE ONE THAT WAS BUT ON THE TOPPING THAT WAS SANDED.  THIS WITNESS TESTIFIED THERE SHOULD BE NO ASBESTOS IN THAT.

MR. JACKSON:  BUT THE JOINT COMPOUND IS ALSO SANDED.  THAT IS WHAT WAS SANDED, ACTUALLY, IN THE STUDY.  THAT IS WHAT MR. PACHECO SANDED.

THE COURT:  THAT IS NOT WHAT DOCTOR LONGO JUST SAID.

MR. CAMPANIE:  I HAVE BEEN TRYING TO EXPLAIN THIS TO HIM.

MR. JACKSON:  I UNDERSTAND YOUR RULING.

---oOo---

**EXHIBIT X**

817

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

BEFORE THE HONORABLE DIANE ELAN WICK, JUDGE

DEPARTMENT 611

--oOo--

MARK LEWIS, SHIRLEY HACKETT,)
                            )
        PLAINTIFFS,          )
                            )
    VS.                      )   NO.  306774
                            )
JOHN CRANE, INC., and GASKET)
HOLDINGS, INC.,              )
                            )
        DEFENDANTS.          )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS


MONDAY, APRIL 3, 2000

AFTERNOON SESSION

VOLUME C-2


REPORTED BY:   JOSEPH HAYDEN VICKSTEIN, CSR No.

813

A P P E A R A N C E S

For the Plaintiff:

Law Offices of HARTWICK, CARBER, HAROWITZ, SMITH & TIGERMAN
By: STEPHEN M. TIGERMAN, Attorney at Law
101 California Street, Suite 2200
San Francisco, Ca  94111

For the Defendant JOHN CRANE, INC.:

Law Offices of HASSARD BONNINGTON
By: JOHN R. CUMMINGS and MARGARET O'SULLIVAN BYRNE,
        Attorneys at Law
Two Embarcadero Center, Suite 1800
San Francisco, Ca  94111

For the Defendant GASKET HOLDINGS, INC.:

Law Offices of KNIGHT, BROWN & BONESTEEL
By: FRANK BERFIELD, Attorney at Law
100 Bush Street, 27th Floor
San Francisco, Ca  94104

```
1    observation until matter. Just please let me know   Just
2    bring me a little slip. You don't have to announce it in
3    front of everyone. Just bring me a little note tomorrow.
4    Otherwise, we will aim for recessing on Good Friday by noon.
5         So with that; if there are no questions, I will
6    remind you of the admonition not to discuss the case among
7    yourselves; and we will see you tomorrow morning not later
8    than 8:30. Thank you.
9         (WHEREUPON the following proceedings are had in
10   open court, out of the presence of the jury:)
11        THE COURT: At this time then a number of things.
12   Mr. Tigerman, I'm going to have to remind you that this is
13   not an interview, and to avoid the banter. I know it's
14   schmoozing the jury. You know it's not the appropriate way.
15   It's by question and answer. And so I am going to ask you
16   and your witnesses to -- as well as defense counsel, to
17   avoid doing that.
18        MR. TIGERMAN: Yes, Your Honor.
19        THE COURT: Also, the Court made some rulings and
20   before you leave today, you need to have the charts that
21   have been marked. And as a matter of fact, you may want to
22   have the pages and the rest of the tables marked that you
23   know you are going to be using, because the record needs to
24   be made as the pages are being marked what pages they are.
25        MR. TIGERMAN: Yes, Your Honor.
26        THE COURT: Next, there were a number of rulings
27   that I made this morning off the record so that the
28   testimony of Dr. Longo could go forward. And that was
```

662

1    before we had the reporter in  And so my ruling were as
2    follows:

3        With respect to the Defendants' motion to exclude
4    the testimony of Captain Messer-Fuller as a naval historian
5    regarding ship repair, the Court denied it in part and
6    granted it in part.  Captain Messer-Fuller will be permitted
7    to testify as a researcher of Navy records.  She may testify
8    as to the documents she obtained, where she obtained them,
9    and the contents of the documents.  She may also testify as
10   to what others told her about the content, i.e., defining
11   certain terms.

12       She may not interpret the documents and she may
13   not answer any hypothetical questions, as an insufficient
14   foundation has been established as to her expertise to do
15   so.  It is questionable whether she would qualify as a naval
16   historian.  And if so, it would be naval with a small "n" as
17   opposed to a U.S. Navy with a capital "N" historian.

18       Next, I did not rule on this this morning, but I
19   am prepared to do it at this time.  And this is regarding
20   the Plaintiff's motion to exclude evidence of the Navy's
21   negligence and apportionment of damages to the Navy.
22   Plaintiff's motion is denied.  In particular, the Richards
23   case which Plaintiff was relying on is distinguishable from
24   the facts of this case.  Richards was based on a California
25   immunity to tobacco companies, Civil Code Section 1714.45,
26   based upon a legislative judgment that tobacco companies
27   would not be held responsible for smoking-related disease.

28       In other words, the California Legislature

1   may testify about the installation of gaskets at the

2   shipyards where he was employed as well as his observations

3   about the use of gaskets and/or packing materials of the

4   Defendants.  He may not use any samples.  He may show the

5   U.S. Navy training film on insulation installation.  He may

6   not testify as to any testing that he has done on gaskets or

7   packing materials, as there's been an insufficient

8   foundation laid as to his ability to render such an opinion.

9        And then with respect to the motions concerning

10  the use of videotapes on Tyndall lighting and all of the

11  motions related thereto, it was granted in part and denied

12  in part.  The first segment of the Millette Tyndall

13  videotape that shows the Crane Packing Company gasket is

14  admissible.  The second segment showing the Garlock gasket

15  is not admissible as it is not relevant in this case.

16       As to the other five videotapes submitted by the

17  Plaintiff, they are excluded pursuant to Evidence Code

18  Section 352 as this Court believes their prejudice

19  substantially outweighs their probative value.

20       The Millette video portrays the movement of

21  airborne particles in the Tyndall light.  The other

22  videotapes have an air of doom and gloom about them as a

23  result of the use of moon suits and respirators.  The

24  enclosed tents and the movement of the persons in them.

25       Testimony by experts such as that just given by

26  Dr. Longo, however, as to work simulations is admitted so

27  long as there is sufficient foundation laid by the Plaintiff

28  and his co-workers and other witnesses.  If the foundation

272

1   is not late, the Court will strike the work simulation

2   testimony.

3       Testimony from experts such as studies or work

4   simulations or experiments on reentrainment of fibers is

5   excluded as it lacks a sufficient foundation as to its

6   reliability in the scientific community.

7       Plaintiff and his co-workers, however, may testify

8   as to their observations of fibers on their clothing.  When

9   the Plaintiff's counsel then proposed using the photograph

10  of one of the Tyndall beams taken from one of the five

11  videos, that did not include the moon suits, the

12  respirators, et cetera, the Court permitted that exhibit to

13  be used, which Dr. Longo just did.

14      MR. TIGERMAN:  May I seek some clarification just

15  on one item, Your Honor?

16      THE COURT:  Yes.

17      MR. TIGERMAN:  On the issue of reentrainment,

18  there will be medical testimony that that is significant

19  exposure without attempting to quantify it.

20      THE COURT:  That is acceptable.  There the Court

21  is not excluding that.

22      MS. BYRNE:  Can I get clarification?  Though it's

23  not to be based upon a hypothetical question based upon

24  Dr. Longo's counts.  Because as we showed in our brief,

25  there is absolutely nothing in the literature today that

26  allows somebody to determine whether those levels as counted

27  by Dr. Longo, are significant in terms of a health risk.  So

28  I take your order to mean that all experts are excluded from

873

1    using those numbers.

2           MR. TIGERMAN:  Your Honor, actually --

3           MS. BYRNE:  That was our motion.

4           MR. TIGERMAN:  The medical evidence will be that

5    if there is that level of asbestos on clothing, that that is

6    a significant health risk, period.  Nobody will attempt to

7    quantify how many fibers come off the clothes.  Although I

8    do want the Court to understand that -- and we may have to

9    do this outside the presence of the jury.  There is a

10   concept called "X Factor."  And scientists have measured the

11   amount of fiber release based on X Factor.  And, in fact,

12   Dr. Millette has even done studies on X Factors and fiber

13   release from surfaces, and he is able to and prepared to

14   testify about the release of fiber based on X Factor

15   studies.

16          We never did address all of the X Factor

17   information, because we wanted the Court to understand we

18   are not attempting to quantify the amount of dust that is

19   released from clothing, and we are not attempting to

20   quantify the amount of dust that's released from surfaces.

21          THE COURT:  All right.

22          MR. TIGERMAN:  All we want to do is have our

23   people say that that is a significant source of potential

24   exposure and it is actually a significant industrial hygiene

25   concern and a significant health risk.

26          THE COURT:  And if your witnesses, your experts

27   are able to testify to that as being sufficient, then they

28   may do so.  However, they may not quantify it.

374

```
 1        MR. TIGERMAN:   Right.   They will not [  ] the
 2   release of the fiber from the clothing and none of them has
 3   attempted to do that.   And none of them will attempt to
 4   quantify it other than to describe it as a significant risk
 5   or a significant --
 6        THE COURT:   So they can't take the levels that
 7   Dr. Longo has now placed on the clothes and attempt to
 8   extrapolate by showing that would be released.
 9        MR. TIGERMAN:   No, other than to say that would
10   definitely be a risk or an area of concern.
11        MS. BYRNE:   No.
12        THE COURT:   Right.
13        MR. TIGERMAN:   And medically that is very well
14   established and we can lay the foundation for that.
15        THE COURT:   But they can't testify that that would
16   be, that that amount would be reentrained.
17        MR. TIGERMAN:   No, they will actually testify that
18   that amount will not be reentrained.   But they will testify
19   that if that were indeed the case in any work environment,
20   it would be something that would be very much an issue of
21   increased risk.
22        THE COURT:   It can't be quantified.   That is the
23   Court's ruling.
24        MS. BYRNE:   So the question cannot be asked, "I
25   want you to assume that Dr. Longo did this experiment"
26        THE COURT:   I am not going to allow that.   You can
27   make your record at the end of tomorrow or so, outside the
28   presence of the jury, so you have got a record for going up.
```

03-14/2003 16:44 FAX 4106911          MARRIOTT BWI                              ✆043

875

1   But I am not going to allow that.

2        Okay, anything else?

3        MS. BYRNE:   Or anything even not based on

4   Dr. Longo.   "Assuming there was this level."

5        THE COURT:   Because that gets into the

6   reentrainment and there's been insufficient foundation.

7   Now, let's move on.   I am not hearing more argument.

8        MR. TIGERMAN:   Your Honor, I just want to know

9   when I can make a record on the issue of the entrainment,

10  not quantification.   Because the fact --

11       THE COURT:   Well, is Dr. Longo gone?   Or is he the

12  one that's going to make it?

13       MS. BYRNE:   He admits he can't.   It's in the

14  testimony.

15       MR. TIGERMAN:   That's not true, Your Honor.   He

16  doesn't admit he can't.

17       MS. BYRNE:   He swore under oath he can't.

18       MR. TIGERMAN:   The record has been misrepresented.

19  I told the Court I didn't have an opportunity to respond to

20  this.

21       MS. BYRNE:   The deposition's been taken and --

22       MR. TIGERMAN:   He is here, and I would like to lay

23  the foundation.

24       THE COURT:   Excuse me, but I need an hour's lunch

25  break.   I was in at 7:00 in the morning and I am going to

26  take a lunch break.

27       MR. TIGERMAN:   Can we return at 2:45 just to

28  elicit the foundational questions from him?   And then when

EXHIBIT Y

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

HONORABLE DIANE ELAN WICK, JUDGE PRESIDING

DEPARTMENT NO. 611

---o0o---

| | | |
|---|---|---|
| WARTNICK GROUP #53 (OTTONE GREGO) | ) ) ) | CASE NUMBER: 996240 |
| PLAINTIFF, | ) ) | |
| -v- | ) ) | |
| TRAILMOBILE TRAILERS, LLC | ) ) | |
| DEFENDANT. | ) ) ) | IN LIMINE MOTIONS |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
MONDAY, FEBRUARY 7, 2000
THURSDAY, FEBRUARY 10, 2000

---o0o---

APPEARANCES:

FOR THE PLAINTIFF:
RICHARD A. BRODY,
DIANA M. GARCIA,
WARTNICK CHABER HAROWITZ
SMITH & TIGERMAN
101 CALIFORNIA STREET
SUITE 2200
SAN FRANCISCO, CA 94111
(415) 986-5566

FOR THE DEFENDANT:
PETER LINDE &
JENNIFER SANCHEZ,
GIBSON & ROBB, LLP
275 BATTERY STREET
EMBARCADERO CENTER WEST
SUITE 320
SAN FRANCISCO, CA 94111
(415) 283-2300

REPORTED BY:
BRENDA C. FIELDS
OFFICIAL REPORTER
CSR NUMBER 7235

BRENDA C. FIELDS, CSR NUMBER 7235

```
1    MONDAY, FEBRUARY 7, 2000                    5:00 O'CLOCK A.M.
2
3                   P-R-O-C-E-E-D I-N-G-S
                          ---oOo---
4         THE COURT:  WE'RE HERE IN THE WARTNICK CASES.
5         PRESENT ARE MR. BRODY, MR. JACOBS, MR. LINDE,
6    MISS SANCHEZ, MR. CIRELLI, MR. VACCHINA, MISS CHOY.
7         AND WE HAVE JUST VIEWED THE PROPOSED TAPE THAT
8    PLAINTIFF WOULD LIKE DOCTOR WILLIAM LONGO TO BE ABLE
9    TO USE DURING HIS TESTIMONY.
10        AND I RECEIVED PAPERS ON BEHALF OF PLAINTIFF
11   TO PERMIT USE OF THE TAPE.  AND I HAVE OPPOSING
12   BRIEFS FROM CARLISLE AND LEAR SIEGLER.
13        BUT BECAUSE THE COURT PERMITTED JOINDER, THE
14   COURT IS REVIEWING THOSE AND IF ANYONE BELIEVES THAT
15   THEY NEED TO ADD SOMETHING, YOU CAN; OR YOU CAN MAKE
16   A VERBAL ARGUMENT THIS MORNING.
17        MR. LINDE:  YOUR HONOR, ON BEHALF OF
18   TRAILMOBILE, I DON'T KNOW THAT I GOT PLAINTIFF'S
19   MOVING PAPERS.
20        MR. BRODY:  I HAVE LEFT THOSE PAPERS HERE LAST
21   WEEK, YOUR HONOR, AND INDICATED ON THE RECORD THAT
22   THEY WERE AVAILABLE FOR REVIEW BY DEFENSE COUNSEL.
23        THE COURT:  DO YOU HAVE EXTRA COPIES?
24        MR. BRODY:  I DO.  AND I HAVE PROVIDED A COPY
25   OF THAT MOTION TO MR. LINDE.
26        THE COURT:  IF COUNSEL ARE GOING TO BRING ANY
27   OPPOSING PAPERS IN, YOU NEED TO BRING THEM IN
28   TOMORROW MORNING.
```

BRENDA C. FIELDS, CSR NUMBER 7235

```
                                                              70
 1  THAT WILL SHOW YOU WHAT A BACKING PLATE

 2      THE COURT:  THE CASE WAS SUBMITTED AND I'M

 3  PREPARED TO RULE.  ANY PROBLEM?

 4      MR. BRODY:  NO, YOUR HONOR.  I'LL SUBMIT.

 5      MR. JACOBS:  SUBMITTED.

 6      MR. LINDS:  SUBMITTED.

 7      MISS ADAMS:  SUBMITTED.

 8      THE COURT:  AFTER VIEWING THE TAPE AND

 9  REVIEWING THE WRITTEN AND THE ORAL ARGUMENTS, MY

10  RULING IS TO EXCLUDE THE DOCTOR LONGO OCCUPATIONAL

11  SIMULATION VIDEO TAPE AND HIS TESTIMONY REGARDING ANY

12  SIMULATED WORKPLACE ACTIVITIES PURSUANT TO EVIDENCE

13  CODE 352.

14      I BELIEVE THAT THERE IS AN INSUFFICIENT

15  FOUNDATION TO SHOW THAT THE SIMULATION WAS

16  SUFFICIENTLY SIMILAR TO THE ASBESTOS EXPOSURE OF THE

17  PLAINTIFFS HERE AND THAT THE PROBATIVE VALUE OF THAT

18  EVIDENCE WOULD BE SUBSTANTIALLY OUTWEIGHED BY ITS

19  PREJUDICIAL EFFECT.  I ALSO BELIEVE IT WOULD BE

20  CONFUSING TO THE JURY.

21      SO THAT'S MY RULING.  THE RECORD IS MADE.  HOW

22  DOES THAT ELIMINATE THE COPYRIGHT ISSUE?

23      MR. JACOBS:  I THINK IT DOES.

24      THE COURT:  OKAY.  SO THAT TAKES CARE OF THAT.

25  THERE'S STILL SOME MISCELLANEOUS MOTIONS.  BUT

26  DOES ANYONE ELSE HAVE ANYTHING ELSE FOR THIS MORNING?

27      MR. BRODY:  NOTHING, YOUR HONOR.  I'LL

28  INDICATE THAT I'LL HAVE SOMETHING TO THE COURT AT THE
```

**EXHIBIT Z**

12/12/01 Hansen (no tape 1)

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN FRANCISCO
BEFORE THE HONORABLE ALFRED G. CHIANTELLI, JUDGE PRESIDING
DEPARTMENT NUMBER 503

—oOo—

DONNA HANSEN AND RUSSELL GARY
HANSEN,

    PLAINTIFFS    )  NO. 321639

VS.

ASBESTOS DEFENDANTS, ET AL,

    DEFENDANTS

REPORTERS' TRANSCRIPT OF PROCEEDINGS
WEDNESDAY, DECEMBER 12, 2001

APPEARANCES OF COUNSEL:

FOR PLAINTIFFS:
PAUL & HANLEY
1608 CENTRAL AVENUE, SUITE 100
RICHMOND, CA 94804
BY: J. BRUCE JACKSON

FOR DEFENDANTS:
GORDON & REES
275 BATTERY STREET, 20TH FLOOR
SAN FRANCISCO, CA 94111
BY: THOMAS ARTHUR PACKER
HANK HOLMBERG

REPORTED BY: MARIA ANTONIA TORREANO, CSR # 8600, RMR, CRR
OFFICIAL REPORTER

10/7/02 7:42 AM

12/12/01 Hansen (no expert)

1    PORTO-THERM.

2    THE COURT: I UNDERSTAND. ANYTHING ELSE?

3    MR. RUNDIN: HE DOESN'T DO ANY OF THIS CONSULTING WORK AS TO

4    AUTOMOTIVE PRODUCTS.

5    MR. PACKER: HE IS NOT A MECHANIC.

6    THE COURT: HE'S NOT A MECHANIC.

7    MR. PACKER: HE DOESN'T HAVE ANY EDUCATION OR TRAINING FOR

8    DOING BRAKE WORK.

9    THE COURT: ANYTHING ELSE?

10   MS. MCNEIL: YOUR HONOR, WE ALSO FILED A MOTION ON BEHALF OF

11   HAMILTON MATERIALS TO EXCLUDE HIM BASED HE HAS NEVER WORKED WITH

12   DRYWALL TAPING MATERIALS, THAT HIS TESTIMONY WOULD BE CUMULATIVE

13   AND LACKING FOUNDATION WITH RESPECT TO WORK THAT HE MAY HAVE —

14   BECAUSE HE'S NEVER DONE ANY AS AN INSULATOR.

15   THE COURT: BECAUSE HE'S NEVER PUT UP ANY DRAW WALL?

16   MS. MCNEIL: YES.

17   THE COURT: ANYTHING ELSE?

18   MR. RUNDIN: YOUR HONOR, I'D LIKE FOR THE RECORD, I'D LIKE

19   TO NOTE THAT BORG-WARNER HAS JOINT IN OTHER DEFENDANT'S MOTION

20   IN LIMINE.

21   THE COURT: LET THE RECORD REFLECT EVERY SINGLE MOTION

22   BROUGHT BY ANY PARTICULAR DEFENDANT IS JOINED BY EVERY OTHER

23   DEFENDANT WITHOUT REQUESTING AN ORDER. AND SO THEY'LL ALL

24   APPLY, A RULING ON ANY MOTION WILL APPLY TO ALL SEVEN UNLESS YOU

25   INDICATE FOR YOUR OWN PURPOSES IT SHOULD NOT APPLY TO YOU.

26   SUBMITTED ON THIS ONE ON THE CHARLIE AT ISSUE, THE WALL

27   BOARDS AND ALSO TESTIFYING AS TO BRAKES? ALL RIGHT. DENIED.

28   OKAY.

10/8/02  5:08 PM

29

12/12/01 Hansen (no expert)

1  NEXT MOTION IN LIMINE NUMBER 24, WHICH IS OUR OPPOSITION
2  TO DEFENDANTS AND THERE'S SEVERAL DEFENDANTS. I SHOULD
3  REPRESENT, MOTION TO EXCLUDE DR. LONGO, WHICH IS THE MOTION IN
4  LIMINE, AS PHRASED, IN THIS TRIAL. PLAINTIFF WILL BE CALLING
5  HIS COLLEAGUE, RICHARD HATFIELD, WHICH IS ALSO WITH THE
6  LABORATORY IN GEORGIA. THE SUBJECT OF HIS TESTIMONY IS THE
7  SAME. THE MOTION IS THE SAME. THE DEFENDANTS WANT TO EXCLUDE
8  RICHARD HATFIELD'S TESTIMONY AND THE VIDEOTAPES REGARDING HIS
9  TESTING THAT HE'S DONE ON VARIOUS PRODUCTS, INCLUDING BRICKS,
10  INCLUDING DRYWALL, INCLUDING CLUTCHES. AND THEY ALSO WANT TO
11  EXCLUDE ANY TESTIMONY REGARDING THAT TESTING.
12      MR. PACKER: YOUR HONOR, FOR ALLIED SIGNAL, WE FILED A
13  MOTION TO EXCLUDE LONGO AND HATFIELD. MAY I GIVE THE CLERK OUR
14  MOTIONS?
15      THE COURT: I ALREADY HANDLED IT IN THE LAST TRIAL. IS THIS
16  DIFFERENT FROM THE ONE I JUST HAD?
17      MR. PACKER: IT HAS A TWIST TO IT, IF YOU WILL.
18      THE COURT: TELL ME WHAT THE TWIST IS.
19      MR. PACKER: THE TWIST IS THE MOTION SEEKS TO EXCLUDE, IN
20  ADDITION TO THE VIDEO TAPES, HIS TESTIMONY, ASKING THE COURT TO
21  BE A GATEKEEPER. AND WE INCLUDED IN OUR MOTION, AT SOME LENGTH
22  IN THE MOTION, TO INCLUDE ANOTHER ORDER, FOR EXAMPLE, FROM A
23  COURT IN TEXAS BUT A TRIAL COURT WHICH DISQUALIFIED
24  LONGO/HATFIELD CALLING HIS TESTIMONY JUNK SCIENCE.
25      THE COURT: WAS THAT OUT OF BARKER, TEXAS?
26      MR. PACKER: LAMAR COUNTY.
27      THE COURT: BEAUMONT?
28      MR. PACKER: LAMAR COUNTY.

10/8/02 5:06 PM

37

12/12/01 Hansen (on expert)

1   THE COURT: IT'S NOT PRECEDENTIAL VALUE. LET ME ASK YOU
2   THIS: MAKE YOUR BEST PITCH FOR YOUR VIDEO OR DO YOU WANT TO
3   SUBMIT IT ON THE PAPERS?
4       MR. JACKSON: I'LL DO THIS TO SHORTCUT OUR ARGUMENTS. IF
5   YOU WANT ME TO GIVE YOU YOUR TENTATIVE, I'LL SUBMIT ON THE
6   TENTATIVE.
7       THE COURT: I DON'T LIKE THE VIDEOS IN. THEY DON'T GO ON
8   SUBSTANTIVE TESTIMONY ON THE TESTING. I ALLOW HIM TO TESTIFY.
9       MR. JACKSON: I SUBMIT ON THE TENTATIVE.
10      THE COURT: TENTATIVE. I'M NOT TENTATIVE HERE.
11      MR. JACKSON: I'M JUST SUGGESTING TO THE COURT —
12      THE COURT: NOTHING TENTATIVE ABOUT ME, HA HA.
13      MR. JACKSON: UNLESS YOU'RE INCLINED TO CHANGE THAT.
14      THE COURT: NO, I MEAN, I WANT TO DO SOMETHING THAT DOESN'T
15  SHOW AN ABUSE OF DISCRETION. IS THERE SOMETHING HERE IMPORTANT
16  THAT YOU WANT ME TO READ ON THIS NEW TWIST? I WANT TO CONSIDER
17  IT. I GOT ERASERS AT THE END OF MY PENCILS, SO SHOW IT TO ME.
18  I'M MISSOURI, SHOW ME. I'M NOT GOING TO GO THROUGH THAT. SHOW
19  IT. WHAT DO YOU HAVE? TAB WHAT.
20      MR. PACKER: 24.
21      THE COURT: YOU HAVE TO WORRY ABOUT THE VIDEOTAPE. SO WHAT
22  PAGE?
23      MR. RUNDIN: YOUR HONOR, WALTER RUNDIN. MAY I SUBMIT A
24  BINDER TO THE COURT?
25      MR. MCNEIL: YOUR HONOR, FOR THE RECORD, I WOULD LIKE THE
26  COURT TO HAVE MY MOTION, WHICH IS A MOTION WHICH HAS NOT BEEN
27  SUBMITTED BEFORE.
28      THE COURT: LODGE IT, LODGE IT. SURE, OF COURSE. ARE THEY

10/8/02 5:08 PM

25

EXHIBIT AA

1/8/02  Berning (Abraham, Ben-Zion)

227

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN FRANCISCO
BEFORE THE HONORABLE ALEX SALDAMANDO, JUDGE PRESIDING
DEPARTMENT NUMBER 518
—OOO—

JOHN B. BERNING AND BERNADINE
A. BERNING,

            PLAINTIFFS,          )
                                 ) CASE NO. 315733
    VS.                          ) JURY TRIAL
                                 ) (PAGES 227-344)
A.P. GREEN INDUSTRIES, INC.,     )
ET AL,                           )
                                 )
            DEFENDANTS.          )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS
TUESDAY, JANUARY 8, 2002
APPEARANCES OF COUNSEL:
FOR PLAINTIFFS:
    [illegible]
    [illegible] SUITE 200
    [illegible] CALIFORNIA 94804
    BY: BRICE JACKSON
    ATTORNEY AT LAW

FOR DEFENDANT ALLIEDSIGNAL, INC., SUCCESSOR IN INTEREST TO THE
BENDIX CORPORATION:

    GORDON & REES, LLP
    EMBARCADERO CENTER WEST, 20TH FL.
    275 BATTERY STREET
    SAN FRANCISCO, CALIFORNIA 94111
    BY: JOSEPH J. KUBANCIK
        STEPHANIE B. BRADSHAW
    ATTORNEYS AT LAW

REPORTED BY: VALERIE EAFATE, CSR NO. 6899
             JUDITH N. THOMSEN, CSR NO. 6591
                                 228

1/8/02 Berning (Abraham, Ben-Zion)

1   CASE AMONGST YOURSELVES NOR WITH ANYONE ELSE. IF ANYONE
2   CONTACTS YOU IN ANY WAY, I WANT TO HEAR ABOUT IT WHEN WE
3   RECONVENE AGAIN TOMORROW. THAT, AGAIN, WILL BE AT 8:30. EXPECT
4   A FULL DAY, 8:30 TO 1:30. AND WE WILL SEE YOU THEN.
5   (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE OF
6   THE JURY:)
7   MR. JACKSON: YOUR HONOR, I HAVE A BRIEF ON -- IN OPPOSITION
8   TO ALLIEDSIGNAL'S MOTION IN LIMINE TO APPLY KANSAS LAW.
9   I HAVE NOT YET FILED THAT. I HAVE THE ORIGINAL TO FILE
10  AFTER COURT.
11  DOES THE COURT REQUIRE ME TO GIVE A FILE ENDORSED COPY NOW,
12  OR IS A COURTESY COPY TO THE CLERK SUFFICIENT? BECAUSE I
13  HAVEN'T GIVE YOU A COPY YET.
14  THE COURT: A COURTESY COPY IS FINE. I AM, OBVIOUSLY, NOT
15  GOING TO DECIDE THAT TODAY.
16  MR. JACKSON: OKAY. THEN I WILL PROVIDE THAT TO GAIL
17  (INDICATING).
18  THE CLERK: WHAT IS THIS?
19  MR. JACKSON: THE MOTION IN LIMINE OPPOSITION.
20  THE CLERK: ARE YOU GOING TO FILE THIS DOWNSTAIRS?
21  MR. JACKSON: YES.
22  THE CLERK: OKAY.
23  MR. JACKSON: I LEAVE THE ORIGINAL TO FILE.
24  THE CLERK: OKAY.
25  MR. JACKSON: AND THEN IN TERMS OF TODAY, I THINK ONE OF THE
26  ISSUES WE DO HAVE TO RESOLVE IS THE ISSUE OF THE TESTIMONY OF
27  RICHARD HATFIELD IS A COLLEAGUE OF DR. BILL LONGO AT THE MAS
28  LABORATORIES IN GEORGIA, WHO HAS DONE TESTING AND AIR SAMPLING

10/8/02 5:06 PM

234

1/8/02 Berning (Abraham, Ben-Zion)

1   ON BENDIX BRAKE PRODUCTS AND IS HERE TOMORROW TO GIVE TESTIMONY

2   REGARDING HIS AIR SAMPLING RESULTS.

3       AND THE PLAINTIFFS ALSO INTEND TO OFFER AS PART OF HIS

4   TESTIMONY VIDEOTAPED SIMULATIONS, WHICH HAVE VIDEOTAPED THE

5   TESTING OF THE BENDIX BRAKE LININGS THAT HE HAS DONE, WHICH

6   WOULD INCLUDE BLOWING OUT A BRAKE DRUM, WHICH WOULD INCLUDE

7   GRINDING OF A BRAKE, AND WHICH WOULD INCLUDE CLEANUP AFTER BRAKE

8   REPAIR WORK INVOLVING BENDIX BRAKE LININGS.

9       THE TESTIMONY IS TWOFOLD --

10      THE COURT: WELL, LET ME CUT TO THE CHASE ON THIS.

11      MR. JACKSON: OKAY.

12      THE COURT: THE ISSUE HERE IS WHETHER OR NOT THE EXPERIMENTS

13  THAT ARE BEING DONE ARE SUBSTANTIALLY SIMILAR TO THE FACTUAL

14  SITUATION WE HAVE IN OUR CASE.

15      AT THIS POINT THE TESTIMONY OF THE BERNING SONS IS -- AND I

16  BELIEVE MR. BERNING ALSO TESTIFIED -- IS THAT HE DID HIS REPAIR

17  WORK, BRAKE JOBS, EITHER INSIDE THE GARAGE OR OUTSIDE THE

18  GARAGE, DEPENDING ON THE WEATHER. HIS GRINDER WAS INSIDE THE

19  GARAGE. HE USED A RASP, AS WELL AS A GRINDER, TO SHAVE THE -- TO

20  FIT THE LININGS SO THAT THEY WOULD BE ADJUSTED. HE WOULD BLOW

21  OUT EITHER USING HIS LUNG POWER OR PERHAPS ONE OR MORE OCCASIONS

22  SOME KIND OF AIR COMPRESSOR THAT HE HAD IN HIS SHOP.

23      MY RECOLLECTION OF THE EVIDENCE -- AND COUNSEL CAN CORRECT

24  ME IF I'M WRONG -- IS THAT NONE OF THE WITNESSES TESTIFIED AS TO

25  THE DIMENSIONS OF THE GARAGE, CEILING HEIGHT OR THE SQUARE

26  FOOTAGE OR, IN ANY OTHER WAY. THERE WAS A GARAGE DOOR. IT

27  WASN'T EVEN CLEAR TO ME AT THE TIME THAT HE WAS DOING HIS BRAKE

28  JOBS WHETHER THE GARAGE DOOR WAS OPENED OR CLOSED.

10/8/02  3:06 PM

175

1/8/02 Berning (Abraham, Ben-Zion)

1     THERE WAS NO EVIDENCE PRESENTED AS TO THE VENTILATION, THE
2     GARAGE, WHETHER IT WAS JUST OPEN TO THE AIR WHEN THE DOOR WAS
3     OPEN, WHETHER THERE WERE ANY WINDOWS OR ANYTHING ELSE. SO NOT
4     HAVING SEEN THE, THE VIDEOS, BUT MY UNDERSTANDING BASED ON THE
5     REPRESENTATIONS MADE IN THE PAPERS IS THAT THESE EXPERIMENTS
6     WERE CONDUCTED IN SOME KIND OF CLOSED ENVIRONMENT.
7        MR. KUBANCIK: THAT'S CORRECT, YOUR HONOR.
8        THE COURT: IT'S NOT CLEAR TO ME WHAT THE VENTILATION SYSTEM
9     WAS. AND I DON'T KNOW WHAT THE SQUARE FOOTAGE OF THE
10    ENVIRONMENT WAS. AND SO IT APPEARS TO ME THAT THERE IS A
11    POTENTIAL HERE THAT THE EXPERIMENTS WILL UNDULY EMPHASIZE THE
12    DISPERSAL OR THE — NOT DISPERSAL BUT THE LACK OF DISPERSAL OF
13    THE SUBSTANCE EITHER THROUGH VENTILATION, AN OPEN DOOR, BLOWING
14    WINDOW — I MEAN, BLOWING WIND OR SOME OTHER WORK THAT WAS BEING
15    DONE OUTSIDE.
16       NOW, THE GRINDING, OBVIOUSLY, WAS DONE INSIDE.
17    THERE WAS ONE OF THE WITNESSES, ONE OF THE BERNING BROTHERS,
18    TESTIFIED THAT AT ONE POINT OR ANOTHER HE WAS ABLE TO SEE THE
19    ACTUAL DUST SUSPENDED IN THE AIR BECAUSE OF THE LIGHTING
20    CONDITIONS. IT WOULD APPEAR TO ME THAT JURORS ARE SOMEWHAT
21    FAMILIAR WITH THE DISPERSAL OF DUST FROM THINGS. SO I AM NOT
22    SURE THAT THIS — THESE EXPERIMENTS ARE SUBSTANTIALLY SIMILAR
23    ENOUGH THAT THEY SHOULD BE SHOWN TO THE JURY.
24       MR. JACKSON: OKAY. A COUPLE OF POINTS HERE THAT I WANT TO
25    MAKE ON THE PURPOSE OF MR. HATFIELD'S TESTIMONY. BECAUSE FROM
26    OUR PERSPECTIVE IT IS CRITICAL AS TO THE RELEVANCE OF IT.
27       THE COURT: I AM NOT SAYING IT IS NOT RELEVANT, COUNSEL.
28    THE QUESTION IS IS IT — ONE OF THE PROBLEMS IS — WITH THESE

10/5/02 5:06 PM

330

1/8/02 Barning (Abraham, Ben-Zion)

```
1    EXPERIMENTS IS IS IT -- IS THE PREJUDICE TO THE OTHER SIDE
2    OUTWEIGHING WHATEVER RELEVANCY THE INFORMATION HAS BECAUSE IT'S
3    NOT SUBSTANTIALLY SIMILAR TO THE ACTUAL CONDITIONS.
4        AND ONE OF THE THINGS THAT THIS EVIDENCE TENDS TO SHOW IS
5    HOW THIS THING APPEARS TO THE NAKED EYE. AND ONE OF THE
6    PROBLEMS I SEE WITH THIS IS I DON'T KNOW HOW BIG THIS GARAGE
7    WAS. SO I DON'T KNOW WHETHER WHATEVER CONFINED SPACE THAT THESE
8    EXPERIMENTS WERE CONDUCTED IN ARE SIMILAR ENOUGH THAT IT REALLY
9    GIVES A FAIR PICTURE OF WHAT WOULD HAVE BEEN GOING ON IN THIS
10   GARAGE. BECAUSE WE ALL KNOW THAT A PICTURE IS WORTH A THOUSAND
11   WORDS. WE HAVE TESTIMONY OF WITNESSES SAYING IT. THE JURORS
12   CAN USE THEIR OWN EXPERIENCE IN DETERMINING, WELL, OBVIOUSLY,
13   THERE HAS GOT TO BE SOME KIND OF JUST GENERATED. NO ONE IS
14   DISPUTING THAT, BUT THE QUESTION IS HOW MUCH.
15       MR. JACKSON:  BEFORE I BEGIN TO ARGUE, IS IT THE COURT'S
16   LEANING AT THIS POINT BASED UPON--
17       THE COURT:  I WILL BE HAPPY TO LOOK AT THE VIDEOS, COUNSEL.
18       MR. JACKSON:  OKAY.
19       THE COURT:  BUT I THINK YOU HAVE GOT AN UPHILL BATTLE
20   BECAUSE I DON'T KNOW THE DIMENSIONS OF THE GARAGE.
21       MR. JACKSON:  WHAT I DO WANT TO UNDERSTAND, FIRST, BEFORE I
22   SPEAK TO THE ISSUE IS IS IT THE COURT'S INTENTION TO EXCLUDE THE
23   VIDEOTAPED DEMONSTRATIONS, THE WORK PRACTICE SIMULATIONS, ON 352
24   GROUNDS BUT TO PROVIDE OR TO ALLOW MR. HATFIELD TO GIVE
25   TESTIMONY REGARDING THE TESTING THAT HE HAS DONE AND THE RESULTS
26   THAT HE HAS HAD BY HIS OWN EXPERT OPINION?
27       THE COURT:  I THOUGHT -- I HAD SPEED READ THESE MOTIONS.
28   BUT MY RECOLLECTION OF THE MOTION IS THE ONLY THING THEY WERE
```

10/6/02  5:06 PM                                                      337

1/8/02 Berning (Abraham, Ben-Zion)

1   SEEKING TO EXCLUDE WERE THE VIDEOTAPES. WERE YOU ALSO SEEKING

2   TO EXCLUDE THE TESTIMONY?

3   MR. KUBANCIK: I BELIEVE THAT WAS PART OF IT, YOUR HONOR.

4   THE COURT: WELL...

5   MR. JACKSON: AND THE REASON I ASKED THAT IS BECAUSE IF WE

6   ARE GOING TO DISCUSS VIDEOTAPED TESTIMONY, I WILL SUBMIT A BRIEF

7   ON THAT ISSUE. BUT IF WE ARE GOING TO TALK ABOUT THE PERTINENT

8   OPINIONS OF MR. HATFIELD, I DO WANT TO EXPLAIN TO THE COURT WHY

9   HE IS BEING OFFERED AND WHY THE TESTIMONY THAT HE IS GOING TO

10  GIVE ABOUT HIS RESULTS ON TESTING BENDIX IS CRITICAL TO THE

11  ISSUES IN THIS CASE.

12  THE COURT: I DON'T HAVE ANY PROBLEM WITH A WITNESS

13  TESTIFYING AS TO, YOU KNOW, HE HAS DONE SOME EXPERIMENT. YOU

14  KNOW, IT'S PROBABLY SIMILAR ENOUGH TO WHAT IS GOING ON IN THE

15  REAL WORLD TO BE OF SOME PROBATIVE VALUE.

16  BUT I DO HAVE A PROBLEM WITH SOMETHING THAT UNDULY SUGGESTS,

17  YOU KNOW, HOW SOMETHING ACTUALLY HAPPENED BY USING SOME KIND OF

18  VISUAL MEANS.

19  MR. JACKSON: WELL, THE PURPOSE OF HIS TESTIMONY, YOUR

20  HONOR, IS NOT TO GIVE THE TESTIMONY THAT THIS IS WHAT ACTUAL

21  EXPOSURE THAT MR. BERNING HAD. AND I DON'T THINK IT WOULD BE

22  APPROPRIATE FOR ANY INDUSTRIAL HYGIENIST, DEFENSE OR PLAINTIFFS,

23  TO DO THAT.

24  THE COURT: YES, BUT THE EXPERIMENTS ARE SUBSTANTIALLY

25  SIMILAR, COUNSEL.

26  MR. JACKSON: BUT THE ISSUE, THOUGH, IS NOT TO RECREATE HIS

27  ACTUAL EXPOSURE. THE ISSUE IS TO ADDRESS WHAT ARE THE DISPUTES

28  IN THIS CASE.

10/5/02 5:08 PM

33d

1/8/02 Berning (Abraham, Ben-Zion)

1    AND THE DISPUTE THAT I AM UP AGAINST, YOUR HONOR, IS THAT

2    THEIR INDUSTRIAL HYGIENIST WILL SAY THAT USE OF BRAKES IS SAFE,

3    THAT IT DOESN'T RELEASE ASBESTOS, THAT WHEN YOU BLOW OUT A BRAKE

4    DRUM, YOU ONLY HAVE A VERY LITTLE AMOUNT OF FIBER BECAUSE OF THE

5    FACT THAT IT'S CONVERTED —

6    THE COURT:  AND YOU WILL HAVE YOUR WITNESS CONTRADICTING

7    THAT TESTIMONY.

8    MR. JACKSON:  AND THE REASON IT CONTRADICTS IT IS BECAUSE HE

9    IS ACTUALLY, UNLIKE THEIR INDUSTRIAL HYGIENIST — HE HAS

10   ACTUALLY TESTED A BENDIX BRAKE, HE HAS GRINDED IT, AND HE HAS

11   TAKEN MEASUREMENTS TO SEE WHAT HAPPENS.  AND IT'S THIS SIMPLE.

12   THE COURT:  IF HE TESTIFIES TO THAT, I DON'T HAVE ANY

13   PROBLEM WITH THAT.

14   MR. JACKSON:  OKAY.  SO YOUR RULING —

15   THE COURT:  MY PROBLEM IS WITH THE VIDEOS.

16   MR. JACKSON:  YOUR RULING IS THAT MR. HATFIELD CAN GIVE HIS

17   TEST RESULTS THAT HE HAS DONE AND THE OPINIONS THAT HE HAS DONE

18   BASED ON THAT AS THE FORM OF AN EXPERT.  BUT THE VIDEOTAPED

19   TYNDALL BEAM DEMONSTRATIONS ARE EXCLUDED.

20   THE COURT:  YES.

21   MR. JACKSON:  I JUST WANT A CLARIFICATION, AND THEN I HAVE

22   NO FURTHER ARGUMENT.

23   THE COURT:  ANYTHING FURTHER?

24   MR. KUBANCIK:  NO, YOUR HONOR.  SUBMITTED.

25   THE COURT:  AT THIS POINT THE MOTION IS GRANTED TO THE

26   EXTENT THAT THE VIDEOTAPED EXPERIMENTS ARE EXCLUDED FOR THE

27   REASONS WHICH I HAVE STATED.  THE COURT DOESN'T FIND THAT THEY

28   WOULD BE SUBSTANTIALLY SIMILAR TO THE EVIDENCE THAT IS GOING TO

10/8/02 5:06 PM

339

1/8/02 Berning (Abraham, Gen-Zien)

1   BE BEFORE THE JURY.

2   MR. JACKSON: AND ALSO, AS A PART OF THAT RULING, THAT THE

3   ACTUAL TESTING HE HAS DONE AND THE OPINIONS THAT HE HAS FORMED

4   BASED ON THOSE TESTS ARE ADMISSIBLE.

5   THE COURT: THAT'S WHAT I SAID, COUNSEL. THAT'S WHAT I

6   SAID.

7   MR. JACKSON: THANK YOU, YOUR HONOR.

8   THE CLERK: SO THE MOTION TO EXCLUDE VIDEO DEPOSITION IS

9   GRANTED.

10   THE COURT: YES. THE VIDEOTAPES ONLY BUT NOT THE ACTUAL

11   TESTIMONY.

12   ALL RIGHT. ANYTHING ELSE WE NEED TO RESOLVE TODAY?

13   MR. JACKSON: NOT IN TERMS OF SUBSTANTIVE MOTIONS. BUT I

14   SHOULD ALERT THE COURT TO WHAT OUR SCHEDULE IS SINCE WE ARE VERY

15   FAR AHEAD OF SCHEDULE.

16   AT THIS POINT TOMORROW OUR TESTIMONY IS DR. RICHARD COHEN

17   AND THEN MR. HATFIELD. AND WE ARE THEREAFTER DONE WITH OUR LIVE

18   WITNESSES. GIVEN THE TESTIMONY THAT WE HAVE HAD ON CAUSATION,

19   THE PROBLEMS THAT I HAVE HAD IN SCHEDULING DR. ALLAN SMITH, WHO

20   WAS MY LAST LIVE WITNESS, WE ARE NOT GOING TO CALL HIM TO GIVE

21   TESTIMONY IN TRIAL. SO AFTER THE WITNESSES TOMORROW, THEN THE

22   BODY OF EVIDENCE THAT WE HAVE TO SUBMIT COMES IN THE FORM OF

23   DOCUMENTS AND DEPOSITION TESTIMONY WITH RESPECT TO THE CORPORA

24   NEGLIGENCE AND PUNITIVE DAMAGES CLAIMS AGAINST ALLIED.

25   THE COURT: ALL RIGHT. SO TOMORROW IS THE 9TH. SO YOU CAN

26   PRETTY MUCH FILL TOMORROW.

27   MR. JACKSON: I CAN FILL TOMORROW WITH THE LIVE WITNESSES.

28   AND THEN THE DOCUMENTS REALLY SHOULD AMOUNT TO NO MORE THAN

10/8/02 2:05 PM

140

EXHIBIT BB

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

BEFORE THE HONORABLE WALLACE P. DOUGLASS, JUDGE PRESIDING

DEPARTMENT 001

D'ARCY RICHARDSON and CAROLE       )
RICHARDSON,                         )
                                    )
                        PLAINTIFFS, )
                                    )
VS.                                 )   CASE NO.  411648
                                    )
A.W. CHESTERTON COMPANY, et al.,    )
                                    )
                        DEFENDANTS. )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTIONS IN LIMINE

MARCH 13, 2003

REPORTED BY:

ROHY N. BARULICH, CSR 9241
OFFICIAL COURT REPORTER

ROHY N. BARULICH, CSR #9241

21

1   that's without prejudice.

2        THE COURT: Well, are you thinking of something that you

3   are going to spring on me that was going to change my mind?

4        MR. FISHBACK: Well, yes.

5        THE COURT: Tell me about it.

6        MR. FISHBACK: Namely, the videotapes themselves which the

7   Court hasn't had an opportunity to review. And secondarily,

8   we believe we can satisfy the standard -- substantially

9   similar standard that the law requires under Culpepper for

10  the videotapes that we will be seeking to admit. It is not

11  an across the board every videotape satisfies the standard.

12  There are certain videotapes that plaintiff's counsel will

13  seek to enter into evidence.

14        And given once we accomplish that, the next issue becomes

15  one of a 350, 352 analysis and that is a separate and

16  distinct issue. I don't know that the Court can rule on that

17  without hearing the testimony about the videotapes. And

18  secondarily, seeing the videotapes, because there is just no

19  way, I don't see a way to really analyze if they are overly

20  prejudicial without having looked at them and seen them. And

21  seeing the ones plaintiffs are going to proffer --

22        THE COURT: I'll tell you what my analysis was, Mr.

23  Fishback, and it is an analysis which doesn't depend on

24  viewing the videotapes. And that is that how, when, where,

25  why, to what degree exposures took place are sufficiently

26  uncertain, so there is no way that you could concoct an

27  expert that would adequately approximate or duplicate the

28  conditions that plaintiff was exposed to.


                    RONY M. BARULICH, CSR #9241

22

1    Now, if it turns out that Mr. Richardson comes and he
2    testifies with such precision and particularity, then that is
3    the sort of thing which would changed my mind.  But it is not
4    based on viewing the videotapes, it is based on I think
5    you've got an impossible situation, so adequately approximate
6    or duplicate the conditions to which the plaintiff was
7    exposed.

8        MR. FISHBACK:  Judge, I think that the Court may be
9    misinterpreting part of our purpose for the videotapes.  It
10   is not the simulation what happens in the field when Mr.
11   Richardson used a particular product.  The videotapes depict
12   what happens when just as Mr. Richardson did, you cut a piece
13   of transite.  And it doesn't matter -- as I said before, it
14   doesn't matter where you are in the field, in your home, in a
15   chamber, when you cut a piece of transite, certain things
16   happen, and it has to do with dust release.  There are lots
17   of variables in any situation.  On any given day, the wind
18   may have been exactly like it was when Mr. Richardson -- when
19   the wind that Mr. Richardson was facing on the day he cut the
20   transite may be exactly what it is in the chamber where the
21   transite is being cut.  On the other hand, the winds may have
22   been blowing away from him.  On the other hand, it may have
23   been blowing towards him.  What that tells you, Your Honor,
24   is that there is a range of exposures.  No one is trying to
25   and no one can frankly come in and say -- and no one will say
26   this is the level to which Mr. Richardson was exposed when he
27   did this particular job or when he did this particular --
28   when he cut this particular product.  No one will say that.


                    RONY N. BARULICE, CSR #9241

23

1    What everyone will do is give ranges of exposures or attempt
2    to.  The difference between what other witnesses purport to
3    do and what Mr. Ratfield will do is that Mr. Ratfield's
4    analysis is based not on what someone else did and what
5    somebody else's studies did.  He did the actual studies
6    himself to determine what dust is released when he cut a
7    piece of transite.  How much is let off into the air, that's
8    what the issue is.  It has to do with the amount of asbestos
9    release in the product, not what happens to the asbestos once
10   it goes.  This isn't a study about wind currents.  So it is
11   important to understand what kind of wind currents Mr.
12   Richardson was in to determine whether or not the study was
13   applicable.  That's what my brief and the issues in our brief
14   touched upon.  The case law doesn't talk about you having to
15   recreate the situation.  Particularly whereas here, that is
16   not even close to our attempt, we are not in any way and no
17   one is claiming to be able to recreate the circumstances.
18   But we are with great specificity able to recreate the actual
19   circumstances of cutting a piece of transite.  And that is
20   what we are trying to accomplish.  Cutting a piece of
21   transite and watching what happens and how much dust is given
22   off, and additionally, how much invisible dust to the naked
23   eye is given off versus what happens when you actually look
24   through a Tyndall light and you can actually see the dust.
25   So it, again, it goes to the issue of the failure to warn
26   claim we have against all the manufacture and supplier
27   defendants.  It is particularly relevant to that.
28        And so if the Court was to focus on the fact that Mr.

24

1   Richardson isn't ever going to come in and testify that he

2   was cutting asbestos cement pipe in a 15-by-10 chamber

3   wearing a full hooded respirator and when there was a Tyndall

4   light being shined into the room, I think you are right, we

5   will submit on that issue.  But what Mr. Richardson is

6   clearly going to do is say, "Well, I have been in a situation

7   where I used a power saw and was in a trench, or on top of a

8   hill, or on top of the trench where I was using a power saw

9   or hand tool to cut transite, or I was working next to a guy

10   who was using that, and you know, what I saw and what I did

11   looks exactly what I saw in those videos.  And that that's

12   the way I did it."  It isn't that he is using a hammer to cut

13   off the piece of paper and I never used a hammer.  It is I am

14   using the same tools he is using and that's what happened.

15   And it becomes important for the plaintiffs' claim and as I

16   suggested a few days ago, I submit there is nothing more

17   relevant to this case, a products liability case, than how

18   the product at issue actually reacts to use.  There is

19   nothing more important to the plaintiffs' position than

20   demonstrating to the trier of fact that the claims of the

21   defendants, namely, that our product doesn't release dust

22   and/or our product isn't a hazard, is just absolutely

23   incorrect.  And the best evidence we have of that now is the

24   re-creation of the cutting of the product or the actual use

25   of the product just as it was used by the workers who are now

26   suffering from the illness.  And it is Mr. Richardson and it

27   is his co-workers who will all come in and say, yeah, this

28   matches.  And because we can meet that threshold question,

ROMY N. BARULICH, CSR #5241

25

1   the issue as to the videotapes, I think, becomes -- shifts
2   from one of we can't meet the criteria for satisfying
3   Culpepper which I think the Court has indicated that whatever
4   is on the videotape is never going to match what the
5   plaintiff's testimony is about his use of the product, I
6   think that the Court needs to hear testimony and evidence of
7   that before it can make its decision.  And it needs to do it
8   having seen or looked at the videotapes and then listen to
9   the evidence that is presented by plaintiffs before it can
10  make a blanket ruling that plaintiffs can't do it.  Because,
11  Judge, we have done it before, we are entitled to attempt to
12  do it here.  We think we can do it here.
13      It will be my offer of proof that we will accomplish and
14  satisfy the requirement of Culpepper, so, again, the analysis
15  becomes one of something a little built different.  And that
16  is whether or not there is a 352 argument.  But again, the
17  Court cannot make that ruling without having seen and heard
18  all the testimony with respect to the videotapes and the
19  witnesses who are going to satisfy the foundational
20  requirements for their admission into evidence.
21      THE COURT:  We are talking about Culpepper versus
22  Volkswagon of America, Inc., 1973, 33 Cal.App.3d, 510.  My
23  answer to your question, Mr. Fishback, which I understand as
24  being are there circumstances under which I would reconsider
25  my ruling excluding the videotapes.  The answer is yes, I
26  would reconsider it the testimony as to the plaintiff's
27  exposure to asbestos from products of the defendants, if it
28  is other than that I anticipate it will be, then sure.

ROMY N. BARULICH, CSR #9241

26

1    MR. FISHBACK:  I understand, Your Honor.  And also, we

2    cited in our brief, that the People v. Carpenter case which

3    is essentially there are a number of cases which were held on

4    to the Culpepper standard and hasn't within changed all that

5    much.  Although it wasn't clarified in some cases, including

6    People v. Carpenter, a '97 case that was cited in our brief.

7    So I guess the answer is the appropriate time we will

8    bring a motion to reconsider in some fashion.  Unless or

9    until we get to that point, I guess the issue --

10    THE COURT:  I indicated in our earlier discussion I'm not

11    upset by a technique which makes something more readily

12    visible than ordinarily is difficult to discern, not tint the

13    light.  But the problem is in this big fat cloud, we don't

14    know how much asbestos is in that dust and how much other

15    stuff is in the dust.

16    MR. FISHBACK:  That is a common concern of defendants.  It

17    is an issue that is raised both on direct examination of Mr.

18    Hatfield and again on cross and recross and re-recross of the

19    witness.  And it is something that is easily explained and

20    frankly, very understandable which is, you are right, we

21    don't know how much is asbestos, but we know about when you

22    talk about dust and avoid creating dust and things like that,

23    there is no warning that says avoid creating asbestos dust.

24    It says avoid creating dust.  Unlike some counsel

25    represented, it is not asbestos hazard.  It is not just about

26    mesothelioma either.  It is about the hazards related to

27    exposures with asbestos and what defendants did or didn't do

28    to warn, to tell, to alert people like that.  So issues with

ROMY N. BARULICH, CSR #5241

27

1    warnings that say avoid creating dust, the industrial

2    hygienist will say it doesn't mean a thing, it is an

3    impossible standard.  If you say avoid creating dust and the

4    product doesn't look dusty to the naked eye, what does that

5    mean? All those things are important to the plaintiffs'

6    case.

7        I understand the Court's position and we will bring it up

8    again at the appropriate time.

9        MR. KUROWSKI:  Make one short comment, Judge, it won't

10   touch on all the points.  We would submit this case is not

11   about the rest of the dust.  It is about the asbestos dust.

12   And we don't think, depending on what Mr. Fishback wants to

13   do later, that the concept of what is in the air in the

14   Tyndall light is going to change.  That's why we went through

15   great length to attach the testimony of their experts.  There

16   is numerous experts.  We are going to submit that is not

17   going to change.

18       THE COURT:  Remember to --

19       MR. KUROWSKI:  John Kurowski for a A.W. Chesterton.

20       THE COURT:  Okay.

21       MR. FISHBACK:  Judge, so just to be clear, crystal clear

22   about the Court's ruling, is the Court excluding the

23   videotapes based on an inability to satisfy Culpepper or some

24   other legal basis?  I want to be specifically clear about

25   that.

26       THE COURT:  This is a Culpepper 352 of the Evidence Code

27   analysis, balance of probative value against consumption of

28   time, possibility of misleading the jury, yadda, yadda.


ROMY N. BABULICH, CSR #9241

28

1   yadda.

2       MR. FISHBACK:  Since we get into a 352 analysis, Your

3   Honor, then as we indicated in our papers, we request that

4   the Court do the analysis that the appellate courts have

5   subjected the courts need to do, which is specific recitation

6   of what the evidence is and why it is more probative, why it

7   is more prejudicial than probative, why it is -- what makes

8   it such an undue consumption of time.  Because, again, the

9   facts presented in plaintiffs' opposition papers, we are

10  talking about an issue of showing videotapes that range from

11  a few videotapes in the amount of one minute a piece, this

12  isn't -- it is a five-minute type thing.  It isn't a whole --

13  we are not watching War and Peace the video.  This is

14  something that doesn't take a long time.

15      So pursuant to the authorities cited in our papers, we

16  would request that the Court would do such an analysis.  And

17  again, I don't think it is possible for the Court to do that

18  because it hasn't seen the videotapes.

19      THE COURT:  I think we are in agreement on that.  I will be

20  in a better position to deal with 352 analysis, but my

21  prediction is this is where it is going to come out on the

22  basis of what I have seen so far.

23      MR. FISHBACK:  Fair enough.

24      THE COURT:  So for now at least, the motion to exclude is

25  granted.

26      MR. FISHBACK:  I don't have anything else on that subject,

27  Judge.

28      THE COURT:  Okay.  Is there anything other concern that

ROMY N. SARDLICH, CSR #9241

EXHIBIT CC

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

Department 611

| | | |
|---|---|---|
| VICTOR TRINCHESE and FRANCESCA TRINCHESE, | ) | No. 400787 |
| Plaintiffs, | ) | |
| v. | ) | TRIAL RULINGS |
| RAYBESTOS-MANHATTAN, INC., et al., | ) | |
| Defendants. | ) | |

To expedite the commencement of trial in the above-referenced action, this court issues the following rulings, without prejudice, on issues routinely presented in the trial court in complex asbestos trials:

PROCEDURE:

1.  For each sub-group of cases tried jointly, trial will be conducted in one phase, except that in cases where punitive damages are sought, evidence of a defendant's financial condition will be excluded unless a jury finds malice, oppression, or fraud.

2.  A motion filed by one defendant shall be deemed to be joined in by all other defendants and apply to all plaintiffs, unless a party expressly opts out. A motion filed by one plaintiff shall be deemed to be joined in by all other plaintiffs and apply to all defendants, unless a party expressly opts out.

3. All potential witnesses are excluded from the courtroom during trial, except for parties and representatives of corporate parties.

4. Each party shall serve the court and all other counsel with a case specific witness list prior to jury selection as ordered by the court. Testimony by witnesses not shown on the case specific witness list is excluded.

5. For each witness disclosed on the case specific witness list, counsel shall disclose to the court and opposing counsel the date and time the witness will testify, and the exhibits to be used by each witness, not later than the following:

| WITNESS SCHEDULED TO TESTIFY ON: | NOTICE REQUIRED NOT LATER THAN PRIOR: |
|---|---|
| Monday | Thursday by 4 pm |
| Tuesday | Friday by 4 pm |
| Wednesday | Friday by 4 pm |
| Thursday | Monday by 4 pm |
| Friday | Tuesday by 4 pm |

6. Exhibits must be pre-marked for identification by the courtroom clerk not later than one court day prior to its use by a witness. Exhibits not timely pre-marked may not be shown to a witness.

7. Each party shall disclose to the court and opposing counsel prior to jury selection a list of all unavailable witnesses the party seeks to have testify in the form of videotapes or transcripts from other actions, including case name, case number, date of transcript, and a declaration from counsel setting forth the requirements of Evidence Code sections 240 and 1290-1292. Excluded from this ruling are depositions or trial transcripts that an attorney plans to use solely to impeach a live witness. Page/line numbers of transcripts shall be disclosed when instructed by the court.

2

8.   Counsel are required to submit proposed jury instructions
     and proposed verdict forms to the court prior to opening
     statements. Proposed BAJI instructions that have not been
     modified in substance are to be submitted as a list of BAJI
     numbers only. A copy of each proposed BAJI instruction
     that has been substantively modified and special (non-BAJI)
     instructions must be submitted with a citation to supporting
     authority.

9.   Defendants are prohibited from contacting any treating
     physician of a plaintiff, except for trial scheduling purposes.

10.  A party is prohibited from having more than one attorney
     participate in each of the following trial phases for each
     plaintiff's case: opening statement, examination of a
     witness, and closing argument, without prior approval of the
     court. If associated medical counsel appears in any trial
     phase, only the associated medical counsel may address the
     medical issues.

11.  Plaintiff has the burden of proving legal causation in each
     case. Defendants have the burden of proving comparative
     fault of the plaintiff and other persons.

12.  Civil Code sections 1431-1431.5 (Proposition 51) will be
     applied in this case.

13.  In order to be made a record in this case, all documents
     must be filed in the Clerk's Office on the 1st floor of the Civic
     Center Courthouse, as this courtroom does not have the
     ability to accept documents for "filing." A courtesy copy of
     each document must be delivered to the court.

EVIDENCE

14.  Testimony by an expert witness who was not timely disclosed
     to opposing counsel pursuant to this court's general orders
     is excluded.

15.  Testimony by known witnesses and documents not disclosed
     during discovery is excluded.

16.  Reference to any party shall be in a form that distinguishes
     that party from another party with a similar name.

3

17. Reference to the physical absence or attendance of a party or the corporate representative of a party in the courtroom is excluded.

18. Reference to punitive damages is excluded, except for limited questions during voir dire in cases where punitive damages are sought.

19. Reference to any party's pleading, its caption, or the parties named therein, is excluded.

20. Reference to the bankruptcy status or insolvency of any asbestos manufacturer or supplier is excluded.

21. Reference to insurance is excluded.

22. Reference to a plaintiff's collateral sources of benefits is excluded.

23. Reference to the asbestos industry, asbestos defendants or other phrase that joins defendants or non-party manufacturers, suppliers, premise owners, or contractors is excluded.

24. Reference to any concert of action or conspiracy between a defendant or non-party is excluded without prior approval of the court.

25. Reference to any breach of implied or express warranty is excluded.

26. Reference to the loss of enjoyment of life by plaintiff as a separate element of damages is excluded.

27. Reference to government statistics that purport to quantify the value of life, also referred to as "hedonic damages," is excluded.

28. Reference to the existence of any pending action, medical condition, or health status of any person other than a plaintiff in this trial is excluded.

29.  Evidence, discovery responses, and documents obtained in other cases are excluded without prior approval of the court. This ruling does not apply to testimony by expert witnesses in prior cases who are present in this court and give testimony.

30.  Evidence of a plaintiff's pre-existing medical conditions or other injuries is excluded unless there is a ruling of admissibility after an offer of proof.

31.  Reference to the wealth or present support status of a plaintiff is excluded.

32.  Reference to any expectation of income after a plaintiff's death by a plaintiff's spouse is excluded.

33.  Reference to any federal, state, or local asbestos or workplace safety order or regulation is excluded.

34.  Evidence of workers' compensation records is excluded.

35.  Evidence of minutes of the Asbestos Textile Institute is excluded.

36.  Causation testimony by an expert witness is limited to the "substantial factor" rule. Examination directed to other testimony about "proximate causation," or the "but for" test is excluded.

37.  Evidence of background or ambient exposure to asbestos is admissible.

38.  Evidence of conduct by a plaintiff's employer or a third party is admissible if otherwise relevant, but not as a superseding cause of plaintiff's disease.

39.  Evidence of asbestos-containing products/sites of persons or entities not present at trial to which plaintiff was exposed is admissible.

40.  Evidence of other known causes of plaintiff's fibrosis is excluded unless there is a ruling of admissibility after an offer of proof.

41. Medical, employment, and social security records of the plaintiff, except reports by retained expert witnesses, produced pursuant to discovery shall be deemed to be authentic with no foundation necessary to be laid. Admissibility of said documents will be determined separately.

42. State of the art evidence is excluded if plaintiff is proceeding solely on a consumer expectation theory. State of the art evidence is admissible if plaintiff is also proceeding on a strict liability warning defect and/or negligence theory.

43. Demonstrations by counsel and/or witnesses are excluded without prior approval of the court, and after forty-eight hour notice has been given the court and opposing counsel.

44. Evidence or reference pertaining to the market share theory of liability is excluded.

45. Disclosure by a plaintiff of identities, amounts, sources, and dates of prior settlements is deferred until a jury has awarded damages to the plaintiff.

~~MEDICAL~~

46. Evidence of the number of medical examinations conducted on a plaintiff is excluded.

47. Reference to a medical examination of a plaintiff as being independent, or performed by court-appointed and/or court-sanctioned medical examiners, is excluded.

48. Reference to a protected or invasive medical examination requiring approval by the court per CCP 2032(d) is excluded.

49. Evidence of the types of examinations or diagnostic procedures conducted on plaintiff by plaintiff's treating physicians or other medical witnesses is admissible.

50. Reference to plaintiff having a "fear of cancer" is excluded, unless there is a ruling of admissibility after an offer of proof has been submitted.

OS 14 2003 16:18 FAX 41905

51.   Evidence of high resolution computed tomography (CT) scans is admissible.

52.   Evidence of gallium scans is excluded.

WITNESSES:

53.   Testimony by Charles Ay is admissible on the subject of the installation of asbestos-containing products by insulators, as well as the U.S. Navy training film/videotape. Testimony by Charles Ay in friction cases is excluded. Videotapes other than the U.S. Navy training film, demonstrations in court by Ay, and/or product samples are excluded.

54.   Testimony by William Longo, Ph.D. and/or Richard Hatfield or other materials analysts is admissible on the subject of asbestos dust exposure, including work practice simulations performed by them. Videotape demonstrations of work practice simulations performed by the witness or his company are excluded.

55.   Testimony by Barry Castleman, Ph.D. on corporate knowledge of certain defendants of health hazards of exposure to asbestos fiber and asbestos-containing products is admissible in cases where state of the art knowledge is admissible, but his testimony is limited to a description of his research and investigation methods. Dr. Castleman is precluded from reading from identified documents or offering opinions as to what the documents mean or represent or what industry knew or should have known.

56.   Examination of Kenneth Cohen concerning an ethics investigation conducted by the American Industrial Hygiene Association on Cohen is excluded.

DEFENSES:

57.   Evidence or reference to a government contract defense or military specification defense is excluded.

58.   Evidence or reference to an employer of a plaintiff being a sophisticated user of asbestos-containing products is excluded.

7

The above rulings are without prejudice, and may be raised by counsel by written motion. Motions concerning issues not listed above may also be submitted to the court. Said motions shall be submitted within two days of the case being assigned to Department 611 and shall include case specific facts and law on the issues addressed. The submission of canned briefs that fail to address the specific facts of the case in relation to the issues and authority addressed in each motion will be subject to sanctions.

Dated: June 18, 2002

Diane Elan Wick
Judge of the Superior Court

EXHIBIT DD

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

Department 611

| | | |
|---|---|---|
| ROBERT JAMES and CONNIE JAMES, | ) | No. 316856 |
| Plaintiffs, | ) ) | |
| v. | ) ) | TRIAL RULINGS |
| RAYBESTOS-MANHATTAN, INC., et al., | ) ) | |
| Defendants. | ) ) | |

To expedite the commencement of trial in the above-referenced action, this court issues the following rulings, without prejudice, on issues routinely presented to the trial court in complex asbestos trials:

PROCEDURE:

    1.   For each sub-group of cases tried jointly, trial will be conducted in one phase, except that in cases where punitive damages are sought, evidence of a defendant's financial condition will be excluded unless a jury finds malice, oppression, or fraud.

    2.   A motion filed by one defendant shall be deemed to be joined in by all other defendants and apply to all plaintiffs, unless a party expressly opts out. A motion filed by one plaintiff shall be deemed to be joined in by all other plaintiffs and apply to all defendants, unless a party expressly opts out.

3.   All potential witnesses are excluded from the courtroom during trial, except for parties and representatives of corporate parties.

4.   Each party shall serve the court and all other counsel with a case specific witness list prior to jury selection as ordered by the court. Testimony by witnesses not shown on the case specific witness list is excluded.

5.   For each witness disclosed on the case specific witness list, counsel shall disclose to the court and opposing counsel the date and time the witness will testify, and the exhibits to be used by each witness, not later than the following:

| WITNESS SCHEDULED TO TESTIFY ON: | NOTICE REQUIRED NOT LATER THAN PRIOR: |
|---|---|
| Monday | Thursday by 4 pm |
| Tuesday | Friday by 4 pm |
| Wednesday | Friday by 4 pm |
| Thursday | Monday by 4 pm |
| Friday | Tuesday by 4 pm |

6.   Exhibits must be pre-marked for identification by the courtroom clerk not later than one court day prior to its use by a witness. Exhibits not timely pre-marked may not be shown to a witness.

7.   Each party shall disclose to the court and opposing counsel prior to jury selection a list of all unavailable witnesses the party seeks to have testify in the form of videotapes or transcripts from other actions, including case name, case number, date of transcript, and a declaration from counsel setting forth the requirements of Evidence Code sections 240 and 1290-1292. Excluded from this ruling are depositions or trial transcripts that an attorney plans to use solely to impeach a live witness. Page:line numbers of transcripts shall be disclosed when instructed by the court.

17.   Reference to the physical absence or attendance of a party or the corporate representative of a party in the courtroom is excluded.

18.   Reference to punitive damages is excluded, except for limited questions during voir dire in cases where punitive damages are sought.

19.   Reference to any party's pleading, its caption, or the parties named therein, is excluded.

20.   Reference to the bankruptcy status or insolvency of any asbestos manufacturer or supplier is excluded.

21.   Reference to insurance is excluded.

22.   Reference to a plaintiff's collateral sources of benefits is excluded.

23.   Reference to the asbestos industry, asbestos defendants or other phrase that joins defendants or non-party manufacturers, suppliers, premise owners, or contractors is excluded.

24.   Reference to any concert of action or conspiracy between a defendant or non-party is excluded without prior approval of the court.

25.   Reference to any breach of implied or express warranty is excluded.

26.   Reference to the loss of enjoyment of life by plaintiff as a separate element of damages is excluded.

27.   Reference to government statistics that purport to quantify the value of life, also referred to as "hedonic damages," is excluded.

28.   Reference to the existence of any pending action, medical condition, or health status of any person other than a plaintiff in this trial is excluded.

29. Evidence, discovery responses, and documents obtained in other cases are excluded without prior approval of the court. This ruling does not apply to testimony by expert witnesses in prior cases who are present in this court and give testimony.

30. Evidence of a plaintiff's pre-existing medical conditions or other injuries is excluded unless there is a ruling of admissibility after an offer of proof.

31. Reference to the wealth or present support status of a plaintiff is excluded.

32. Reference to any expectation of income after a plaintiff's death by a plaintiff's spouse is excluded.

33. Reference to any federal, state, or local asbestos or workplace safety order or regulation is excluded.

34. Evidence of workers' compensation records is excluded.

35. Evidence of minutes of the Asbestos Textile Institute is excluded.

36. Causation testimony by an expert witness is limited to the "substantial factor" rule. Examination directed to elicit testimony about "proximate causation," or the "but for" test is excluded.

37. Evidence of background or ambient exposure to asbestos is admissible.

38. Evidence of conduct by a plaintiff's employer or a third party is admissible if otherwise relevant, but not as a superseding cause of plaintiff's disease.

39. Evidence of asbestos-containing products/sites of persons or entities not present at trial to which plaintiff was exposed is admissible.

40. Evidence of other known causes of plaintiff's fibrosis is excluded unless there is a ruling of admissibility after an offer of proof.

41. Medical, employment, and social security records of the plaintiff, except reports by retained expert witnesses, produced pursuant to discovery shall be deemed to be authentic with no foundation necessary to be laid. Admissibility of said documents will be determined separately.

42. State of the art evidence is excluded if plaintiff is proceeding solely on a consumer expectation theory. State of the art evidence is admissible if plaintiff is also proceeding on a strict liability warning defect and/or negligence theory.

43. Demonstrations by counsel and/or witnesses are excluded without prior approval of the court, and after forty-eight hour notice has been given the court and opposing counsel.

44. Evidence or reference pertaining to the market share theory of liability is excluded.

45. Disclosure by a plaintiff of identities, amounts, sources, and dates of prior settlements is deferred until a jury has awarded damages to the plaintiff.

MEDICAL:

46. Evidence of the number of medical examinations conducted on a plaintiff is excluded.

47. Reference to a medical examination of a plaintiff as being independent, or performed by court-appointed and/or court-sanctioned medical examiners, is excluded.

48. Reference to a protected or invasive medical examination requiring approval by the court per CCP 2032(d) is excluded.

49. Evidence of the types of examinations or diagnostic procedures conducted on plaintiff by plaintiff's treating physicians or other medical witnesses is admissible.

50. Reference to plaintiff having a "fear of cancer" is excluded, unless there is a ruling of admissibility after an offer of proof has been submitted.

51. Evidence of high resolution computed topography (CT) scans is admissible.

52. Evidence of gallium scans is excluded.

WITNESSES:

53. Testimony by Charles Ay is admissible on the subject of the installation of asbestos-containing products by insulators, as well as the U.S. Navy training film/videotape. Testimony by Charles Ay in friction cases is excluded. Videotapes other than the U.S. Navy training film, demonstrations in court by Ay, and/or product samples are excluded.

54. Testimony by William Longo, Ph.D. and/or Richard Hatfield or other materials analysts is admissible on the subject of asbestos dust exposure, including work practice simulations performed by them. Videotape demonstrations of work practice simulations performed by the witness or his company are excluded.

55. Testimony by Barry Castleman, Ph.D. on corporate knowledge of certain defendants of health hazards of exposure to asbestos fiber and asbestos-containing products is admissible in cases where state of the art evidence is admissible, but his testimony is limited to a description of his research and investigation methods. Dr. Castleman is precluded from reading from identified documents or offering opinions as to what the documents mean or represent or what industry knew or should have known.

56. Examination of Kenneth Cohen concerning an ethics investigation conducted by the American Industrial Hygiene Association on Cohen is excluded.

DEFENSES:

57. Evidence or reference to a government contract defense or military specification defense is excluded.

58. Evidence or reference to an employer of a plaintiff being a sophisticated user of asbestos-containing products is excluded.

The above rulings are without prejudice, and may be raised by counsel by written motion. Motions concerning issues not listed above may also be submitted to the court. Said motions shall be submitted within two days of the case being assigned to Department 611 and shall include case specific facts and law on the issues addressed. The submission of canned briefs that fail to address the specific facts of the case in relation to the issues and authority addressed in each motion will be subject to sanctions.

Dated:  December 12, 2001

Diane Elan Wick
Judge of the Superior Court

EXHIBIT EE

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA.

RECEIVED

CED 0 4 7003

Jordan & Moses

MARY ELLEN TYRE, Individually and as
Executrix of the Estate of ROYCE A.
TYRE, Deceased,

                         Plaintiff,

vs.

CSX TRANSPORTATION, INC.,

                         Defendant.

CASE NO:  16-2002-CA-4837
DIVISION: CV-B

STEPHEN T. TISON,

                         Plaintiff,

vs.

CSX TRANSPORTATION, INC.,

                         Defendant.

CASE NO:  16-2002-CA-4836
DIVISION:  CV-C

TROY HICKOX,

                         Plaintiff,

vs.

CSX TRANSPORTATION, INC.,

                         Defendant.

CASE NO:  16-2002-CA-4835
DIVISION:  CV-D

JUDY E. MURRAY, Individually and as Executrix
of the Estate of ERNEST E. MURRAY, Deceased,

                    Plaintiff,

vs.
                              CASE NO:  16-2003-CA-3021
                              DIVISION:  CV-D
CSX TRANSPORTATION, INC.,

                    Defendant.

---

JAMES A. WOOD,

                    Plaintiff,

vs.
                              CASE NO:  16-2002-CA-4833
                              DIVISION:  CV-E
CSX TRANSPORTATION, INC.,

                    Defendant.

---

CLYDE VARNADORE,

                    Plaintiff,

vs.
                              CASE NO:  16-2002-CA-7566
                              DIVISION:  CV-E
CSX TRANSPORTATION, INC.,

                    Defendant.

---

ROBERT GERALD LEAR,

                    Plaintiff,

vs.
                              CASE NO:  16-2001-CA-8235
                              DIVISION:  CV-F
CSX TRANSPORTATION, INC.,

                    Defendant.

GLORIA V. WILLIAMSON, Individually and as
Executrix of the Estate of CARL WILLIAMSON,
Deceased,

                                  Plaintiff,

vs.                                 CASE NO:   16-2002-CA-4834
                                        DIVISION:   CV-H

CSX TRANSPORTATION, INC.,

                                  Defendant.
_____

### ORDER GRANTING DEFENDANT CSX TRANSPORTATION INC.'S MOTION TO EXCLUDE WORK SIMULATION STUDIES, VIDEOTAPES, AND OPINION OF RICHARD HATFIELD

Above styled cases were consolidated for purposes of a *Frye* hearing by order of the Chief Judge July 3, 2003.  The hearing commenced on September 8, 2003.  The parties produced multiple witnesses, mountainous documents and other evidentiary exhibits, and vigorous argument during the three day hearing which ended on the late afternoon of September 10, 2003.

The issues at hand were whether Plaintiff's expert witnesses' methodology for counting asbestos fibers in an industrial setting and workplace had been generally accepted in the scientific community and, secondly, whether the testing procedures used to apply that principle to the facts at hand have the same general acceptance as the methodology.  See *Brim v State, 695 So2d 268, 272 (Fla 1997)*, citing *Ramirez v State, 651 So2d 1164, 1168 (Fla 1995)*.

Initially, Defendant challenged the indirect transfer method of counting fibers which was used by the Plaintiff's experts.  On the last day of the hearing, Plaintiff announced that no attempt would be made to elicit testimony or other evidence of use of that method of counting asbestos fibers.  That consideration shall not be included in the Court's determination of the

issues. (The Court notes that EPA has approved the indirect transfer method; OSHA has not as yet done so.)

At the heart of the issue at this time is the question of whether Plaintiff's experts use of a simulation chamber for air sampling and video taped demonstratives of "work practices" conform to the requirements of *Brim*, *supra*.

The use of a chamber by which simulations may be performed is agreed to by all experts testifying on the issue. It appears to this Court that the use of a chamber is not a new or novel method of testing. Disagreement between the experts arose, however, as to whether the chamber had been used properly for the test results to be used at trial and the video tapes to be used as demonstrations of how workers are exposed to asbestos fiber during performance of occupational function using certain tools to remove asbestos or in cutting or shaping it for installation purpose.

Defendant argues and the record supports that Plaintiff's experts did no investigation of the environment of the Defendant's shop at Waycross, Georgia in preparation for conducting a simulated air sampling study. In fact, each of Plaintiff's experts testified that neither had ever visited the work area at Waycross; that their only understanding of conditions there was learned from three individuals who, although they worked at the facility, did not work with any of the Plaintiffs in the above styled cases. Neither the Plaintiffs in these cases nor workers with the same functions as Plaintiff were ever interviewed by Plaintiff's experts. Each expert admitted to a lack of experience or any knowledge of the railroad business. No information was gathered regarding the area of the facility, its ceiling height, and whether it was an open, shed like structure or an enclosure with forced method of ventilation which is crucial. The chambers used herein measured 8' x 12' and 15' x 20'. Each had an 8' ceiling. It does not necessarily follow that the ventilation method used in those facilities would be the same as the ventilation in a "much

larger" facility.  Mr. Hatfield testified that he "was sure" the railroad facility was "much larger".

In response to the failed attempt to duplicate or more nearly simulate the work place and work practices of the Plaintiffs in these cases, Plaintiff's experts testified of doing a chamber study individualized for the facts of each of the work practices in a work place resembling the work place involved was impractical.  However, the "impractical" type of investigation and the facts derived has been advocated by one of the experts (Dr. William E. Longo) in a study entitled <u>Baseline Studies of Asbestos Exposure during Operation and Maintenance Activities</u> published 1994.  After extolling the benefit of simulations, the article addresses the validity of simulated studies:

> "On the other hand, a simulation approach is <u>only valid</u> if the
> simulation is realistic, that is if the work conditions and worker
> performance are <u>faithfully reproduced</u>." p.854 (emphasis supplied)

In describing simulation procedures in the 1994 study, Dr. Longo provides the following information regarding authentication:

> "To ensure authenticity of the methods and procedures used in
> performing the various tasks, we drew upon our extensive
> experience (estimated at 30 man-years) in designing, implementing,
> and evaluating O&M programs for buildings with ACM.  In addition,
> experienced service workers were interviewed regarding
> procedures they typically used for each of the following tasks. . . ."
> Id, p.854

This evidence that Dr. Longo failed to follow his own procedure of "faithful reproduction" raises a concern for the reliability of the studies.  In this Court's view, while the videotape may ably reflect a study demonstrating an exposure to asbestos fibers for training purposes of various workers involved in each of the work practices exhibited on the tape, the question is raised as to their reliability in an asbestos fiber counting study if precision for the count is required.  It appears that the Plaintiff's experts have not followed the "faithful

reproduction" and "authentication" procedures described in the work cited above. Their failure to interview the individual workers involved or other workers of similar functions who were experienced and who had first-hand knowledge of the working environment is a flaw in the method used when viewed in light of their admissions that they had never visited the railroad facility and knew nothing about the railroad business. Reliance only on a description of their activities provided by Plaintiff's attorney and three workers who had brought suit against Defendant are indicative of a less than scientific approach to a simulated study for counting asbestos fiber. The procedures used indicate a desire and practice which taints the credibility of their study. Such opens a procedure to a needed result with adjustments to obtain that result or, in addition a disregard of precision procedure.

Defendant offered three expert witnesses who, by their testimony, attack the validity of the studies proffered by Plaintiffs. Much of their testimony addressed the weight to be given in consideration of the study which, if admitted, a jury should consider. Of importance to this issue however, is the agreement of the three that the difference in facility sizes between the railroad facility and the chambers used in the study; the lack of facts regarding ventilation at the facility; the lack of facts regarding humidity. The Court considers that knowledge of the environment and work practice of the Plaintiffs in that environment are important factors for the Court's consideration in determining the admissibility of the studies. Such facts combine to provide a standard which must be faithfully reproduced in so far as can be achieved.

The Court recognizes that it is not always possible to duplicate the exact conditions in simulation testing. The law recognizes that very few tests can be made under the exact conditions present when a prior event occurred. The law does, however, require substantially the

same conditions must exist. *Rindfletsch v Carnival Cruise Lines, Inc.*, 498 So2d 489, 493 (3rd DCA 1986) citations omitted.

The Court makes a specific finding that the simulated studies do not meet the substantial conditions on the facts of this case. The ventilation consideration alone would require that finding even if there were no other considerations. That conclusion is on the face of the testimonies of Dr. Longo and Mr. Hatfield in their failure to comply with their own standard for simulated testing.

An additional consideration arises from testimony of Plaintiff's experts which discloses these studies were done for litigation purposes, but not for these cases nor scientific purposes. The studies were done and the video tapes were made and sold to litigants (to Plaintiff's). The testimony revealed that each tape was sold for the sum of $2500.00. In addition, Plaintiff's experts were retained to testify to the results of the tests and the activity shown on each tape. Richard L. Hatfield, Plaintiff's expert, testified that upon inquiry from an interested attorney, a tape would be selected from an inventory of five or six different studies. The selection was made of a tape that "came close" in depiction to the work practice of the Plaintiff worker involved in the litigation. As a part of the tape selection Mr. Hatfield testified he would read the deposition of the Plaintiff "if it were available" or a "client summary" sheet prepared by Plaintiff's attorney. Apparently, Mr. Hatfield was not concerned about a study not performed with the faithful reproduction and authentication of its validity in selecting a tape. He has testified in deposition that if he did not have such study, he would look to "... in general is (sic) what kind of exposures do you get from sweeping up and cleaning up debris. ... And I know I have got cleanups from Kaylo and I know we have got cleanups from, you know, joint compounds and things like that and we may have one of the clean-up. . . . . .". That practice has led Mr. Hatfield

to furnish a tape and study submitted for evidence with a scientific area which do not meet evidentiary requirements. These studies and the videotapes were made before the experts even knew of the Plaintiffs in these cases.

In *Berry v. CSX Transportation, Inc. 709 So.2d 552, 561 (Fla. App. 1 Dist. 1998),* at ft. nt. 8, the First District Court of Appeal expressed disdain for scientific studies made for litigation. In citing *Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1317 (9th Cir. 1995),* the Court acknowledged that:

> "... we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office. That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science."

As a last ground, the Court has considered what appears to be valid argument by the Defendant that the Plaintiffs offered no other expert opinion in support of their expert witness' testimony. The Defendant argued that the defense had offered three experts in support of its position. The next argument was a sequel: if the Plaintiffs had had any expert witness to support their experts' testimony he would have been at this hearing and testified. The Court notes that this is not the first courtroom challenge to the testimony and the tapes made. Because of the critical nature of the outcome of this hearing, the Court finds some credibility in the Defendant's argument.

Though it is not necessary for the Court's further consideration of the videotapes' admissibility because of the ruling of above, the Court finds that the prejudicial effect of the tapes outweighs any value they may have in assisting the jury understand the testimony regarding the study.

It is therefore,

ORDERED:

1. The testimony of Richard L. Hatfield and Dr. William E. Longo regarding the work practice studies and videotapes which are the subject of this hearing and order are excluded and shall not be admitted at trial in this cause.

2. The subject work practice studies are irrelevant and would tend to mislead a jury and are therefore inadmissable.

3. The videotapes are irrelevant and unduly prejudicial and not admissible at trial.

DONE AND ORDERED in Chambers at Jacksonville, Duval County, Florida this 22nd day of September, 2003.

JAMES L. HARRISON
SENIOR CIRCUIT JUDGE

copies to:

Ronald F. Bennett, Esquire
348 East Adams Street
Jacksonville, FL 32202
FAX: 904/355-2800

Roger B. Lane, Esquire
Mark J. Bujold, Esquire
1601 Reynolds Street
Brunswick, GA 31520
FAX: 912/265-3757

Eric L. Leach, Esquire
815 South Main Street, Suite 200
Jacksonville, FL 32207
FAX: 904/346-3692

copies continued:

Randall A Jordan, Esquire
Post Office Box 20704
St. Simons Island, GA 31522
FAX: 912/638-0605

aaa

**WHARTON COUNTY**
**QUARTERLY REPORT**

PLAINTIFF REPORTS:
07/23/2001      Columbia University – 530 West 168th Street – New York, New York 10032 –
                diagnosis: malignant mesothelioma

EXHIBIT FF

RATE HEARING ON 9/9/03

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA.

JAMES A. WOOD,                      NO.: 02-04833-CA
                                    DIVISION CV-E

STEPHEN L. TYSON,                   NO.: 03-04836-CA
                                    DIVISION CV-C

ROBERT GERALD LEAR,                 NO.: 02-04838
                                    DIVISION CV-F

TROY MIXTRE,                        NO.: 02-04836-CA
                                    DIVISION CV-D

GLORIA WILLIAMSON,                  NO.: 02-04874-CA
Individually and as                 DIVISION CV-A
Executrix of the Estate of
CARL WILLIAMSON, deceased,

MARY ELLEN BYRE,                    NO.: 02-4837-CA
Individually and as                 DIVISION CV-B
Executrix of the Estate of
BOYCE A. BYRE, deceased,

JOHN E. MORAY, Individually         NO.: 2003-CA-003822
and as Executrix of the             DIVISION CV-G
Estate of ERNEST E. MORAY,
deceased,

CLYDE WARNAGONE,                    NO.: 02-07366-CA
                                    DIVISION CV-E
        Plaintiffs,

vs.

CSX TRANSPORTATION, INC.,
a corporation, et al.,

        Defendants.

TESTIMONY AND PROCEEDINGS
Tuesday, September 3, 2003

ASSOCIATED REPORTING REPORTERS
233 EAST BAY STREET, SUITE 913
JACKSONVILLE, FLORIDA 33202
(904)356-6401

APPEARANCES

ROGER LANE, Esquire
ARNOLD BENNETT, Esquire
1405 Reynolds Street
Brunswick, Georgia 31521
Attorneys for Plaintiff.

RANDALL A. JORDAN, Esquire
MARY ELLEN MONKS, Esquire
Jordan & Moore
1234 Production Road, Suite G
Post Office Box 28764
St. Simons Island, Georgia 31522
and
ERIC L. LEACH, Esquire
Milton, Leach, Whitman, O'Andrea,
Church & Milton, P.A.
815 Beach Main Street, Suite 300
Jacksonville, Florida 32217-4157
Attorneys for Defendant.

IN THE SUPERIOR COURT OF WARE COUNTY
STATE OF GEORGIA

ANSEL R. TUIMOKE,                   FILE NO. 91V-932
EUGENE J. WARD,                     FILE NO. 91V-933
BETTIE SCHULTZ,                     FILE NO. 91V-934
LUVIS POWELL,                       FILE NO. 91V-935
OSWALD A. FADRE,                    FILE NO. 91V-936
HENRY HARRIS,                       FILE NO. 91V-937
DANIEL L. BRYANT,                   FILE NO. 91V-952
HUBERT BOOTH, SR.,                  FILE NO. 91V-953
JOHN WILLIE HALL,                   FILE NO. 91V-953
ARTHUR EARLE (deceased),            FILE NO. 91V-954
JAMES F. CHERRY,                    FILE NO. 91V-977
JOHN B. MOORE,                      FILE NO. 91V-978
WILLIAM E. JERNIGAN,                FILE NO. 91V-3005
ANTHONY J. BANNER,                  FILE NO. 91V-1129
MOTON L. SCOTT,                     FILE NO. 91V-1128
LAWTON GALE (deceased),             FILE NO. 91V-1131
LONNIE ADAMSON, SR.,                FILE NO. 91V-3123

        Plaintiffs,

vs.

CSX TRANSPORTATION, INC.,

        Defendant.

STATE OF FLORIDA  )
COUNTY OF DUVAL   )

CONTINUATION OF TESTIMONY AND PROCEEDINGS

before the Honorable James Harrison, Circuit Judge, at
the Duval County Courthouse, Room 229, Jacksonville,
Duval County, Florida, on Tuesday, the 3th day of
September, 2003, commencing at 9:00 o'clock a.m., as
reported by Helen A. Anderson, RPR, Notary Public in
and for the State of Florida.

INDEX

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WILLIAM LONGO | | | | |
| (By Mr. Lane) | 272 | | | |
| (By Mr. Jordan) | | 312 | | |
| (By Mr. Lane) | | | 342 | |
| GERALD ROBERTS | | | | |
| (By Mr. Lane) | 388 | | | |
| (By Mr. Jordan) | | 419 | | |
| (By Mr. Lane) | | | 431 | |
| FRANCIS W. WEIR | | | | |
| (By Mr. Jordan) | 635 | | | |
| (By Mr. Lane) | | 476 | | |
| LARRY RAY LINDNER | | | | |
| (By Mr. Jordan) | 497 | | | |
| (By Mr. Lane) | | 528 | | |

EXHIBITS

| EXHIBIT NO. | FOR IDENT. | IN EVIDENCE |
|---|---|---|
| Plaintiffs' 19 | --- | 112 |
| Plaintiffs' 20 | | 243 |
| Plaintiffs' 21 | | 276 |
| Plaintiffs' 22 | | 383 |

FRYE HEARING ON 9/8/03

197

1　A　No, the attempt was not to match everybody.
2　It was to provide an example.
3　Q　In the Casket IV study, I think you
4　referenced some materials that you-all did from a
5　power plant?
6　A　Yes. The plaques came from a
7　steam-processing plant.
8　Q　And you don't know whether the railroad
9　people ever worked on anything similar to that or not,
10　do you?
11　A　Well, they certainly had steam involved.
12　Q　But the answer to my question is no, you
13　don't know whether they did or not?
14　A　Oh, no, not that — I mean, that the piping
15　was exactly the same or something like that, no.
16　Q　Now, did you testify earlier about health
17　risk assessments? —
18　A　Probably the only thing that I can recall in
19　said anything close to health risk assessments was
20　when I read from the document on the Tyndall light,
21　where this guy had written for occupational
22　hygienists, ventilation engineers and health and
23　safety practitioners and others interested in how
24　exposures to airborne particles occur. That's the
25　closest thing I can recall to that area of testimony.

198

1　Q　Would the permissible exposure limits be
2　part of the health risk assessment?
3　A　Certainly could be.
4　Q　And your PEL numbers do not relate to the
5　permissible exposure limits, do they?
6　A　That's correct.
7　Q　Now, under the act that established OSHA,
8　they were trying to ensure a reasonably safe workplace
9　by establishing certain regulations and guidelines; is
10　that correct?
11　A　Sure. I think that would be an okay
12　description for their general purpose.
13　Q　And the Secretary of Labor had a role in
14　getting the PELs established as law, did he not?
15　A　Well, I can't say with certainty. I'm
16　certain that he had some role in there. I mean, he
17　was in charge of it.
18　Q　But that's what the OSHA act — one of the
19　things that the OSHA act did was say the PELs now have
20　the force of law in the workplace?
21　A　Oh, absolutely.
22　Q　And that was dealing with health, wasn't it?
23　A　Of, of course it was the basis of health
24　protection.
25　Q　And you-all's PEL numbers don't have any

199

1　relationship to the PELs, do they?
2　A　That's what I said just a minute ago.
3　You're correct.
4　MR. JORDAN: Can I see — let's see their
5　Exhibits 6, 10, 11 and 12, please, Your Honor.
6　THE COURT: Here's 6.
7　What was the next one?
8　MR. JORDAN: 10, 11 and 12, please, sir.
9　THE COURT: There's 10. Let's see. I guess
10　there was a whole package. There's 12 and 11.
11　MR. JORDAN: Thank you, Your Honor.
12　BY MR. JORDAN:
13　Q　Mr. Hatfield, you were talking about some
14　methods that had been offered earlier, and I refer you
15　to the ISO standard which is marked as Plaintiffs'
16　Exhibit No. 6.
17　　Do you know the author of that standard?
18　A　I do.
19　Q　Who is that?
20　A　Eric Chatfield.
21　Q　And with respect to the standard that's been
22　marked as Exhibit No. 10, do you know the author of
23　that standard?
24　A　Yes. I believe Eric also compiled this
25　method.

200

1　Q　Dr. Chatfield did that as well?
2　A　Yes, he did.
3　Q　Plaintiffs' Exhibit No. 11, do you know the
4　authored that?
5　A　This one is the water method and the
6　Superfund, yes. Eric Chatfield, also.
7　Q　And then referenced as Plaintiffs' Exhibit
8　No. 12, can you tell us who authored that standard?
9　A　I think I already testified that Eric
10　Chatfield compiled that cloth method.
11　Q　And that's, in fact, called the Chatfield
12　method?
13　A　Yes, it usually is. There's actually two
14　different methods that are usually called the
15　Chatfield method.
16　Q　There was an exhibit earlier — No. 16, I
17　believe, if my memory is correct, were your notes from
18　discussions you had with three gentlemen, Mr. Hobbs,
19　Mr. Rawlings and Mr. Kirkland.
20　A　Yes.
21　Q　You talked to them about various issues and
22　exposures at the railroad?
23　A　Yes.
24　Q　And I know you presumed that they were
25　telling you the truth when they were talking to you.

FRYE HEARING ON 9/9/03

**312**

1   spending just with asbestos, and that's why I've
2   not chosen to get the certified industrial
3   hygiene degree --
4       THE COURT: Continue, Mr. Kane.
5       THE WITNESS: -- or application or
6   certification, I guess.
7       MR. KANE: I think that's all the questions
8   I have, Doctor.
9       THE COURT: Anybody want a break before we
10  launch into cross-examination?
11      MR. JORDAN: That would be good.
12      THE COURT: Let's take until ten o'clock.
13  That's seven minutes.
14      (Short break.)
15      THE COURT: Mr. Jordan on cross-examination.
16      MR. JORDAN: Thank you, Your Honor.
17                  CROSS-EXAMINATION
18  BY MR. JORDAN:
19      Q   Good morning, Dr. Longo.
20      A   Good morning sir.
21      Q   I think you said earlier you were not a
22  certified industrial hygienist, so I won't go through
23  that, but you're certainly familiar with the field of
24  industrial hygiene?
25      A   Involving asbestos, yes, sir.

**313**

1       Q   Would you agree that an industrial hygienist
2   is a person who practices the art of recognizing,
3   evaluating and controlling health hazards in the
4   workplace?
5       A   Yes, sir, I would.
6       Q   That's not something you do?
7       A   Not all hazards, no, but I do involve
8   asbestos.
9       Q   And it's not your role to control health
10  hazards that occur in the workplace, is it?
11      A   Well, yes and no.  No, I don't make health
12  recommendations.  But I certainly in the workplace
13  have provided consulting on how to clean up asbestos.
14      Q   And you don't do health risk analysis?
15      A   No, sir, I don't.
16      Q   And you don't interpret health risk analysis
17  daily?
18      A   I do not, that's correct.
19      Q   Would it be fair to say that your TEM
20  results, your TEM numbers, don't have any relevance to
21  the OSHA standards?
22      A   I would agree with that.  It's not
23  designed -- the OSHA standard is designed for phase
24  contrast microscopy.  The TEM, of course, is not
25  covered to OSHA standards.  We don't use it for that.

**314**

1       Q   That's not the intention?
2       A   No, sir.  Never was.
3       Q   So with your TEM numbers, they don't relate
4   to things like the PELs?
5       A   No, sir.  PELs are based on phase contrast
6   microscopy.
7       Q   Now, do I understand what your testimony is,
8   that with these tests that you did, specifically with
9   Kaylo II and Gasket IV, that what you're trying to
10  demonstrate through those tests and through those
11  videos is pathways of exposure, that is, that the
12  products can create asbestos exposure, and your
13  purpose is not to demonstrate what the individual
14  plaintiffs in these cases were exposed to?  Is that
15  fair to say?
16      A   Let me think about that for a second.
17          I think that's almost correct, but I think
18  our studies go a little bit further than what you're
19  suggesting, is that it gives us the ability to look at
20  a particular product and make a determination if a
21  person using that product is more similar manner as
22  who's around somebody using that product -- those
23  studies help us determine if they will have a
24  significant exposure or not to asbestos.  And is there
25  a possibility of them getting over the PEL or over the

**3**

1   excursion limit by the use of the product because of
2   the product's characteristics.
3       But, no, we can't say, because our Kaylo
4   studies show eight fibers per cc when we take one
5   piece and cut it in ten times, that a person is going to
6   get eight fibers per cc.  The person may have more
7   exposure; may have a little bit less.
8       But what we can say about our product
9   studies that has been shown in such of the studies is
10  that a person using this type of product is going to
11  have a significant exposure to asbestos if that
12  product releases in some manner.  You know, we've
13  tested products where I would say there would be no
14  significant exposure when a person uses the product
15  the same manner.
16      Q   You're not here to tell us what the
17  individual exposures of the individual plaintiffs
18  were, are you?
19      A   Well, I can't.  I was not -- my part in this
20  was just to come and defend our work.  I did not
21  review any of the plaintiffs' depositions.
22  Mr. Satfield I guess is the one who did that.
23      Q   Now, with respect to your gasket studies,
24  would it be fair to say that your gasket results have
25  no applicability to automotive gaskets?